UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARMOND MCCLOUD, JR.,<br><br>       Plaintiff,<br><br>   -against-<br><br>CITY OF NEW YORK; CARLOS GONZALEZ, MARYANN HERBERT; THOMAS WRAY; JAMES GIRDUSKY; JOSEPH CROCE; MICHAEL DEMPSEY; ADMINISTRATOR OF THE ESTATE OF VINCENT GRECO; GLENN BOVE; MAUREEN A. KEMPTON; EDWARD GARNAR; RUBIN MARTINEZ; ALQUIMIDES ARROYO; and JOHN and JANE DOE 1-10,<br><br>       Defendants. | **SECOND AMENDED COMPLAINT**<br><br>**Jury Trial Demanded**<br><br>23 CV 8341 (NRM) (CLP) |

**"I am not a murderer, and one day my innocence is going to be proven."**

**-Armond McCloud, Jr., April 16, 1996**

Plaintiff Armond McCloud, Jr., by and through his attorneys, the law firm Elefterakis, Elefterakis & Panek, alleges as follows:

## INTRODUCTION

1. Plaintiff Armond McCloud, Jr. spent the majority of his life, nearly 29 years, incarcerated as an alleged murderer.

2. Mr. McCloud, however, had no involvement in or knowledge of the crime for which he was convicted.

3. This injustice resulted from a series of intentional acts by the individual defendants, outlined herein, and as a direct consequence of policies, practices and customs maintained by defendant City of New York.

## NATURE OF THE ACTION

4.   This is an action to recover money damages arising out of the violation of plaintiff's rights under the Constitution.

## JURISDICTION AND VENUE

5.   This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States and the laws of the City and State of New York.

6.   The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343 and 1367(a).

7.   Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## NOTICE OF CLAIM

8.   Within ninety days after the claims alleged in this complaint arose, a written notice of claim was served upon defendants at the Comptroller's Office.

9.   At least thirty days have elapsed since the service of the notice of claim, and adjustment or payment of the claim has been neglected or refused.

10. This action has been commenced within one year and ninety days after the happening of the events upon which the claims are based.

## JURY DEMAND

11. Plaintiff demands a trial by jury in this action.

## PARTIES

12. Plaintiff Armond McCloud, Jr. is a resident of the State of New Jersey.

13. Defendant City of New York is a municipal corporation organized under the laws of the State of New York. It operates the NYPD, which is a department or agency of defendant City of New York responsible for the appointment, training, supervision, promotion and discipline of police officers and supervisory police officers, including the individually named defendants herein.

- 2 -

14. The individual defendants at all times relevant herein, were officers, employees and agents of the NYPD. The individual defendants are sued in their individual capacities.

15. At all times relevant defendants John and Jane Doe 1 through 10 were police officers, detectives or supervisors employed by the NYPD. Plaintiff does not know the real names and shield numbers of defendants John and Jane Doe 1 through 10.

16. At all times relevant herein, defendants John and Jane Doe 1 through 10 were acting as agents, servants and employees of the City of New York and the NYPD. Defendants John and Jane Doe 1 through 10 are sued in their individual capacities.

17. At all times relevant herein, all individual defendants were acting under color of state law.

**Preliminary Statement**

18. By judgment dated April 15, 1996, following a jury trial in Queens County, plaintiff Armond McCloud, Jr. was convicted of murder in the second degree (two counts – felony murder under N.Y.P.L. § 125.25(3) and depraved indifference murder under N.Y.P.L. § 125.25(2)), as well as criminal possession of a weapon in the second degree (N.Y.P.L. § 265.03(1)(b)).

19. At sentencing, after Mr. McCloud made a statement asserting his innocence and that he had been coerced to falsely confess, Mr. McCloud was sentenced to 25 years to life. Mr. McCloud commenced service of his sentence immediately.

20. On January 31, 2023, Mr. McCloud was released on parole.

21. On August 24, 2023, following an exhaustive joint investigation by the Queens County District Attorney's Conviction Integrity Unit ("CIU"), the New Jersey Innocence Project at Rutgers and the Center on Wrongful Convictions at Northwestern's Pritzker School, Queens District Attorney Melinda Katz filed a joint motion to vacate the conviction under C.P.L. §§ 440.10(g), noting:

> Fairness in the criminal justice system means we must re-evaluate cases when credible new evidence of actual innocence or wrongful conviction emerges. Those who have served prison time for crimes they demonstrably did not commit deserve to have the slate wiped clean.

22. In a 48-page affirmation filed in support of the joint motion to vacate, the Director of the CIU, Bryce Benjet, Esq., pointed to three confluent factors as "seriously undermining the reliability of the defendant's confession" and mandating vacatur:

> 1) the post-trial discovery that Det. Carlos Gonzalez, who took defendant's confession, elicited multiple false statements in two Manhattan wrongful convictions involving false confessions; 2) the presence in the defendant's confession of false facts traceable to Det. Gonzalez's misunderstanding of the facts of the crime as represented in erroneous police reports; and 3) the use of techniques in this case similar to those used in the other false confession cases in which Det. Gonzalez was involved. A crime scene reconstruction expert also reviewed the case and confirmed that the descriptions of the crime in McCloud's confession is impossible. Because of the newly discovered evidence and because the defendant's confession can no longer be considered reliable, the conviction should be vacated pursuant to CPL 440.10(1)(g).

23. Citing *People v. Hargrove*, 162 A.D.3d 25 (2nd Dep't 2018) and recognizing the "frailty of the confession evidence supporting McCloud's conviction," the District Attorney concluded that Detective Gonzalez's central role in the proven false confession cases of the Exonerated Five and Johnny Hincapie was "outcome determinative."

24. The indictment was dismissed on August 24, 2023.

### Background

25. Armond McCloud, Jr., who is affectionately known to his family and friends as Junior, was born in March 1974 in the Bronx but grew up primarily in the Lefrak City housing complex in Queens, where he lived from 1976 to 1994.

26. Mr. McCloud's parents were a constant, stable, and influential presence in his life.

27. Both were employed full-time: his mother, Grace McCloud, worked for Kroll Associates, a global security company, and his father, Armond McCloud, Sr. worked as a mailroom clerk for a major financial firm.

28. Mr. McCloud's father passed away in 1993, approximately one year before Mr. McCloud's arrest, and his mother died in 2007, when he had been incarcerated for thirteen years.

29. Mr. McCloud remembers that both of his parents instilled in him "good morals and principles," which he hopes to pass on to his own children, should he have them in the future.

30. In addition to his parents, Mr. McCloud was surrounded by a loving extended family, including his sister, Tenikia, and grandmother, aunt, and niece.

31. Mr. McCloud attended New York City public schools, including Newtown High School in Queens.

32. Unfortunately, he struggled academically in high school and eventually left Newtown without graduating in 1991, when he was 17 years old.

33. Nevertheless, he continued to pursue his education at the Brooklyn Adult Learning Center, with the hope of earning his Graduate Equivalency Diploma.

34. After leaving Newtown, Mr. McCloud was determined to obtain gainful employment, despite not having a high school diploma. Between the ages of seventeen and twenty years old, he held a series of responsible jobs, including positions at Tiffany and Co., Kroll Associates, and other New York City-based businesses.

35. Mr. McCloud's positive trajectory was derailed on August 8, 1994, when he was detained by New York City police detectives and taken to the 110th Precinct for what he initially thought was an issue with his car registration.

36. Instead, once at the police station, he was told that he was a suspect in the death of Mr. Kei Sunada, who had been shot and killed during an apparent robbery in Lefrak City four days earlier.

37. As will be discussed in greater detail below, Mr. McCloud vehemently professed his innocence throughout the night.

38. Nevertheless, at 4:30 AM on August 9th, after more than nine hours of intense interrogation by defendants, Mr. McCloud's will was overborne and he wrote a ten-sentence statement implicating himself and an acquaintance, Reggie Cameron, in the crime.



39. Almost four hours later, beginning at 8:10 a.m., plaintiff participated in a video interrogation conducted by an assistant district attorney in the presence of two of the defendants

who had manufactured his written statement. He did so because the defendants employed coercive interrogation techniques – lies about evidence, threats, minimization, and false promises of leniency, sleep and food deprivation, among others – that have been linked to false confessions.

40. So firm was his faith in the legal system that Mr. McCloud—who had never before been convicted of any offense as a juvenile or adult—eventually turned down a plea offer because he believed that his innocence would be proven at trial.

41. The only substantive evidence admitted against Mr. McCloud at trial was his false confession. There were no witnesses to the crime, no forensic evidence that established or even pointed to his involvement, and no weapon.

42. From the outset and throughout his decades of incarceration, Mr. McCloud has steadfastly maintained his innocence.

43. Between his arrest on August 8, 1994 and his release from custody on January 31, 2023, Mr. McCloud was incarcerated for 28 years, 5 months and 24 days for a crime he did not commit. Plaintiff then spent an additional 205 days on parole, for a total of 10,609 days of lost liberty.

### The Science of False Confessions

> Our distrust for reliance on confessions is due, in part, to their decisive impact upon the adversarial process. Triers of fact accord confessions such heavy weight in their determinations that the introduction of a confession makes the other aspects of a trial in court superfluous, and the real trial, for all practical purposes, occurs when the confession is obtained. No other class of evidence is so profoundly prejudicial. Thus the decision to confess before trial amounts in effect to a waiver of the right to require the state at trial to meet its heavy burden of proof.

*Colorado v. Connelly*, 479 U.S. 157, 182 (1986) (Brennan, J., dissenting) (citations and quotation marks omitted).

44. New York State has an above-average rate of false confessions.

45. In exonerations based on DNA evidence in New York State, of which there have been approximately thirty, false confessions appear in nearly 50% of cases.

46. The best scientific estimate of the nationwide false confession rate is in the range of 20-25%, with a much higher rate in murder cases.

47. In 1985, a leading academic researcher, Professor Saul M. Kassin of the John Jay College of Criminal Justice and Williams College, with Lawrence S. Wrightsman, established a framework of three types of false confessions: voluntary, compliant and internalized, that has gained widespread acceptance.

48. According to Professor Kassin, a compliant false confession is where "the suspect acquiesces in order to escape from a stressful situation, avoid punishment, or gain a promised or implied reward." Such false confessions are common even in the absence of physical violence.

49. The quintessential compliant false confession case is that of the Central Park Five (now known as the Exonerated Five), youths who in 1989 were convinced by detectives including defendant Carlos Gonzalez that they would be brought straight home if they falsely admitted to peripheral involvement in a jogger's brutal rape. The teens were instead convicted and sentenced, only to be exonerated years later through DNA evidence.

50. Defendant Gonzalez used similar tactics to frame Johnny Hincapie for felony murder arising out of the high-profile September 2, 1990 Subway stabbing of "Utah Tourist" Brian Watkins. As a result of evidence manufactured by Gonzalez and others in that case, including a false confession from Hincapie, Hincapie spent over 25 years incarcerated before evidence proving his innocence surfaced.

51. Even when conducted legally, American-style police interrogation is a psychologically oriented, guilt-presumptive process in which lying is permitted and suspects are intentionally isolated and confronted.

52. The literature describes police interrogation as an inherently asymmetrical social interaction "led by an authority figure who holds a strong *a priori* belief about the target and who measures success by the ability to extract an admission from that target."

53. Researchers have identified "situational risk factors," that increase the likelihood of false confession, including the presentation of false evidence and the use of misinformation.

54. In replicable peer-reviewed experiments, innocent individuals presented with false evidence are found nearly twice as likely to give a false written confession, doing so at a rate of 94%.

55. A suspect's profile may also increase their "dispositional vulnerability," or the likelihood that they will succumb to even legal interrogation tactics.

56. Youth is considered by far the primary risk factor for false confession, with 90% of juveniles waiving *Miranda*, even where it is offered.

57. The presence of "interested adults," as some states require, has been shown to do little to curb false confessions, as guardians often urge cooperation with interrogators, as was seen in the Jogger case.

58. Kassin explains:

> As to what makes juveniles so vulnerable, developmental research indicates that adolescents display an immaturity of judgment in their decision making—a pattern of behavior that is characterized by impulsivity, a focus on immediate gratification, and a diminished capacity for perceptions of future risk. For the myopic adolescent, confession may serve as an expedient way out of a stressful situation. To make matters worse, most justice-involved youth have diagnosable psychological disorders, putting them at double jeopardy in the interrogation room.

59. Aside from age, researchers have identified being prone to compliance in social settings and suggestibility as generally associated with dispositional vulnerability.

60. People who are easily coerced score high on the Gudjonsson suggestibility scale, a diagnostic test developed by Icelandic psychologist Gisli Hannes Gudjonsson that involves reading the subject a short story and testing their recall.

61. Those who are "highly anxious, fearful, depressed, delusional, or otherwise psychologically disordered" are also more likely to falsely confess under pressure.

62. Another identified cause of false confessions is the inability of police interrogators to accurately recognize when someone is lying. Studies show that law enforcement officers have little to no increased ability to detect false statements.

63. Kassin tells the story of Jeffrey Deskovic, who spent 15 years in prison after he falsely confessed to a murder before being exonerated by DNA evidence. In relenting to pressure and offering a false confession, Deskovic believed that "truth and justice would prevail" and that his innocence would be discovered: "I thought it was all going to be okay in the end."

**Shooting of Kei Sunada and Initial Investigation**

64. Kei Sunada lived in an apartment on the 17th floor of the Colombia building of the Lefrak City housing complex. Sunada, a Japanese citizen, was sharing an apartment with a woman who he had met at a boxing gym. On the evening of August 4, 1994, Sunada returned home from work alone and spoke to the building security guard for about five minutes before entering the building between 11:15 p.m. and 11:20 p.m. The security guard did not see where Sunada went after he entered the Colombia building.

65. About 5 minutes later, a tenant reported to building security that she heard "shots fired" that seemed to be coming from the stairwell of the Colombia building. Special Patrol Officer Patrick Codling, who worked as a peace officer within Lefrak City, conducted a vertical patrol

down from the 7th floor and found Sunada bleeding from a gunshot wound to the head on the landing of the 4th floor stairwell. Sunada was described as semi-conscious, but unable to speak. An open knapsack, with a black shirt hanging out, was found on the landing less than a foot away from Sunada. SPO Codling radioed the Lefrak City Security Office to call 911 and within minutes Police and EMT's arrived at the scene. Sunada was transported to the hospital but died three days later without ever regaining consciousness.

66. A DD5 from August 8, 1994, reports information from Tom Gardner of the Japanese Consulate, who told police that Sunada "liked to use the stairs to reach his apartment on the 17th floor because he felt it was a good form of exercise in connection with his 'kick-boxing' workouts." The DD5 went on to state that Gardner claimed that Sunada "always carried a blue knapsack wherever he went."

**Crime Scene Evidence**

67. The Crime Scene Unit investigated the scene in the early morning hours of August 5th, after Sunada had been transported to the hospital. An analysis of the crime scene evidence indicates that Sunada was killed by a single gunshot fired from the inside of the stairwell on the 4th floor landing.

68. Sunada was found on the fourth-floor landing with his head oriented towards the stairs leading down. Investigators recovered two pieces of ballistics evidence from the stairwell: a discharged shell and a deformed bullet. The discharged shell (T-1) was located on the fourth-floor landing, where Sunada's body was found. And the deformed bullet (T-2) was recovered from the fifth-floor landing above. A bullet impression (BIM-1) was also noted on the wall near the stairs leading up to the fifth floor. The crime scene diagram below depicts the location of the ballistics evidence.



Although Sunada was removed from the stairwell before the scene was documented, the photographs below depict (1) the fourth-floor landing (pictured through the hallway door) and blood stain on the wall where Sunada's head was oriented, and (2) the discharged shell near the stairs going down:



*4th Floor Landing*



*Discharged Shell (T-1) Near Stairs Going Down*

No fingerprint evidence was recovered from the stairwell or hallway. The only items noted in the

hallway were some articles of Mr. Sunada's clothing which, according to another witness, had

been removed from his person and placed there by medical personnel. Police searched Sunada's

knapsack and found several items, including a letter addressed to Sunada, a check for $600, and a

Walkman. However, **the bag was never vouchered and could not be accounted for at the time of trial (or ever analyzed for forensic evidence)**.

69. As part of its reinvestigation of the case the CIU consulted with a crime scene reconstruction expert Kevin Parmelee Ph.D., of the New Jersey Institute of Technology. Working pro bono with NJIT students, Parmelee visited and documented the scene creating a 3-D representation of the scene and trajectory of the bullet. Based on Parmelee's analysis, the bullet was fired from within the stairwell traveling outwards towards the fourth-floor hallway door. The bullet traveled through Sunada's head before ricocheting off two walls and landing on the fifth floor as depicted in the crime scene reconstruction image below.



Lefrak shooting Reconstruction

Medical records and Sunada's autopsy confirm that he died of a single gunshot wound to the head, consistent with the ballistic evidence of only a single bullet and shell casing found at the scene.

Under no circumstances could the ballistics evidence and bullet impression mark be explained if the shooting took place in the hallway.

### Errors in Early NYPD Paperwork

70. The defendants included significant errors in the initial police reports about (1) the location of the shooting and (2) the number of gunshot wounds. These errors—found in the Complaint Report and the first DD5—correspond with inaccuracies in confessions later obtained by Det. Gonzalez.

1. **Fabricated Report by Det. Gonzalez that Shooting Took Place in Hallway**

71. Det. Gonzalez was assigned to lead the homicide investigation and responded to the scene while EMTs were still removing Sunada from the scene on a gurney. Det. Gonzalez took a polaroid photo of Sunada while he was strapped to the gurney in the hallway. After interviewing Lefrak City Security P.O. Williams, Det. Gonzalez falsely reported in a DD5 that Sunada had been found in the hallway:

> 2. The above S.P.O. states that he arrived and found a M/A lying face down in a pool of blood on the 4th Floor hallway. He radioed his dispatch for Police.

Det. Gonzalez also drafted the initial DD5 (Follow up #1) in the case that likewise falsely reported that Sunada was shot in the hallway:

> SUBJECT:    Assault 1°
>
> CONTENT:    1.   On 8/4/94 at approx. 2330hrs., the U/S did respond to 97-15 H.H.E. to investigate a male shot in the hallway of the 4th Fl.

2. **Fabricated Report of Two Gunshot Wounds**

72. Defendant Girdusky was the first NYPD officer to respond to the 911 call by Lefrak City Security. P.O. Girdusky completed the initial Complaint Report which reflected Det. Gonzalez's presence at the scene and falsely described Sunada has having been shot twice:

> List Additional Victims & Witnesses – Reconstruct Occurrence including Method of Entry & Escape – Include Unique or Unusual Actions
>
> AT T/P/O A male victam was found shot 2 in the Stairewell on the 4th floor of 97-15 Horace HARD. The peep fled the scene And is unknown. The police who were at the scene are: Det. Gonzalez of 110 pds. ADA Antigani.

Another form completed by P.O. Girdusky on the same date also falsely reported two gunshot wounds:

> The above said person is a victim of an Att. Murder. He was shot twice. Once in the head. There was not family members known. No positive I.D. made.

As discussed *infra*, these errors in the police reports correspond with factual errors in the statements defendants later elicited from Cameron and plaintiff.

## Defendants Manufacture a Pretext to Arrest Plaintiff

73. Between August 4 and August 8, police from the 110th Precinct uncovered few if any leads in the case, despite intense media coverage and what appears to have been pressure from the Japanese consulate and the city government. Their luck changed at 3:20 p.m. on August 8, when defendant Detective Thomas J. Wray (Shield No. 3951) questioned a 16-year-old named Lemuel Tuopaeh, who had been arrested and brought to the stationhouse in relation to an apparently unrelated robbery. Tuopaeh told Wray that he could provide the police with information about Mr. Sunada's shooting in exchange for leniency in his own case. According to Wray, Tuopaeh had heard "people saying [at the candy store in Lefrak City] that the 'Headcrack' was the one who did it." He further stated that "Headcrack" referred to "Junior," which, as noted above, was plaintiff's nickname. Tuopaeh also told police that he had seen Kendo McDonald

- 16 -

with plaintiff and Reggie Cameron in the past, and that Cameron and plaintiff were "always together. . . . They usually come around 57th Avenue after 10PM [and] play dice all the time." According to subsequent news reports, Detective Wray promised Tuopaeh "that the Queens DA handling his current arrest would be advised of his cooperation with [the] homicide investigation." Defendant Bove was also reportedly responsible for questioning Tuopaeh.

74. Plaintiff did own a vehicle with a sticker on the windshield that read "Headcrack." But contrary to the narrative that emerged in both the media and in police testimony, the term "Headcrack" is a common reference to a roll in "Cee-Lo," a popular dice game.[1] There is no evidence that this term was the appellation of a street gang or a reference to the use of physical force during armed robberies. But at plaintiff's trial 18 months later, defendant Herbert offered this unsolicited testimony (and incorrectly replaced the word "headcrack" with "headcracker" when she testified):

> I had heard . . . that [plaintiff, Cameron, and McDonald] were in a white car, and right on the front windshield was-- had head crackers or head breakers, or something like that. **And it was told . . . that this was in regard to robberies that they were doing. They would hit people over the head and rob them and that is why this was on the car.** And that they had been looking for that car, and these individuals were occupying that car when it was found.

Trial Transcript, March 21, 1996, p. 291, l. 3, *et seq*. Based solely on the information that Tuopaeh provided, detectives from the 110th Precinct, including defendant Arroyo, went to Lefrak City, where they found and arrested plaintiff, Cameron, and McDonald between 7:05 and 7:10 PM. **Both the trial court and the Appellate Division later found Tuopaeh's statements insufficient to**

---

[1] *See, e.g., Life's a Risk, Roll the Dice*, headcrack.nyc, May 10, 2016, available online at https://www.headcrack.nyc/blogs/the-winners-digest/101915073-lifes-a-risk-roll-the-dice; *see also, e.g.*, lyrics of "4,5,6" by Kool G Rap; recording available at https://www.youtube.com/watch?v=2x0-TPYWxRY.

**establish probable cause, rendering plaintiff's arrest unlawful**. *See People v. McCloud*, 247 A.D.2d 409 (1998) (upholding trial court's denial of suppression on attenuation grounds). Nonetheless, Tuopaeh's statements were sufficient in the eyes of defendants to trigger interrogation.

75. The contents of Tuopaeh's statement indicate that defendants were already considering at least McDonald and Cameron as suspects because their photos were shown to Tuopaeh despite Tuopaeh only mentioning persons by common names "Junior" and "Reggie" and not mentioning McDonald at all. Defendant Wray also testified that he was previously provided with the names of persons known to have committed robberies in the area, including McDonald and Cameron. In November 1993, McDonald and Cameron were arrested for robbing a man at gunpoint in an elevator in the Colombia Building; a crime for which McDonald was on probation. Defendant Gonzalez also testified at a pretrial hearing that he viewed a poster of Cameron in the Lefrak City Security Office prior to August 8, 1994.

**76.** McDonald had also been identified as the perpetrator of an August 1, 1994, armed robbery in the elevator of a nearby Lefrak City building. In that case, an elderly man named David Kurtz was struck in the head in the elevator and then dragged into a nearby stairwell where he was found unconscious. **Kurtz's identifications of McDonald in a photo array and lineup were known to defendants but never disclosed to plaintiff.**

77. As part of the CIU investigation, Tuopaeh was interviewed by a QCDA detective investigator on September 23, 2021. **When read the contents of his 1994 statement, Tuopaeh asserted that it was not true**. He claimed that he was told what to say happened to "the Chinese guy," and that he only signed the statement and did not write it. He stated that he was under a lot of pressure and just wanted to go home. Police asked Tuopaeh specifically

**about Junior (plaintiff) and Reggie (Cameron). He said that he felt detectives knew who they were looking for and that he never told them that anyone committed a robbery or shooting. He was promised that he could go home if he gave information.** Tuopaeh described being released on his own recognizance after arraignment. The charges related to Tuopaeh's robbery arrest were dismissed in 1995 in conjunction with a plea agreement on an unrelated marijuana charge.

### Arrests and Initial Interrogations of Plaintiff, McDonald and Cameron

78. At the 110th Precinct, plaintiff, McDonald and Cameron were placed in separate rooms and interrogated throughout the night by defendants. None of the young men admitted any knowledge of or involvement in the crime during the first four hours of questioning. After midnight, defendants' continued coercive interrogations produced a series of inconsistent and unreliable statements that formed the basis of the case against plaintiff.

### Interrogation and Statement of Kendo McDonald

79. In the late hours spanning August 8th and 9th, Kendo McDonald was interrogated by multiple defendants about Sunada's murder and ultimately made a statement implicating plaintiff and Cameron. At the time, McDonald was still on parole for the 1993 robbery in the elevator of the Colombia Building. At some point on August 8th, McDonald was also identified from a photo array as the perpetrator of the August 1st robbery of David Kurtz in another Lefrak City elevator.

1. **McDonald Claims He Has No Information About the Murder During Four Hours of Interrogation by Defendant Wray**

80. McDonald was initially questioned on and off for about four hours by defendant Wray. Wray testified that he went back and forth between questioning McDonald and Cameron — each were interrogated separately about three times. Throughout this questioning, McDonald

consistently denied any knowledge or involvement in the crime. Defendant Wray testified that he last spoke with McDonald around 11:30 p.m.

2. **McDonald is Coerced to Implicate Plaintiff and Cameron When Questioned by Defendants Herbert and Martinez**

81. The questioning of both McDonald and Cameron was then continued by defendants Herbert and Greco. Defendant Wray testified that he saw the two detectives question both suspects between the hours of 11 p.m. and 2 a.m. At one point, defendant Wray testified that he entered the room while defendant Herbert was alone with McDonald, but that defendant Herbert "informed me that she was speaking in private with Kendo McDonald and I should leave the room at that time."

82. Defendant Herbert testified at a pretrial hearing that she interviewed McDonald for "about an hour and 45 minutes to perhaps two hours." Herbert reported that at about 12:45 a.m. McDonald first made an oral statement implicating plaintiff and Cameron. McDonald then signed a statement timestamped 1:45 a.m. that was witnessed by defendants Herbert and Martinez. In the statement attributed to McDonald, he described going to the lobby of the Peru building with plaintiff and Cameron when the two left to rob the victim in the adjacent Colombia building:

> as I went with them to the peru building. While we went in the building there was a light skinned Asian guy waiting by the elevator of the columbia (sic) building. Reggie and Junior saw the guy at the elevator and said (Yo, son, what's up with that?). They started to pursue the guy and told me to chill. The guy on the elevator had a bag with pockets on it. They got on the elevator with him. I waited downstairs in the back entrance smoking a cigarette.

McDonald then described purported admissions and other inculpatory conduct when plaintiff and Cameron allegedly returned:

> They come running down the stairs as junior comes down the second set of stairs he starts to put a gun in his waist line. As they come out Junior says yo son game on. He tells me yo son I was trying to open the door of the stairs and started licking at the guy. We all came out

the back door and they started to run. Reggie throw the wallet as they were going down the hill. They ran me towards Horace Harding and I ran up 57th Avenue. Sunday I was talking to Reggie and he said yo son Junior shot him. I said word y'all a-hole are stupid. Reggie said I got the wallet and Junior said they were fronting this means he had more stuff than they took. So Junior said f- it as they were going down the stairs and started shooting at anything. The guy was fighting Junior as Junior was trying to search him.

83. Defendants then released McDonald from the precinct.

<u>**Interrogation and Statements of Reginald Cameron**</u>

84. Like McDonald, defendants also interrogated Cameron for approximately four hours. During questioning by defendants Wray and Kempton, Cameron repeatedly denied any knowledge or involvement in the crime. Only later in the evening when interrogated by defendants Herbert and Gonzalez did Cameron make a statement implicating himself and plaintiff. This statement, repeated in a video with an ADA, was inconsistent with the facts of the crime and the statement later obtained from plaintiff.

1. **Cameron Denies Involvement During Four Hours of Interrogation by Defendants Wray and Kempton**

85. Defendant Wray testified that he personally questioned Cameron during three sustained sessions and had approximately ten conversations with Cameron in total between 8-11 p.m. Even when Cameron was not being questioned by defendant Wray, either defendant Kempton or another detective was with him—"there was always someone with Cameron." Defendant Wray also identified defendants Croce and Dempsey as participating in the interrogation of Cameron. Throughout these hours of questioning by multiple defendants, Cameron denied any knowledge or involvement in the murder.

2. **Defendants Gonzalez and Herbert Coerce Cameron to Implicate Himself and Plaintiff.**

86. At a pretrial hearing, defendant Herbert testified that she first spoke to Cameron while he was locked in a cell in the Detective Squad at the 110th Precinct and then took him to an interview room at around 2:15 a.m. During her testimony she denied any knowledge of who had previously interviewed Cameron, but also stated that she had been "apprised . . . of the interviews being conducted and was briefed on the situation" by defendants Wray, Kempton and Garnar.

87. Defendant Herbert testified that she first Mirandized Cameron and then, before asking any questions, shared with him a rough narrative of what she believed happened during the crime:

> I informed him that I was aware that he and another individual had
> followed the victim into an elevator of the building, had tried to rob
> him, and during the course of the robbery the victim was shot and
> killed.

88. According to defendant Herbert, Cameron initially denied killing Sunada. Defendant Herbert then conveyed to Cameron that he was responsible for the murder based on his participation in the robbery. Cameron repeated that he "did not shoot the victim." But over the course of the next hour, defendant Herbert coerced from Cameron an oral statement that largely tracked the narrative she had already provided Cameron. Herbert gave a concise summary of that statement in her pretrial hearing testimony:

> He said that he had been talking to a young lady in the lobby of the
> building, that he was called over by his friend to come into this
> particular building with him. When they went in he called him into
> the elevator, Mr. Cameron went with his friend into the elevator, and
> upon going inside he observed the victim. As the elevator proceeded
> up the victim apparently -- excuse me -- the victim seemed to know
> he was about to be robbed, panicked, pressed the elevator button on
> the fourth floor. The doors opened, the victim exited. Mr. Cameron
> and Mr. McCloud followed. A struggle took place and the victim
> was shot.

After defendant Herbert obtained this brief oral statement, defendant Gonzalez joined the interrogation. Defendant Gonzalez testified that he went over the story with Cameron twice orally, asking him questions. However, Gonzalez could not recall most of the questions he asked or the answers he obtained. The defendants then had Cameron make a written statement. At 3:33 a.m. Cameron signed a more detailed written statement that was obtained through coercive questioning by defendants Herbert and Gonzalez. This statement reads as follows:

> My name is Reginald Cameron Jr. I'm in the 110 prect. My statement is as follows. I was just outside the Colombia building with my friend's Junior, Arin and David, also this girl I was speaking to. As I was speaking to my girlfriend and Junior walked off, about a minute later Junior called me towards the Colombia building. He was holding the elevator. I got in and there was a Chinese man in the elevator. We got in and the elevator stopped at the fourth floor. Junior moved toward the man and the man backed out on the floor. Junior then approached the man for his money. The man started moving away and Junior went for his pockets. That's when the man got louder and louder. Then all of a sudden I saw two flashes, I heard no noise but the man fell down. I then tried to close the elevator door because I knew nothing about Jr having a gun or his intentions of robbing the man. Jr then stopped the elevator and got in he pressed for the basement and I pressed for the lobby and I ran away.
>
> I'm sorry that the events went the way they did, but I had no knowledge of any of this was going to happen.

Defendant Gonzalez testified that it took about 20 minutes for Cameron to write out this statement.

### 3. Cameron Makes Video Statement with Defendant Gonzalez and ADA

89. After signing the statement, Cameron was taken to sit at Defendant Gonzalez's desk. At 9:05 a.m., the ADA commenced a video interview, for which defendant Gonzalez was present. Cameron recited a narrative of the crime that generally tracked the written statement he had provided six hours earlier. However, when questioned by the ADA about details, his answers were often vague, inaccurate, or unverifiable. For example, Cameron was expressly told by the ADA that she was investigating "an incident that occurred on Thursday August 4, 1994, at approximately

"11:15 p.m." when she introduced herself, but Cameron could not give an approximate time of the incident, describing it as either "late" or "just starting to get late." Cameron could not provide a description of the victim other than the incorrect statement that "I think I remember him having a plastic bag with him." Cameron described seeing two muzzle flashes, repeating the false information defendants had recorded in official police reports.

### 4. Cameron Describes Coercion and False Confession During Pretrial Hearing

90. Cameron testified at a pretrial hearing and provided a different account of the interrogation. According to Cameron, he requested a lawyer after being brought to the precinct, but defendants questioned him anyways. While handcuffed to a chair, multiple defendants questioned him regarding the homicide repeatedly in approximately 20 minutes intervals. At some point Cameron described being told false information to persuade him to make an admission:

> I was . . . . shown a plastic bag in which was a wallet. They said my fingerprints was on the wallet. They also said there was some bullets found in Armond McCloud's car.

He claimed that he was repeatedly pressured to implicate plaintiff:

> They said to me that I should implicate Armond McCloud because a third-party Kendo McDonald was implicating me and if I had any smarts that I would implicate Armond.
>
> ***
>
> They told me all I had to say [was] I was present and I witnessed Armond shoot the deceased.

Cameron testified that, after repeated denials, he became nervous and eventually told defendants what they wanted to hear. He described first making an oral statement at around 12:30 a.m. that did not satisfy the detectives: "because I wasn't able to tell them how many shots were fired and if the deceased had a bag or not." While Cameron could not identify all the detectives who questioned him, he stated that defendant Herbert and another detective were those who did not like

his initial statement. He also testified that he only signed the Miranda warning card before the videotaped statements, and not prior to giving his oral and written statements.

91. When interviewed by the CIU in 2021, Cameron similarly described a coercive interrogation leading to his false confession.

**Interrogation and Statement of Plaintiff**

92. Plaintiff was arrested along with McDonald and Cameron and placed in an interview room at the 110 Pct. at around 8 p.m. for questioning. For approximately 8 hours, plaintiff was interrogated by multiple defendants, including Gonzalez, Herbert and Croce. At around 5:00 a.m., exhausted, hungry, hopeless and fearful of what the defendants promised would be retribution by "Japanese gangsters" against his family should he refuse to falsely confess, plaintiff signed the statement next to the signatures of Herbert and Gonzalez. With defendants Gonzalez and Herbert watching him, plaintiff tried to retell the false story defendants had coerced him to adopt to an ADA on video.

1. **No NYPD Witness Describes Plaintiff's Initial Eight Hours of Interrogation and Custody**

93. Although it is clear from the record that plaintiff was interrogated throughout the night, there is no documentation of who questioned plaintiff and what was said during the first 8 hours of interrogation. No officer testified at the pretrial hearing or at trial to the contents of any interrogation during this initial span of 8 hours. Defendant Croce recalled that at around 7:45 p.m. in the precinct, he was shown plaintiff, and that plaintiff was handcuffed to a chair. Defendant Croce admitted to "popping in" to the interview rooms throughout the night and seeing plaintiff being interrogated "once or twice." However, he could not recall who was in the interview room with plaintiff.

94. Defendant Wray also confirmed that plaintiff was interrogated throughout the evening but could not say by whom. Defendant Wray described the room where plaintiff was held as a separate room outside the detective squad, and that the door was "kept closed." Defendant Wray testified that he saw plaintiff twice between the hours of 8 p.m. and 1 a.m. He testified that defendant Croce was with plaintiff when he entered the room earlier in the evening, and that defendant Herbert was with plaintiff when he went into the room just before he left at around 1 a.m. Defendant Herbert likewise acknowledged that plaintiff had been interrogated throughout the night, but was unable to say by whom:

> Q.    To your knowledge was there any other detective questioning McCloud while he was at the precinct besides Detective Gonzalez?
>
> A.    I wouldn't know who did the actual questioning, but I assume because of his presence in the interview room and the length of time that he was present, I'm sure one of the detectives had been speaking with him.

Despite aggressive and coercive questioning for 8 hours in the closed interview room, plaintiff truthfully maintained his innocence and did not make any admissions. Defendant Herbert confirmed in her trial testimony that plaintiff hadn't "given a statement" prior to his interrogation by defendant Gonzalez at around 4:00 a.m.

95. Defendant Gonzalez's pretrial hearing testimony proves that plaintiff invoked his right to silence at some point during the interrogation:

> Q.    Now, Mr. McCloud had been interviewed by others prior to you; is that correct?
>
> A.    I don't know.
>
> Q.    In any of your conversations with other officers there at the time, did any of them indicate to you that they had interrogated or questioned Mr. McCloud?
>
> A.    They informed me that Mr. McCloud did not want to talk to them.

When the trial judge immediately interjected by asking: "Mr. McCloud said that he did not want to speak to anyone, is that right?", defendant Gonzalez clarified that he was informed by other detectives that "He wasn't talking."

### 2. Defendants Coerce Plaintiff to Falsely Confess

96. At approximately 4:00 a.m., plaintiff's interrogation continued with questioning by defendants Gonzalez and Herbert. Defendant Gonzalez described his initial contact with plaintiff in his trial testimony:

> A.    … I told him straight out, listen, everybody is dropping a dime on you, everybody is telling me what you did.
>
> You might as well-- this is the chance that you have, you might as well tell me exactly what happened. It's up to you, you want to keep quiet, go right ahead and keep quiet. But if not, tell me what happened. I know it was an accident. I know it.
>
> So if it was an accident, tell me it was an accident. I have no problem with that. Its up to you. Give you 5 minutes, and I'll be right back.
>
> Q.    What you told him was all of that true?
>
> A.    No.
>
> Q.    What was not true?
>
> A.    That it was an accident.
>
> Q.    Can you tell us how that it came about that you said that you knew it was an accident?
>
> A.    In the course of my investigations, I find that people don't like to talk unless they have a way out. Its like somebody being cornered.
>
> As long as they have something on the way to get out, which they believe, okay, everything was all right, they would talk. And sure enough it did occur that way.

Gonzalez testified that he then left McCloud alone in the interview room for 5 minutes to let him think about it. According to defendant Gonzalez, upon their return to the room plaintiff agreed to talk. He allegedly gave an oral statement, and at 4:28 a.m. proceeded to write it as depicted *supra.*

3. **Plaintiff's Video Statement**

97. Approximately four hours after signing the coerced, cursory written statement, Gonzalez persuaded plaintiff, who initially refused, to sit for a videotaped interview with an ADA, purportedly telling plaintiff:

> Well, it's strictly up to you, but if we go to court, and if I testify that you told me that that wall is orange most likely they are going to say, 'that wall is orange;' when if you come up and you put yourself on video and you say that wall is green, it's going to stay green, and no matter what I say it's going to stay green, so it's to your benefit, but again, it's up to you. Let me know. It is your option.

Defendant Gonzalez gave inconsistent accounts of what transpired during the four hours between plaintiff's alleged written statement and his video interview. During the pretrial hearing, defendant Gonzalez testified that he continued to "interview" plaintiff through to the time he made the videotaped statement:

> Q. What were you doing from that time from 3 o'clock until approximately 9 o'clock in the morning?
>
> A. I was interviewing Mr. McCloud.

But in his trial testimony, Gonzalez claimed that there was no further conversation between the time plaintiff supposedly made the written statement at 4:28 a.m. and his videotaped interview approximately four hours later:

> Between the time he gave the written statement and the video, there was no interview, there was just – he asked for a cigarette, and at that time when he called me over he indicated that he was willing to do the video. Other than that, there was no other interview.

This inconsistency was not resolved at trial.

98. At 8:10 a.m., the ADA conducted a videotaped interview under the watchful eyes of defendants Gonzalez and Herbert. He described a robbery in the fourth-floor hallway in which his gun accidentally discharged after Sunada "nicked" his hand with a defensive karate kick.

99. According to plaintiff's video statement, he followed Cameron and McDonald into the building, and all three went up the elevator with a Chinese man. Cameron and McDonald told plaintiff to rob the Chinese man and after the Chinese man came out of the elevator on the 4th floor he started to walk fast and then run. The man then got into a Karate stance and started to kick at plaintiff. Plaintiff stated that Cameron had given him a gun when he got off the elevator, which he had pulled out of his pocket and was pointing toward the ground. One of the Chinese man's kicks hit plaintiff's gun and caused it to discharge a single bullet. Afterwards plaintiff gave the gun back to Cameron and ran to the elevator which he and McDonald used to escape. Plaintiff could not remember if Cameron joined them in the elevator or came down a different way.

100.      Although his statements on video were greatly expanded from the short written statement he had allegedly made, none of the information provided by plaintiff was consistent with the record or plausible. Plaintiff did not remember what he was doing before they entered the building or where he was coming from. He did not remember what he did right after running away from the crime scene. When pressed for the details on certain subjects, plaintiff changed his answers:

- At first, he answered that the "Chinese" man only came close to kicking him and that his finger was not on the gun's trigger, but he then waivered and claimed that the kick "nicked" his hand causing the gun to fire while his finger was on the trigger.
- At one point plaintiff stated that the Chinese man was not carrying anything, but later stated (incorrectly) that the man had carried a grocery bag.

The video interview was concluded at 8:41 a.m.—about 13 hours after plaintiff was handcuffed near his home and taken to the precinct. Defendant Garnar participated in and approved plaintiff's arrest and interrogation.

4. **Plaintiff Describes Coercive Interrogation and False Confession**

101.     Although plaintiff did not testify at the pretrial hearings or at his 1996 trial, he made

a statement at sentencing that he had falsely confessed in response to police pressure:

> I maintain my innocence, and the only reason that I confessed to it
> was because the way the police went about it saying that the father
> is so powerful and has so much wealth that if I did not confess to the
> crime I would more likely wouldn't be standing right here, because
> I would believe I would die if I didn't confess. . .

In a 2001 letter addressed to Queens District Attorney Richard Brown excerpted below, plaintiff

also alleged that he was threatened by the officers (using a "good cop/bad cop" ploy) and was told

that the victim's family would kill him if he did not confess:

> I tried to explain my whereabouts at the time of the murder, but I
> was told to cooperate (confess) because there is a statement and
> physical evidence against me.
>
> ***
>
> The "good cop" for what seemed like [the] hundredth time
> enter[ed] the room and basically told me:
>
>> The father had arrived in New York with very strong
>> Asian support. Hear of the flying dragons? very
>> dangerous people. If we let you go which you're free to
>> go (I wasn't) they already have a description of you, your
>> car, your family and where you live and work (Tiffany
>> & co) no telling what they will do to you and your family.
>> See, what I am trying to say is: I think you're much safer
>> with us. I'll give you five minute to think about it and I'll
>> be back.
>
> I sat there dumbfounded. But I thought. And thought. And thought.
> If I say I did it, I'll go to Riker's Island but eventually the truth will
> surface about my innocence in a court of law. Most importantly I'll
> be safe from whoever this powerful person is that is already
> convinced that I killed his son. I didn't kill nobody though! But the
> seed is already planted. I don't want to leave only to have the flying
> dragons? Asian mob? Or whoever the "good cop" said would be
> waiting to possibly murder me in revenge of his son? Blow up my
> car? Or the unthinkable go after my only living parent left, my
> mother? That can't happen! Especially with my dad no longer with

us. If [there] was any truth to what this "good cop" was saying would happen, [then] I am sure my mother would understand and rather bring support to the court for my innocence, than flowers to the cemetery for my untimely death. So out of pure safety for me and my family… I confessed to a murder I did not commit.

102.    In the years following his conviction, plaintiff was also interviewed by a plaintiff's attorney who was pursuing a products liability action against the gun industry. According to a book documenting this litigation, plaintiff denied responsibility when asked if he would cooperate with the lawsuit:

> A.    What, why would I cooperate with something I don't know about?
>
> Q.    What do you mean something you know nothing about. Weren't you convicted of this murder?
>
> A.    Yeah, but that was all bullshit man. My appeal is pending, I'm gonna be outta here in less than six months.

103.    When interviewed by the CIU in 2021, plaintiff described a lengthy interrogation by multiple detectives. According to plaintiff he was told that the victim was "not an ordinary Chinese delivery boy," and was questioned during the initial few hours by an aggressive officer. When defendant Gonzalez began questioning him, plaintiff described Gonzalez pulling the aggressive officer away from him in a manner that made it seem that Gonzalez was protecting him. At some point the aggressive officer also showed plaintiff a wallet and told him that his prints were on it; to which defendant Gonzalez added that Cameron was in the other room "throwing him under the bus." Plaintiff also described an instance in which defendant Gonzalez brought Cameron to the doorway of the room and Cameron allegedly told plaintiff to "tell him what you know, just tell him what you know."

104.    Once plaintiff agreed to make a statement, plaintiff told the CIU that defendant Gonzalez instructed him as to what to say happened and that he should describe it as an accident.

Plaintiff justified his decision to relent to the coercive conduct because he was scared, thirsty and exhausted, and because he was convinced his innocence would come out in court.

### Pre-trial Suppression Litigation

105.     Based only on their confessions, plaintiff and Cameron were indicted for murder. Both defendants filed motions to suppress their confessions as involuntarily made and as the result of an illegal arrest. Cameron also claimed that his confession was improperly elicited after he had invoked his right to counsel. These motions were litigated at a multi-day suppression hearing at which numerous witnesses described the arrests and interrogations—much of which is discussed above. Justice Steven Fisher presided over the hearing and ultimately denied the motions in a published opinion. *See People v. Cameron & McCloud*, 633 N.Y.2d 447 (Queens Sup. Ct. Oct. 2, 1995).

106.     Justice Fisher reviewed the facts surrounding plaintiff and Cameron's arrest and held that both were illegally arrested without probable cause. *See id*. at 453. The Court explained:

> The only information the police had at the time connecting [the defendants] to the homicide was a casual rumor, reported by an individual who was seeking consideration in his own unrelated case. **It was therefore plainly insufficient to support the arrest of either defendant.**

*Id.* However, the Court further held that it need not suppress plaintiff and Cameron's "confessions" because the "chain of causation" leading from the illegal arrest to the subsequent custodial statement became "so attenuated as to remove the taint of the initial illegality." *Id*. Specifically, the Court pointed to the statement of McDonald—who implicated Cameron and plaintiff after four hours of interrogation—as intervening evidence providing independent probable cause for Cameron and plaintiff's detention. *Id*. at 455. Despite noting that (1)

McDonald was himself a suspect in the homicide and (2) that McDonald was arrested along with Cameron and plaintiff, the Court did not address the legality of McDonald's arrest.

107.     And without providing any reasoning, the Court also held that "the evidence establishes beyond a reasonable doubt that each of the statements at issue here was voluntary in the traditional Fifth Amendment sense, and followed a voluntary, knowing, and intelligent waiver of properly administered *Miranda* rights." *Id*. Following the denial of motions to suppress, plaintiff's case was severed from Cameron's, and plaintiff was set for trial first.

<u>**Plaintiff's Trial**</u>

108.     The Hon. Robert J. Hanophy presided over plaintiff's trial that spanned 8 days in March 1996.

1.  **Prosecution Case**

109.     The prosecution case rested on plaintiff's supposed confessions. Plaintiff's oral and written statements were admitted, and his videotaped statement was played before the jury. The prosecution's theory adopted plaintiff's confession as largely true: that Sunada was robbed after taking the elevator up to his apartment, and that plaintiff was the one who was armed with the gun and shot him following a physical altercation. However, the prosecutor disclaimed that the shooting was accidental. He argued in summation that Sunada was trained in boxing and martial arts and was killed because he fought with plaintiff during the robbery.

110.     The prosecution identified the victim through his father and established the neutral facts of the crime by calling first responders, the medical examiner, and officers from ballistics and the CSU. It was undisputed that Sunada was found shot in the head on the 4th floor stairwell landing. Defendants Herbert and Gonzalez and the ADA testified to the interrogations that supposedly led to plaintiff's statements. The details of their testimony are summarized *supra*. And

plaintiff's written and videotaped statements were introduced as evidence. Cameron and McDonald's inconsistent statements were not before the jury.

## 2. **Defense Case**

111.     Through cross examination of the interrogating detectives, defense counsel attempted to elicit evidence that plaintiff's statements were coerced and false. The defense also attempted to present an alibi defense that plaintiff was in the Bronx at the time of the shooting. Plaintiff did not testify in his own defense.

112.     Evelyn English truthfully testified that plaintiff was with her daughter, Daidralyn English, on the evening of August 4th, and that the two were dating at the time. She testified that plaintiff and her daughter left her Bronx apartment at around 6 or 6:30 p.m. in plaintiff's car and returned at around 11 or 11:15 p.m. along with plaintiff's friend that she knew only as Reginald. She last saw plaintiff outside her apartment at around 11:20 p.m. English testified that she remembered the day because another daughter had just returned home from the hospital after delivering her grandchild. English described seeing "perp walk" footage of plaintiff and Cameron taken outside the 110th Precinct following their arrest.

113.     In summation, defense counsel emphasized the lengthy interrogation, indicia of coercion, and the material inconsistencies between plaintiff's confession and the facts of the crime. Counsel noted that the shooting took place in the stairwell—not in the hallway as described in the confession. And he argued that Sunada was likely confronted while climbing the stairs for exercise, as was his practice. Crediting plaintiff's false confession, the jury found plaintiff guilty of murder.

114.     At sentencing, plaintiff made a statement asserting his innocence and repeated that he had been coerced by police to confess. The trial court sentenced plaintiff to 25 years to life.

**Cameron Guilty Plea**

115.    In advance of plaintiff's trial, a draft cooperation agreement was sent to Cameron's attorney. However, no action was taken, and it does not appear that any proffer took place. Cameron did not testify at plaintiff's trial.

116.    Cameron's trial was set after plaintiff's. A jury was empaneled on May 13, 1996, but the case was adjourned. The following day, Cameron pleaded guilty to the charge of robbery in the first degree in exchange for the dismissal of murder charges and a recommended sentence of 3.75 to 11 years. When interviewed by the CIU, Cameron explained that he decided to plead guilty after learning that plaintiff had been convicted and sentenced to 25 to life. At the time of the plea, Cameron had already served more than half of the recommended minimum sentence in pretrial detention.

**Plaintiff's Postconviction proceedings**

117.    Plaintiff's conviction was affirmed on appeal by the Second Department on February 2, 1998. The appellate court briefly addressed the suppression issue, finding that the statements were sufficiently attenuated from plaintiff's illegal arrest. *See People v. McCloud*, 247 A.D.2d 409 (2nd Dept. 1998). All other claims were summarily denied.

118.    Further collateral attacks on plaintiff's conviction spanning two decades were also denied. *See People v. McCloud*, 298 A.D. 2d 409 (2d Dept. 1998); *People v. McCloud,* 306 A.D. 2d 499 (2d Dept. 2003); *People v. McCloud*, 36 Misc. 3d 1226(A) (Supreme Ct. Queens Co. 2012); *McCloud v. Mairs*, 2014 WL 9880043 (E.D.N.Y. 2014); *McCloud v. Mairs*, 2015 WL 3607565 (E.D.N.Y. 2015).

**CIU Investigation**

119.    The CIU's reinvestigation of this case spanned three years and involved a review of all available files relating to the murder prosecution and other criminal charges against both

plaintiff and Reginald Cameron, files from cases involving Kendo McDonald and informant Tuopaeh. Files relating to the false confessions in *People v. Hincapie* and *People v. Santana, McCray, Salaam, Richardson & Wise* were also obtained and reviewed. The CIU's review of these prior cases demonstrated that defendant Gonzalez had engaged in a pattern of facilitating false confessions prior to his interrogation of plaintiff, and that plaintiff was innocent.

120.     The CIU interviewed plaintiff and Cameron. Despite numerous attempts, McDonald evaded efforts by the CIU to interview him. Over a dozen fact witnesses were interviewed, including uncalled alibi witnesses Daidralyn English, and other family members of plaintiff and Cameron who corroborated aspects of plaintiff's account of traveling to the Bronx on the night of the murder. The CIU also interviewed SPO Patrick Codling, who was the first person to find the body; Tuopaeh, who allegedly supplied the tip that initially implicated plaintiff; and defendant Wray, who interrogated Cameron, McDonald and Tuopaeh. Former Japanese consulate official Tom Gardner, who spoke to police about the victim and accompanied the victim's father to court during the trial proceedings was also interviewed. The CIU spoke with trial defense counsel for both plaintiff and Cameron as well as the ADAs who handled the trial and appellate proceedings. However, attempts by CIU detectives to contact other retired NYPD personnel—defendants Herbert and Gonzalez in particular—met with no success. The CIU also consulted with a crime scene reconstruction expert Kevin Parmelee, Ph.D. of the New Jersey Institute of Technology. As discussed above, Parmelee visited and documented the scene and created a 3-D representation of the scene and trajectory of the bullet.

### Defendant Gonzalez's Track Record of Obtaining False Confessions

121.     Defendant Gonzalez was the detective in charge of the Sunada homicide investigation, obtained both Cameron and plaintiff's statements, and was present during their

videotaped interviews. In describing his interrogation of plaintiff, he credited his experience as an interrogator in getting suspects to "talk."

122.    In moving to vacate plaintiff's conviction and dismiss his indictment, the CIU determined that Gonzalez had engaged in a pattern of evidence fabrication that undermined the reliability of the statements he obtained in the Sunada case.

123.    At the time of his testimony, defendant Gonzalez was responsible for closing two high-profile Manhattan cases involving multiple confessions:

- In 1989, Gonzalez interrogated both Antron McCray and Kevin Richardson and obtained statements from the two admitting responsibility in the Central Park Jogger case; and

- In 1990 Gonzalez obtained a confession from a suspect that also implicated Johnny Hincapie in the subway stabbing of a tourist. Hincapie also allegedly confessed after being interrogated by another detective working in collaboration with Gonzalez.

But since plaintiff's conviction, both of these cases are now recognized as wrongful convictions stemming from coerced false confessions:

- In 2002, the convictions in the Central Park Jogger case were reversed when DNA evidence identified an unrelated assailant in the crime and demonstrated that the confessions Gonzalez obtained from McCrae and Richardson were false. *See People v. Wise*, 194 Misc. 2d 481, 496 (Supreme Ct. New York County 2002); and

- In 2015, Hincapie's conviction was reversed based on new eyewitness evidence demonstrating that Hincapie was not involved in the attack and that Hincapie's confession was false. *See People v. Hincapie*, 142 A.D.3d 886 (1st Dept. 2016). A federal judge recently denied Gonzalez's motion for summary judgment in a § 1983 action brought by Hincapie, holding that there was sufficient evidence that Gonzalez "collaborated [with other detectives] to coerce a fabricated confession from Hincapie." *See Hincapie v. City of New York*, 2022 WL 2870411, 18 CV 3432 (S.D.N.Y. 2022).

**Gonzalez's Pattern of False Confessions Undermines the Reliability of the Statement Attributed to Plaintiff**

124.     Defendant Gonzalez's track record of obtaining false confessions must be considered alongside the inherent weakness of the confession evidence used to convict plaintiff. The facts contained in Cameron and plaintiff's confessions are materially inconsistent with each other and the facts of the crime. And some key inaccuracies in both Cameron and plaintiff's statements can be traced directly to errors in NYPD reports which defendant Gonzalez either authored or would have reviewed prior to obtaining the statements. A truthful account by a person who actually participated in the crime would not contain similar errors. Furthermore, these statements were obtained after hours of overnight interrogation under circumstances now known to create a risk of false confessions.

1. **The Statements Contain False Facts that Correspond with Fabrications in NYPD Reports**

125.     Viewed together, the statements of Cameron and McCloud contain two glaring inaccuracies that correspond with fabrications in key NYPD reports that were either authored or likely reviewed by Gonzalez. First, defendant Gonzalez falsely describes the shooting as having taken place in the hallway:

> 2.     The above S.P.O. states that he arrived and found a M/A lying face down in a pool of blood on the 4th Floor hallway. He radioed his dispatch for Police.

Despite irrefutable evidence that Sunada was shot in the stairwell, both Cameron and McCloud's confessions mirror Gonzalez's fabrication by describing the shooting as taking place in the hallway. The NYPD Complaint Report also included the fabricated statement that Sunada was shot twice:

> List Additional Victims & Witnesses – Reconstruct Documents Including Method of Entry & Escape – Include Unique or Unusual Actions _____ es, o_____
> AT T/P/O A male victim was found shot 2 in the Stairwell on the 4th floor of 97-15 Horac-. HARD. The perp fled the scene And is unknown. The police who were at the scene are: Det. Gonzalez of 110 pds. ADA Antigani.

Again, reflecting his interrogator's misunderstanding of the facts, Cameron's written confession and videotaped interview both describe him seeing "two flashes."

126.    One indicator of a police-induced false confession is the presence of facts that were believed to be true by the interrogators at the time but were later found to be not consistent with other evidence in the case. In a 2020 report, the Brooklyn CRU explained the importance of this phenomena in identifying false confessions:

> One of the most powerful signs that a confession contains facts fed to the suspect by police—whether intentionally or inadvertently through suggestive questioning—is when the confession contains "false fed facts." This is a fact in the confession that is ultimately found to be inconsistent with other evidence or implausible but was consistent with the police's understanding of the facts at the time the confession was made.
>
> ***
>
> A false fed fact strongly suggests that other facts contained in the confession (including even the accurate ones) may not have come independently from the suspect. After all, if this particular "fact"—which later turned out to be false—was fed to the defendant, there is no reason to believe it was the only one.

The CIU recognized that both Cameron and plaintiff's statements contain the same sort of "false fed facts" described in the Brooklyn CRU report. The correlation between the factual errors in the statements and the fabricated elements of the NYPD reports that were either authored or reviewed by Gonzalez is evidence that these facts were supplied by Gonzalez during the interrogation.

127.    Further, McDonald, Cameron, and plaintiff's uniform description of a robbery that began in the elevator conformed with the interrogating detectives' knowledge that (1) McDonald and Cameron were previously arrested for a 1993 gunpoint robbery in an elevator in the same building and (2) that McDonald had been identified as the perpetrator of an August 1, 1994,

robbery in another Lefrak City elevator. However, there was no independent evidence that Sunada used the elevator on the night he was shot. In fact, a source from the Japanese Consulate reported that "Sunada liked to use the stairs to reach his apartment on the 17th floor because he felt it was a good form of exercise in connection with his 'kick-boxing' workouts." The statements describing a robbery of Sunada that started in the elevator could reasonably be viewed as based on the interrogators' knowledge of Cameron and McDonald's criminal history and not the actual facts of the crime.

### 2. Inaccurate Descriptions of Sunada's Bag

128.     Plaintiff and Cameron's statements also contain an inaccuracy in describing the victim that suggests a lack of first-hand knowledge of the crime. A blue knapsack was found in the stairwell next to Sunada's body. The knapsack was open with items "partially out of it." A security guard who saw Sunada enter the building described Sunada carrying a "shoulder bag." However, the bag was never vouchered or preserved and could not be found at the time of trial (or ever tested for exculpatory evidence).

129.     Plaintiff's written statement makes no mention of a bag. And when asked during his video statement whether the victim "had any kind of bags with him" at the time of the crime, plaintiff initially said "no" but when prompted further, plaintiff said, "I think he did have a bag." Plaintiff then described it as "like a grocery bag." Cameron likewise did not mention a bag in his oral or written statements. In his videotaped statement, Cameron was asked whether Sunada "had any types of packages or anything with him." He responded, "I think I remember him havin' a plastic bag." Sunada's blue knapsack could not have been confused with a "grocery bag" or a "plastic bag," and there is no self-serving reason to intentionally misrepresent the description of Sunada's bag. Rather, this mutual error as to a neutral fact is further evidence that plaintiff and Cameron were simply guessing in an effort to satisfy defendants.

130.    The circumstances in which the statements of McDonald, Cameron, and plaintiff were taken also included techniques have been shown to increase the likelihood that an innocent suspect may falsely confess.

### 3. The time and length of the interrogation

131.    In the present case, all three suspects denied any knowledge or involvement in the crime during overnight interrogations by multiple detectives for more than five hours, before allegedly giving statements in the early hours of the morning:

- McDonald was the first to sign a statement at 1:45 a.m., after being interrogated off and on for approximately 6 hours;
- Cameron signed a written statement at 3:33 a.m., after 7.5 hours of interrogation; and
- Plaintiff signed his written statement at 4:38 a.m. after 8.5 hours of interrogation.

The interrogating defendants remained with Cameron and plaintiff when they gave video statements later in the morning.

### 4. Minimization

132.    When testifying about his interrogation of plaintiff, Gonzalez described a minimization technique. Specifically, Gonzalez allegedly told plaintiff:

> I know it was an accident. I know it. So if it was an accident, tell me
> it was an accident. I have no problem with that.

In couching the crime in terms of an accident, Gonzalez both minimized plaintiff's involvement in the crime, and suggested a justification. And by adding "I have no problem with that" Gonzalez both expressed sympathy and implied leniency if plaintiff adopted his assertion. Gonzalez acknowledged the effectiveness of this coercive tactic:

> In the course of my investigations, I find that people don't like to
> talk unless they have a way out. Its like somebody being cornered.
> As long as they have something on the way to get out, which they
> believe, okay, everything was all right, they would talk. And sure
> enough it did occur that way.

Gonzalez persuaded plaintiff to falsely admit to an accidental shooting as "the way to get out," and this misrepresentation helped cause plaintiff to falsely confess to the crime.

5. **False Evidence**

133.     Both Cameron and plaintiff allege that defendants showed each of them a wallet and told them their fingerprints were on it. Cameron testified about this during a pretrial hearing:

> I was . . . . shown a plastic bag in which was a wallet. They said my fingerprints was on the wallet. They also said there was some bullets found in Armond McCloud's car.

This testimony is corroborated in part by Cameron's reference to a wallet during his videotaped statement: "there's been talk of a wallet, but I – I didn't see a wallet at all." Plaintiff later described being confronted with similar evidence when interviewed in 2021 by the CIU. No detective admitted on the record that this false evidence ploy took place, but not every detective involved in the interrogations testified or was even identified. Moreover, defendant Gonzalez admitted that he was not truthful with plaintiff during his interrogation, and a similar false evidence ploy was utilized by one of Gonzalez's fellow officers in the Central Park Five investigation. *See infra* (false evidence ploy regarding fingerprints used against Yusef Salaam).

6. **Evidence Defendant Gonzalez Obtained False Confessions in Other Cases**

134.     The CIU determined that Det. Gonzalez's proven track record of obtaining false confessions demonstrates that plaintiff's confession is unreliable. (citing C.P.L. §440.10(1)(g) & *Hargrove*, 162 A.D.3d 25).

*A. False Confessions in the Central Park Jogger Case*

135.     Defendant Gonzalez participated in several important interviews in the well-known Central Park Jogger case, that occurred on the night of April 19, 1989. He was credited with eliciting confessions from two of the five teenaged defendants: Kevin Richardson and Antron McCray.

136.     Gonzalez interrogated Kevin Richardson, who was 15 years old and accompanied by a parent. After roughly 10 hours of overnight interrogation, Richardson "confessed" to having taken part in the jogger's rape. Richardson initially attributed a scratch on his face to an injury relating to his arrest. Gonzalez accused Richardson of lying and threatened to expose him by asking the officer that Richardson claimed scratched him. According to Gonzalez, he "made a show of getting up and walking toward the door as though to leave" when Richardson "broke" and admitted that he was scratched by the jogger during the attack.

137.     Gonzalez also participated in Antron McCray's interrogation. McCray supposedly confessed to police after about 4 hours of questioning. Police eventually convinced his father to ask his mother to leave the interrogation room, purportedly to make McCray feel more comfortable telling the truth. However, after his parents had left the room, his father came back and pleaded with McCray to confess. Later, Gonzalez testified that it had been his idea, and that he thought McCray was hiding something because, "He fidgeted; he wouldn't look the other detective in the eye." Gonzalez also claimed that McCray admitted to penetrating the victim, which differed from his partner Det. Hildebrandt who denied that McCray made this admission.

138.     It is also worth noting that another detective who interrogated one of the Central Park Five suspects employed a false evidence ploy similar to the one described by plaintiff and Cameron. In an interview with New York Magazine, Det. Tom McKenna described confronting suspect Yusef Salaam with false fingerprint evidence:

> The 21-year veteran falsely told Yusef Salaam that fingerprints had been found on the jogger's clothes. "Salaam looks at me and says, 'I was there, but I didn't rape her,'" McKenna recalls. "We are allowed, by law, to use guile and ruse, and we do. People only give things up when you tell 'em you got 'em.

In 2002, all five defendants' confessions were proven false when the Court overturned all five defendants' convictions based on DNA evidence showing that an unrelated perpetrator was actually responsible for the crime.

### B.  False Statements in People v. Hincapie

139.     Gonzalez also elicited false statements from two 18-year-old defendants in a 1990 murder investigation that resulted in the wrongful conviction of Johnny Hincapie. *See People v. Hincapie*, 142 A.D.3d 886 (1st Dept. 2016) (affirming reversal of conviction). On the night of September 2nd, 1990, a group of teenagers robbed the Watkins family on the 7th Ave./53rd St. subway station in Manhattan. Brian Watkins was stabbed to death during the robbery. This was a high-profile case because the victims were tourists in town to attend the US Open. A group of teenagers suspected in taking part in the robbery were interrogated by defendant Gonzalez and others.

140.     One of those arrested that night was Pascal Charpentier. According to police records, Detectives Casey and Gonzalez began Charpentier's interview around 5:30 a.m. on September 3rd. Charpentier gave a written statement that placed Hincapie as being "with" the group that night. He repeated this information later in a videotaped statement that was given to ADA Henken.

141.     Charpentier later recanted his accusation against Hincapie and testified that his statement was coerced by Detectives Casey and Gonzalez. Charpentier stated that Detectives Casey and Gonzalez interviewed him in a closed room while handcuffed and did not read him his Miranda warnings prior to questioning him. They told him that they already knew what happened and that others had told them he was involved. He stated in an affidavit filed as part of Hincapie's successful civil action that:

> They said that if I cooperated, I had their word that I would get off
> and that they would even drive me home. However, if I didn't, I'd
> be the one facing blame for murder.

Gonzalez asked Charpentier to confirm the names of individuals (including Hincapie) who were there, and Charpentier – thinking the detectives already knew who was there and were only seeking corroboration – confirmed all names. During the interview, the Detectives told Charpentier multiple times that they "were told" of certain details of the crime, and when Charpentier denied such details, he was reminded that other suspects had already talked "so I better get this right." Then he was told that he needed to write down his statement, which was dictated to him by defendant Gonzalez. Charpentier stated:

> I complied with the impression that I was simply helping them to
> help me get around a possible murder charge.

Charpentier then gave a videotaped interview after being told that the ADA is an attorney that would help him out of this situation.

142.    Defendant Gonzalez also played a role in the interrogation of Hincapie, who was 18 years old at the time he falsely confessed to participating in the murder. Gonzalez escorted Hincapie to be interrogated by his partner, Det. Casey. Hincapie then confessed after being interrogated for several hours. Hincapie testified that during his interrogation he was physically abused by Det. Casey who also threatened his life. Hincapie also maintained in court papers that Gonzalez knew Casey was being abusive, and either encouraged the abuse or turned a blind eye. A United States District Judge recently held that:

> there is sufficient evidence for a jury to conclude that Detectives
> Casey, Christie, and Gonzalez collaborated to coerce a fabricated
> confession from Hincapie.

*Hincapie v. City of New York*, 2022 WL 2870411, 18 CV 3432 (S.D.N.Y. 2022).

## The CIU Determined that Gonzalez's Pattern of Misconduct Constituted Newly Discovered Evidence

143.     Because Gonzalez's pattern of obtaining false statements was not discovered until years after plaintiff's conviction, the CIU determined that it constituted newly discovered evidence as defined by C.P.L § 440.10(1)(g) and found the Second Department's opinion in *People v. Hargrove* to be directly analogous. *See* 162 A.D.3d 25 (2nd Dept. 2018).

144.     In *Hargrove*, the defendant was convicted of murder based on a single eyewitness identification. Assigned Detectives Scarcella and Chmil oversaw the identification procedure. After learning that Detectives Scarcella and Chmil were found to have obtained false identifications in two prior cases—*People v. Ranta* & *People v. Hamilton*—Hargrove sought a new trial on newly-discovered evidence grounds. At a hearing, both the witness and Det. Scarcella denied any misconduct in the identification procedures. Regardless, the Supreme Court reversed Hargrove's conviction, holding that evidence of Detectives Scarcella and Chmil's pattern of prior misconduct would probably have changed the outcome of the trial. The decision was affirmed on appeal by the Second Department, which discussed the new evidence regarding Detectives Scarcella and Chmil along with numerous inconsistencies and frailties in the trial evidence that were apparent at the time of trial:

> Given this context, it is not difficult to imagine "the reactions of the jurors" if they had been made aware of the new evidence that Detective Scarcella had engaged in a pattern of facilitating false identification testimony during the period in question. The new evidence would have provided a powerful new avenue to argue to the jury "that the pretrial procedure was itself so suggestive as to create a reasonable doubt regarding the accuracy of that identification and of any subsequent in-court identification." Accordingly, the effect of the new evidence at trial provides an additional ground for concluding that the newly discovered evidence would "create a probability" of a more favorable verdict.

145.     The CIU determined that the same outcome flows from the application of the law to plaintiff's case because plaintiff's conviction was obtained based only on his coerced confession. As discussed *supra*, plaintiff's statement did not match the facts of the crime and was inconsistent with the statements of his co-defendant purportedly describing the same events. The statements obtained by Gonzalez from Cameron and plaintiff also contained inconsistencies with known facts that mirror errors that can be sourced to fabrications in NYPD police reports. In addition, the individuals who actually participated in the robbery-homicide would have undoubtedly known the truth about these neutral facts and would not have made the same errors as the defendants.

146.     The CIU's conclusion was also informed by the crime scene reconstruction performed by Kevin Parmelee, Ph.D. Relying on the position of the body when found, the location of the bullet and shell casing, and ballistics damage on a wall within the stairwell, Parmelee's reconstruction demonstrated that both the shooter and Sunada were inside the stairwell at the time Sunada was shot. In direct conflict with the statements, the shooting did not take place in the hallway and could not have been observed by Cameron standing in or near the elevator. Parmelee's reconstruction establishes that the events described in plaintiff's and Cameron's statements are impossible and must have been manipulated by the defendants.

147.     The CIU noted that since plaintiff's 1996 trial, the understanding of false confessions has changed throughout the justice system. From cases like the Central Park Five, we now know that arresting young men with no probable cause and subjecting them to lengthy overnight interrogation by teams of detectives creates a risk of false confessions. Gonzalez testified openly that he intentionally induced plaintiff to make a false statement that minimized plaintiff's culpability as "the way to get out . . . which they believe, okay, everything was all right."

Gonzalez's testimony describes the minimization techniques and implications of leniency that are now well accepted risk factors that can produce false confessions. And most importantly, errors in the confessions that mirror fabrications in Gonzalez's reports are evidence of a nexus between Gonzalez's involvement and the details contained in the false confessions.

148.     The CIU recognized that evidence that Gonzalez had elicited multiple false confessions in the past would have dramatically undermined the trial evidence and left the prosecutor with no basis for a charge, let alone a conviction. In moving to dismiss the indictment against plaintiff, the CIU concluded that a jury confronted with Gonzalez's history of obtaining multiple false confessions in the Central Park Jogger and Johnny Hincapie cases would have disbelieved plaintiff's purported confession, credited his truthful alibi, and voted to acquit.

**<u>Damages</u>**

149.     Armond McCloud, Jr., who had never previously been convicted of a crime, was incarcerated for 28 years, 5 months and 24 days and then placed on parole for an additional 205 days — all for a crime he did not commit.

150.     Over the course of those decades, plaintiff was subjected to egregious acts of sexual assault and violence that left him severely and permanently traumatized. Defendants are responsible for these incidents because they were proximately caused by plaintiff's false arrest, malicious prosecution, coercion and wrongful conviction.

151.     These incidents, coupled with plaintiff's wrongful conviction, led plaintiff - who had no prior mental health history - to become hopelessly suicidal for decades, with the majority of plaintiff's incarceration spent in protective custody, solitary confinement or mental observation – anxious, fearful and engaging in persistent self-harm.

152.      At Sing Sing Correctional Facility in approximately 2001, plaintiff was slashed in the face by an inmate, requiring approximately 24 stitches.

153.     Approximately a year later, plaintiff was stabbed at Great Meadow Correctional Facility by another inmate.

154.     In approximately 2003 at Upstate Correctional Facility, after reporting sexual advances by his cell mate that Corrections staff ignored, ███████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████ resulting in additional trauma.

155.     In approximately 2013 at Attica Correctional Facility, Corrections staff opened plaintiff's cell and allowed another inmate to enter ████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████, infracting plaintiff and causing plaintiff to then spend four months in solitary confinement.

156.     Shortly before plaintiff's release on parole, in 2022, plaintiff was again subjected to sexual violence, this time at Washington Correctional Facility. ███████████████████ ████████████████████████████████████████████████.

157.     The injuries and damages sustained by plaintiff arising from his wrongful conviction and imprisonment include but are not limited to the following: loss of freedom; pain and suffering; physical injuries, including injuries from the incidents described above and other altercations with guards and inmates, the worsening of injuries due to inadequate medical and mental health care, and the development of medical conditions, including severe mental health injuries and suicidal ideations; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological

development and functioning; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression. As a direct result of his wrongful conviction and imprisonment, many of the effects of these disabilities continue to this day and will continue into the future.

158.     Plaintiff's wrongful conviction caused him to miss the prime of his life and all of the associated joys. While his family and friends were building their lives, plaintiff was confined to a cell.

159.     There is no way to know what 20-year-old Armond McCloud, Jr. could or would have achieved had he not been wrongfully convicted of this heinous crime.

160.     In addition to the traumas he suffered while incarcerated, plaintiff suffered severe emotional and mental anguish and pain as a result of being punished for crimes he did not commit. He was denied effective treatment for his emotional and physical injuries while incarcerated and continues to suffer mental anguish and physical ailments to this day. For example, plaintiff fears police contact and his everyday activities are limited and disrupted by the traumas he has suffered in this case. He was imprisoned when his mother—with whom he had an extremely close relationship before he was incarcerated—passed away. He was only allowed to attend his mother's funeral for one hour and was required to do so with his hands and feet shackled to a waist chain.

161.     Plaintiff was also denied the opportunity to pursue normal relationships with, and to enjoy the companionship of, family members and friends. While he was incarcerated, he was denied the opportunity to spend quality time with his extremely close-knit family and to develop full relationships with his relatives, let alone have children himself.

162.     Plaintiff was denied nearly three decades of gainful employment and income. His earning power and ability to support himself have been permanently hampered by the years of productive work experience his wrongful imprisonment denied him, to say nothing of the skills and earning capacity he could have developed in that time.

163.     Plaintiff has been publicly shamed, disgraced, ridiculed, and humiliated, in the most extreme manner possible. He was a figure of international outrage and disdain, for tragic events in which he had no part. Nothing can undo the reputational damage he has sustained.

164.     Plaintiff and his family incurred substantial legal fees and exhausted their savings during the decades he spent seeking to defend himself and prove his innocence.

165.     Additionally, Mr. McCloud claims, *inter alia*, loss of liberty; loss of enjoyment of life; continuing pain and suffering, including post-incarceration psychological issues; post-incarceration mental health treatment costs; post-incarceration medical care and medications; lost earnings while incarcerated; impaired earning capacity and limitations on future employment opportunities; emotional distress; humiliation; indignities; embarrassment; degradation; sexual abuse and dysfunction; physical injuries and lack of access to health care while incarcerated; attorneys' fees, and other pecuniary losses; and past and future pain and suffering.

**166.**     Mr. McCloud can never regain the almost 29 years of his life during which he was wrongfully incarcerated based on the defendants' misconduct. At a minimum, he deserves some measure of compensation for the time, opportunities and experiences that were taken from him and the damages he has suffered and continues to suffer as a result.

## FIRST CLAIM
### Malicious Prosecution Under Federal and State Law

167.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

168.     Defendants Gonzalez, Herbert, Wray, Croce, Kempton and Garnar, along with presently unidentified employees of defendant City, acting deliberately and with malice, initiated and took steps to continue the criminal prosecution of Mr. McCloud, without probable cause or other legal justification.

169.     As described above, there was not even arguable probable cause to arrest or prosecute Mr. McCloud, and no reasonable officer would have believed there was.

170.     Plaintiff's indictment was procured by fraud, negating any presumption of probable cause. Defendants Gonzalez and Herbert, among others, provided a false account of the investigation and interrogations to the grand jury in bad faith, suppressing exculpatory evidence and corrupting the proceedings.

171.     The prosecution ultimately terminated in Mr. McCloud's favor – in a manner indicative of and predicated upon plaintiff's innocence – when the 440 of the Queens CIU was granted, the conviction was vacated and the indictment against him was dismissed.

172.     As a direct and proximate result of individual defendants' misconduct, Mr. McCloud was wrongfully convicted and deprived of his liberty for over twenty-eight years, among other damages.

## SECOND CLAIM
**Fabrication of Evidence in Violation of 4th & 14th Amendments; *Brady* Violations**

173.     Defendants Gonzalez, Herbert, Wray, Croce, Kempton, Martinez, Bove, Garner and Girdusky, and unidentified defendants deliberately fabricated inculpatory evidence and suppressed exculpatory evidence.

174.     Mr. McCloud was then wrongly convicted based on the fabricated evidence and without the benefit of the exculpatory information.

175.     Defendants failed to adequately disclose exculpatory witness information in violation of their obligations under *Brady*, including their coercion of Tuopaeh, plaintiff, Cameron and McDonald, as well as victim David Kurtz's identification of Kendo McDonald as the perpetrator of a robbery committed in the same location a few days earlier, and otherwise suppressed favorable evidence as described above.

176.     Defendants coerced false statements from plaintiff, Cameron, McDonald and Tuopaeh to use as false evidence in procuring the conviction of Armond McCloud.

177.     Defendants fabricated aspects of police reports that were later utilized in obtaining false statements from plaintiff and other witnesses.

178.     Such fabrication and suppression of evidence violated Mr. McCloud's clearly established rights to a fair trial and to not be deprived of liberty without due process of law, as well as *Brady v. Maryland*.

179.     As a direct and proximate result of the individual defendants' fabrications, Mr. McCloud was wrongfully convicted and suffered the injuries and damages described above.

### THIRD CLAIM
**§ 1983 Coercion**

180.     Defendants Gonzalez, Herbert, Wray, Croce, Kempton, Dempsey, Greco and Garnar and unidentified others isolated Armond McCloud – a young man with no criminal record. The defendants engaged in, *inter alia*, a deliberate course of lies, trickery and deceit, threatening bodily harm to plaintiff and his family, and giving him false assurances of leniency.

181.      Then, despite his truthful protestations of innocence, in a custodial interrogation in which *Miranda* warnings and counsel were withheld – and no recording made – plaintiff's will was ultimately overborn, and defendants induced Mr. McCloud to prepare a statement falsely

incriminating himself in violation of his clearly established Fifth and Sixth Amendment right to be free from compelled self-incrimination and to be afforded access to counsel.

182.     Defendants' coercive and conscience-shocking interrogation tactics generated false and unreliable evidence used against Mr. McCloud at trial, causing his wrongful conviction and all the injuries set forth above.

## FOURTH CLAIM
### *Monell*

183.     Plaintiff repeats and realleges the foregoing allegations.

184.     The foregoing violations of Mr. McCloud's federal constitutional rights and injuries were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to defendant City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Mr. McCloud, who are investigated by NYPD detectives and subsequently prosecuted for alleged criminal offenses.

185.     Prior to Mr. McCloud's arrest, policymaking officials at the NYPD, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting, and convicting innocent people, and to the rights of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning: (a) the use of unduly coercive or suggestive interrogation techniques; and (b) the determination of probable cause to initiate a prosecution.

186.     With respect to "(a)" (coercive and suggestive interrogations), prior to Mr. McCloud's arrest and the initiation of his prosecution in 1994, the NYPD provided no training at all.[2]

187.     The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant City of New York, including but not limited to, the NYPD Commissioner, who knew (or should have known):

   a)  to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

   b)  that such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

   c)  that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

188.     The aforementioned policymaking officials had the knowledge and the notice

---

[2] Police officers and detectives in other lawsuits have been deposed concerning their training as of the mid-1990s. Such witnesses have testified that they received no training in the interrogation or evaluation of accomplice or "cooperating" witnesses in order to avoid unduly influencing their stories or testimony, determine their credibility, and assess whether their statements made out probable cause to arrest or prosecute. These deposition transcripts are in the possession of the City of New York. *See, e.g.*, Deposition of Det. Jose R. Hernandez, *Collins v. City of New York*, 11-cv-766 (FB), at p. 36 (cannot recall any training about how to evaluate witness credibility); Deposition of Internal Affairs Det. Kelly Wirth, *Zahrey v. City of New York, et al.*, 98 Civ. 4546 (DLP) (S.D.N.Y.), *supra*, at pp. 26-31 (possibly received a "couple hours" of general training about dealing with confidential informants, but recalls no training about how to evaluate the credibility of such witnesses); Deposition of then-Capt. Robert Boyce, *Zahrey*, *supra*, at pp. 35-36 (cannot recall any training about how to evaluate the credibility of cooperators or informants) (Boyce later became the NYPD's Chief of Detectives).

alleged in the preceding paragraphs based upon, among other circumstances:

a) Credible allegations, many substantiated by judicial decisions finding, that NYPD detectives had manufactured false or unreliable evidence through improper suggestion, promises, or coercion, and/or knowingly given false or misleading testimony;

b) civil lawsuits, some of which resulted in substantial civil settlements, credibly alleging that police had falsified or exaggerated evidence, and/or conducted searches or made arrests without probable cause;

c) numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, Federal District Courts, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under the probable cause requirement of the Fourth Amendment;

d) judicial decisions putting the NYPD on notice that the City could be held liable for its failure to adequately train police officers and investigators regarding their obligations to provide truthful testimony;

e) formal reports of the N.Y.C. Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the N.Y.C. Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action;

f) the Mollen Commission Report, dated July 7, 1994, following a two-year investigation and a year of hearings, finding a "culture of corruption" in the NYPD, pervasive misconduct by NYPD officers and detectives including the fabrication of evidence and testimony, and tolerance of this culture and misconduct by the department's leaders; and

g) the inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers and their powerful incentives to close cases and to obtain arrests and convictions.

189.    Many of the aforementioned illegal practices, their toleration by police policymakers, and the culture of corruption that their indifference created, were documented, before the prosecution and conviction of Mr. McCloud, in the aforementioned Mollen Commission Report, formally known as the Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the NYC Police Department.

190.    The Mollen Commission was formed in 1992 after widespread reports of police corruption, including, among other things, the fabricating of evidence in criminal investigations.

191.     The Commission conducted an investigation and held highly publicized hearings over two years, leading to its issuance of its final report, prior to Mr. McCloud's arrest, on July 7, 1994.

192.     The Mollen Commission found that

> [o]fficers . . . commit falsification to serve what they perceive to be "legitimate" law enforcement ends—and for ends that many honest and corrupt officers alike stubbornly defend as correct. In their view, regardless of the legality of the arrest, the defendant is in fact guilty and ought to be arrested. Officers reported a litany of manufactured tales. . .
>
> Frustrated by what they perceive to be unrealistic rules of law and by their own inability to stem the crime in their precincts through legal means, officers take the law into their own hands. And police falsification is the result.

Report at 38.

193.     The report noted: "Several officers . . . told us that the practice of police falsification . . . is so common in certain precincts that it has spawned its own word: 'testilying.'" *Id.* at 36.

194.     In one NYPD unit, the Commission found that "the unit's commanding officer not only tolerated, but encouraged, th[e] unlawful practice" of "falsif[ying] documents" and "committ[ing] testimonial perjury." *Id.* at 39.

195.     The Commission concluded that there existed

> … a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful.     This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."

*Id.* at 41.

196.     The Commission also noted that

the Department's top commanders must share the blame.     We are not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch.

Nor do we know of a single, self-initiated Internal Affairs Division investigation into patterns of police perjury and falsification. . . . Internal Affairs over the last decade had no record of the number offalsification allegations brought against officers throughout the Department or in a particular precinct or command. There is no evidence that anyone in the Department's chain of command had focused on eliminating this practice, including past Police Commissioners and Internal Affairs chiefs, *who apparently turned a blind eye to unlawful practices that were purportedly committed to fight crime and increase arrest statistics.*

*Id.* at 41-42 (emphasis added).

197.     Consistent with the findings of the Mollen Commission, NYPD policymakers were aware, prior to Mr. Cameron's prosecution, that many detectives habitually violated proper police protocol regarding the investigation of homicides and other felonies, including the use of coercive or unduly suggestive interrogation techniques, and the preparation of false or misleading documentation.

198.     However, policymakers did little or nothing to prevent such misconduct, resulting in countless wrongful arrests, prosecutions, and convictions that were directly attributable to such policymakers' deliberate indifference.

199.     Two detectives whose repeated misconduct NYPD policymaking officials repeatedly turned a blind eye to were the notorious Louis Scarcella and Stephen Chmil.

200.     In 1988, in the murder prosecution of James Jenkins, Brooklyn Supreme Court Justice Francis X. Egitto, following a hearing, found that the "pretrial identification procedures employed by [Scarcella] were unduly suggestive and prejudicial to defendant."

201.     The decision detailed how Scarcella, in blatant violation of proper police practice and constitutional requirements, had shown a single photo of Jenkins to two witnesses instead of a photo array in order to manufacture false and/or unreliable "evidence."

- 59 -

202.     It also detailed how, upon Jenkins's   arrest, Scarcella had brought five witnesses to the precinct and conducted the following improper identification procedure:

> The witnesses were not separated prior to viewing defendant. Indeed, they were individually and collectively told by Detective Scarcella that "we arrested the man we believe was responsible for the death of the deceased; I would like you to take a look at him." After each witness individually viewed the defendant through a two-way mirror, that witness was returned to the room where his fellow witnesses waited. No effort was made to keep the witnesses from discussing their viewing of defendant who was observed, alone, in a room.

203.     The court concluded:

> The practices here utilized represent *a classic illustration of what not to do in conducting pretrial identification procedures*. It was unnecessary to display to the witnesses a single photo; no exigent circumstances justified a showup; and no argument can be advanced to support Detective Scarcella's telling the witnesses that the police had "arrested the man we believe was responsible for the death of the deceased." Based upon this *abysmal showing, and the Police's patent disregard for accepted identification procedures*, the court is left no choice but to exclude from trial all mention of such practices (emphasis added).

204.     Notwithstanding Justice Egitto's harsh criticism, the NYPD conducted no investigation of, and took no disciplinary action against, Scarcella.

205.     Accordingly, Scarcella repeated his misconduct in 1990 in the David Ranta case.

206.     Ranta was charged with murder in the high-profile shooting death of a beloved Orthodox rabbi earlier that year.

207.     Scarcella and his frequent partner Chmil were assigned to investigate the killing.

208.     At a pretrial hearing, Scarcella testified that several months after the shooting, he spoke to a man named Alan Bloom, who had been arrested near the shooting location.

209.     Bloom was facing numerous robbery charges and many years in prison and was incarcerated at Rikers Island.

210.     Scarcella testified that Bloom had implicated men by the names of David and Steve but did not give last names.

211.     Scarcella testified that he then located photos of David Ranta and Steve Sicar, placed them in a photo array or photo arrays, and showed them to Bloom, who identified both men as having participated in the shooting.

212.     At the hearing, Justice Egitto expressed his incredulity:

> I'm still interested when a person gets arrested, when we have a police officer who tells us the name Steve comes up and he goes ahead to the Catch Unit and picks out a picture of Ranta and Steve when nobody told him Steve's last name. I don't know if he's a medium of some kind. He also picked out the name of Ranta before anyone told him Ranta's last name. From what I gather he heard the name David. Lo[] and behold they are the right people.
>
>  It stretches the credulity of the court in how these pictures are obtained.

213.     Scarcella and Chmil manufactured a lineup identification of Ranta by blatantly suggesting to a witness whom he should pick.

214.     Justice Egitto again admonished Scarcella, and now Chmil too, on the record:

> The more I hear this the more I am disillusioned with the work of the detectives.
>
> Here a young man of 14, 15 years of age says specifically I *think* it is number three. The cop, probably Scarcella or Chmil, says, okay, number three. From there on in the kid goes along with the number three . . . .
>
> He said, I *think* it is number three, which is not identifying any one (emphasis added).

215.     This witness later revealed that a detective had told him to "pick the guy with the big nose."

216.     Justice Egitto made the following additional remarks about Scarcella's and Chmil's conduct during the Ranta investigation:

I think what they have done in this case, in my opinion, is decide that Mr. Ranta was the person, the guilty party, and then they went out of their way to make sure it tied up neatly in a package. . . .

[T]hey decide the case and that is the reason why *a lot of our cases are being blown out* when the People only have the police officers to rely upon for their statements, such as narcotics cases and gun cases. *The detectives have to be taught here in New York State, unlike a lot of other places, we have a constitution.* And they have to live up to it.      I think it is ridiculous the way cops take it upon themselves to
be judge, jury, and partial executioner. . . .

I tell you this. In my opinion throughout this case the two detectives did all they could to tie it up in a neat package      I don't think what

they did and the manner in which they did it was, shall we say, absolutely fair (emphasis added).

217.      As a result of Scarcella's and Chmil's misconduct in manufacturing false or unreliable evidence, Ranta was convicted.

218.      Despite Justice Egitto's comments, the NYPD conducted no investigation of their misconduct and took no action to discipline them.

219.      As a result, Ranta remained in prison until the Kings County District Attorney's Office ("KCDAO") itself finally moved to vacate Ranta's conviction in 2013, after *The New York Times* exposed the misconduct of Scarcella and Chmil in the Ranta case and in obtaining numerous other wrongful convictions.

220.      It also was or should have been known to NYPD policymakers that in six different homicide prosecutions, Scarcella had used the false and inherently unbelievable "eyewitness" identifications of suspects by a single witness, Teresa Gomez, a drug addict.

221.      In these and numerous other cases investigated by Scarcella and Chmil, they pressured drug addicts to provide false evidence and used unlawful means to coerce or fabricate confessions and false identification evidence, causing numerous wrongful convictions that were not remedied until many years later.

222.     Scarcella was open about his attitude, saying: "Are there rules when it comes to homicide? No. No, there are none. I lie to them. I will use deception. … I don't play by the rules."

223.     As one judge stated in overturning such a conviction:

> The findings of this court are that *the assigned Detective, Louis Scarcella, was at the time of the investigation [in 1991] engaged in false and misleading practices*. The cases of David Ranta, Derrick Hamilton, Robert Hill, Alvena Jennette and Darryl Austin that were investigated by Scarcella and prosecuted contemporaneously with this case in the early nineties demonstrate this *pattern and practice*. [This decision was issued before several more cases involving Scarcella were overturned.] The *pattern and practice of Scarcella's conduct which manifest a disregard for rules, law and the truth* undermines our judicial system and gives cause for a new review of the evidence.

*People v. Hargrove*, 49 Misc. 3d 1208(A), 2015 WL 6112660, at *8 (Sup. Ct. Kings Cnty. 2015) (emphasis added), *aff'd*, 162 A.D.3d 25 (2d Dep't 2018).

224.     Based on the above pervasive misconduct by Scarcella and Chmil, NYPD policymaking officials knew or should have known that the detectives were coercing confessions, manufacturing false or unreliable identification evidence, intentionally securing testimony that they knew to be false, and giving false testimony themselves.

225.     Yet these policymaking officials failed to supervise or discipline Scarcella or Chmil to ensure that such misconduct did not continue.

226.     Instead, the NYPD treated Scarcella and Chmil as heroes for obtaining arrests and convictions at a blistering rate, thus sending a clear message to the entire NYPD police force that such misconduct would be not just tolerated but celebrated.

227.     Another of the many homicide detectives who engaged in repeated misconduct to which NYPD policymakers were deliberately indifferent was Michael Race.

228.     Race admitted that he investigated 750 murder cases, through the late 1980s and early 1990s, but only one was "done the correct way, from A to Z."

229.     An NYPD colleague testified that Race

had a reputation among detectives for feeding informants and witnesses details about crimes [and] that Race had a reputation of referring informants and witnesses to the TIPS hotline so they could collect rewards for information, which is a violation of police procedure because of the risk of kickbacks. *Blake v. Race*, 487 F. Supp. 2d 187, 204 (E.D.N.Y. 2007).

230.     In 1990, Race caused both Jeffrey Blake and Ruben Ortega to be arrested and convicted on the word of a single informant produced by Race, Dana Garner.

231.     Race fed Garner the details that Garner then provided in testimony against the two men.

232.     At trial, Garner tried to recant his story, but after prosecutors threatened him, he retook the stand and testified against Blake.

233.     A cousin of Garner's testified that Garner had not been in New York at the time of the double murder.

234.     In 1998, the KCDAO conceded that Garner was an unreliable witness and consented to vacating Blake's conviction.

235.     In 1999, Garner signed a sworn statement recanting his accusations against Ortega and against another man, Timothy Crosby, whom Garner had previously accused of kidnapping him, resulting in Crosby's conviction and sentence of 10 years to life.

236. That same year, a state judge vacated Crosby's conviction after finding Garner to be "a completely unreliable witness."

237.     In 2003, the Second Circuit vacated Ortega's conviction based on the unreliability of Garner's testimony.

238.     During civil litigation following the vacatur of Blake's conviction, Garner testified that Race had fed him the details that he repeated in his allegations and eventual testimony in the Blake and Ortega cases.

239.     Despite Race's pattern of unlawful activity and reputation for manufacturing false evidence, NYPD policymaking officials did not investigate, discipline, or supervise him to prevent additional misconduct.

240.     Another case that illustrates the pattern of misconduct to which NYPD policymaking officials were deliberately indifferent is that of Zaher Zahrey.

241.     From 1994 to 1996, various senior detectives from the NYPD's Internal Affairs Bureau ("IAB"), including supervisors, tried to frame Zahrey, a decorated NYPD undercover narcotics detective whom they wrongly suspected of being corrupt, for drug- related crimes including murder.

242.     The initially assigned detective, then-Sergeant Robert Boyce, tape-recorded himself encouraging a state prisoner whom he knew to be a serial robber and murderer and to be addicted to crack, Sidney Quick, to adopt a false story Boyce suggested to him implicating Zahrey in a series of murders, robberies, and drug deals.

243.     Boyce knew the story was false because it contradicted Quick's prior statements as well as independent police investigation.

244.     Boyce improperly promised Quick a "very, very, very sweet deal" and to "drive [Quick] home" if, contrary to his prior statements, he'd "nail Zack to a cross" by accusing Zahrey of being present for and participating in these crimes.

245.     Later, when other IAB detectives could not corroborate Quick's manufactured claims, they convinced the United States Attorney's Office in Brooklyn to take over the case by concealing Boyce's tape of Quick.

246.     While Quick was refusing to cooperate with the federal authorities, another assigned IAB detective, Kelly Wirth, worked with a prosecutor from the KCDAO, Teresa

Corrigan, to use secret coercion and under-the-table promises to induce Quick into agreeing to testify.

247.     Zahrey ultimately was acquitted, but not until he had spent nearly nine months in jail on the manufactured charges.

248.     Zahrey also was acquitted by an NYPD administrative judge who found in a written decision that Boyce had led Quick to manufacture false allegations.

249.     The New York City Police Commissioner formally ratified this finding.

250.     Nevertheless, the NYPD continually promoted Boyce until he received the ultimate reward: appointment as Chief of Detectives for the entire department.

251.     None of the other IAB personnel involved in the Zahrey case were disciplined; instead, most were promoted.

252.     NYPD detectives also committed misconduct to obtain a corrupt murder conviction in 1995 in the Jabbar Collins case.

253.     Brooklyn detectives suspected Collins of having committed the botched robbery-murder of an Orthodox rabbi-landlord in 1994 in Williamsburg.

254.     The assigned detective, Vincent Gerecitano, a veteran homicide investigator, refused to accept the denial of a heroin addict, Edwin Oliva, who had just been arrested for an unrelated robbery committed in the same building, that he knew anything about the murder in question.

255.     Gerecitano detained Oliva for many hours and interrogated him while he was going through withdrawal and was drooling, crying, exhausted, and desperate.

256.     Gerecitano coerced Oliva into signing a sworn written statement implicating Collins by refusing to summon medical assistance for Oliva while simultaneously promising him

that he would assist Oliva in obtaining leniency from the Brooklyn D.A.'s Office.

257.     Gerecitano omitted all these circumstances from his written report and never disclosed them to prosecutors.

258.     Later, before trial, Oliva recanted his coerced written statement, but prosecutors, evidently unaware of how Gerecitano had coerced Oliva's original sworn written statement, brought in Gerecitano to pressure Oliva to recant his recantation.

259.     Ultimately, in 2010, after Collins had spent 16 years in prison, prosecutors revealed the recantation, a federal judge ordered Collins's release, and all charges were dismissed.

260.     Until 2010, the NYPD had no policy, practice, or procedure to learn about and investigate allegations in lawsuits, settlements in lawsuits, or judicial findings of improper or illegal behavior by police officers, concerning investigations, arrests, and prosecutions.

261.     This was even though, since 1992, the NYPD had been admonished by two different New York City Comptrollers, as well as the Bar Association of the City of New York, to impose discipline on officers involved in settled civil cases in which constitutional violations were alleged, and to institute new training in response to such claims, and/or other remedial action.

262.     In a 1992 report, then-Comptroller Elizabeth Holtzman recommended that the NYPD "monitor claims and lawsuits involving charges of police misconduct in addition to complaints filed with the Civilian Complaint Review Board and correlate the data from all three sources," and to "use the data from claims and lawsuits, as well as civilian complaints, to identify and correct problems in training or other procedures and policies; and identify individual police officers and take appropriate follow-up action, including additional training or other assistance" in order to "improve the functioning of the NYPD."

263.     In a 1999 report, then-Comptroller Alan Hevesi recommended that the City

"[r]eview settled claims data," and re-train and discipline officers accordingly.

264. In a 2000 report, The Association of the Bar of the City of New York concluded that the City's "policy" of failing to re-train or discipline officers involved in settled civil rights lawsuits "has resulted in a situation in which the City consistently misses opportunities to increase the protection of the rights of persons in the City."

265. The NYPD took no official action in response to any of these reports and recommendations.

266. In a report issued in 2010, then-Comptroller John Liu reported that, for the first time, the City paid out more money in the 2009-10 fiscal year for lawsuits against the NYPD than against any other City agency. He again recommended that the NYPD monitor incidents and practices that would give rise to claims.

267. The NYPD failed to act despite its being put on notice, in the 1990's and early 2000's, to officers' misconduct by numerous civil lawsuits credibly alleging officers' violations of individuals' constitutional rights.

268. In the following civil rights lawsuits, the City paid substantial monetary settlements to plaintiffs for their claims that NYPD officers manufactured evidence, gave false testimony or statements, initiated prosecutions without probable cause, or otherwise violated the constitutional rights of the accused:

    a. *Almonte v. City of New York, et al.*, 99-cv-519 (E.D.N.Y.) (settled 7/12/00, $30,000): plaintiff arrested on drug sale charges without probable cause; indictment dismissed by the court one year, eight months after arrest.

    b. *Boland v. City of New York, et al.*, 93-cv-5058 (E.D.N.Y.) (settled 8/6/96, $30,000): plaintiff arrested without probable cause; held in custody for two nights.

    c. *Bradley v. City of New York, et al.*, 97-cv-4076 (E.D.N.Y.) (settled 10/14/98, $20,000): plaintiff ordered to pull car over without probable cause; falsely arrested based on outstanding Illinois warrant issued for a different person; and

held in custody for three days despite evidence that she was not the person being sought by the warrant.

d.  *Carthens v. City of New York, et al.*, 94-cv-8764 (S.D.N.Y.) (settled 3/18/97, $200,000): plaintiff arrested without probable cause; police fabricated that plaintiff had dropped a bag that contained cocaine and a weapon; police swore to a Criminal Court complaint with false allegations.

e.  *Castro v. City of New York, et al.*, 94-cv-5114 (S.D.N.Y.) (settled 1/14/97, $72,500): plaintiff arrested on weapons possession charges without probable cause; charges dropped after plaintiff was held in custody for several hours. Complaint alleged that NYPD officer responded to plaintiff's complaints about wrongful arrest by saying that he would not release her, but if the arrest were in error she could "always sue the City, [because] they got a lot of money."

f.  *Coleman, et al. v. City of New York, et al.*, 00-cv-2019 (E.D.N.Y.) (settled 1/2/01, $60,000): Two plaintiffs arrested without probable cause; charges pending for 2 ½ months before dismissal. Complaint alleged that NYPD had policy, custom, and/or practice of arresting individuals without probable cause in lower income areas and areas with high reports of crime, which resulted in plaintiffs' false arrest and malicious prosecution.

g.  *Cotto v. City of New York, et al.*, 00-cv-1341 (E.D.N.Y.) (settled 12/01/00, $30,000): plaintiff arrested without probable cause; charges pending for one month before dismissal by the court.

h.  *Crespo v. City of New York, et al.*, 93-cv-8847 (S.D.N.Y.) (settled 8/29/06, $25,000): plaintiff arrested without probable cause on weapons possession charges. Complaint alleged *Monell* claim based on the NYPD's "fostering [of] a policy to which perjury and the falsification of documents were methods of securing indictments and convictions of innocent individuals."

i.  *Dabbah v. City of New York, et al.*, 95-cv-2952 (S.D.N.Y.) (settled 3/12/96, $35,000): plaintiff arrested without probable cause; charges dismissed on People's motion eight months after arrest.

j.  *Daniels v. City of New York, et al.*, 00-cv-1981 (S.D.N.Y.) (settled 3/15/00, $28,500): plaintiff arrested without probable cause on weapons charges; charges dismissed by the court eight months after arrest.

k.  *Davis v. City of New York, et al.*, 00-cv-387 (S.D.N.Y.) (settled 1/19/00, $175,000): plaintiff arrested without probable cause; spent four months in jail before jury acquittal; during criminal trial, trial court found that plaintiff's arrest was "illegal and outrageous," that he was arrested solely because of his race, and that police took plaintiff's photo and showed it to the complainant unlawfully and without probable cause.

l.  *Deluise v. City of New York, et al.*, 98-cv-4535 (S.D.N.Y.) (settled 3/18/99, $28,000): plaintiff arrested without probable cause.

m.  *Denizard v. City of New York, et al.*, 98-cv-423 (E.D.N.Y.) (settled 6/4/99,

$64,000): plaintiff arrested without probable cause for disorderly conduct, resisting arrest. Charges dismissed on People's motion eight months after arrest.

n. *Dennis v. City of New York, et al.*, 98-cv-5355 (E.D.N.Y.) (settled 5/26/99, $15,000): plaintiff threatened, assaulted, and arrested without probable cause; false charges filed against plaintiff.

o. *Espinal v. City of New York, et al.*, 95-cv-9759 (S.D.N.Y.) (settled 6/7/96, $800,000): plaintiff arrested without probable cause; police falsely testified before the grand jury; after plaintiff's guilty plea, conviction was vacated and the indictment was dismissed as procured by false and/or perjured testimony.

p. *Fields v. City of New York, et al.*, 99-cv-8130 (E.D.N.Y.) (settled 7/28/00, $15,000): plaintiff arrested without probable cause; prosecution continued for four months before dismissal by court.

q. *Frantino v. City of New York, et al.*, 96-cv-3725 (S.D.N.Y.) (settled 4/15/97, $50,000): Two plaintiffs arrested without probable cause and issued Desk Appearance Tickets; district attorney declined prosecution; parking summons issued by police dismissed for facial insufficiency.

r. *Gager v. City of New York, et al.*, 97-cv-4718 (S.D.N.Y.) (settled 6/1/98, $105,000): plaintiff issued false summonses for criminal trespass and disorderly conduct; charges dismissed on People's motion.

s. *Gallion v. City of New York, et al.*, 93-cv-5180 (S.D.N.Y.) (settled 7/18/94,$25,000): plaintiff arrested without probable cause; charges were dismissed.

t. *Gallo v. City of New York, et al.*, 95-cv-2105 (E.D.N.Y.) (settled 7/5/94, $13,334): plaintiff arrested for robbery without probable cause; charges subsequently dismissed.

u. *Gaylock, et al. v. City of New York, et al.*, 96-cv-6183 (E.D.N.Y.) (settled 3/6/98, $90,000): plaintiffs arrested without probable cause on weapons charges, which were pending for 10 months before dismissal by court.

v. *Golston v. City of New York, et al.*, 98-cv-4206 (E.D.N.Y.) (settled 10/26/00, $25,000): plaintiff arrested on false charges of criminal harassment, which were dismissed after four months.

w. *Gordon v. City of New York, et al.*, 97-cv-8035 (S.D.N.Y.) (settled 11/12/98, $40,000): plaintiff arrested without probable cause based on false allegations in felony complaint made by NYPD officers; charges dismissed by prosecutor three months after arrest.

x. *Gurley v. City of New York, et al.*, 95-cv-2422 (E.D.N.Y.) (settled 8/21/97, $1,750,000): conviction obtained in 1972 was vacated more than 20 years later based on prosecutor's withholding of exculpatory evidence, including an NYPD ballistics report. Complaint contained a malicious prosecution claim.

y. *Howlen v. City of New York, et al.*, 97-cv-6544 (S.D.N.Y.) (settled 12/22/97,

$200,000): plaintiff arrested without probable cause; police swore to false complaint; police testified falsely during preliminary hearing and in the grand jury; police admitted to committing perjury in connection with plaintiff's case.

z.  *Jefferson v. City of New York, et al.*, 98-cv-1097 (E.D.N.Y.) (settled 4/14/99, $175,000): plaintiff, a corrections officer, arrested on drug charges without probable cause; charges pending for 5 months before grand jury returned no true bill. Complaint alleged that NYPD officers failed to inform prosecutors of their knowledge of plaintiff's innocence during the prosecution.

aa. *Kadlub v. City of New York, et al.*, 95-cv-1080 (E.D.N.Y.) (settled 12/11/96, $34,000): plaintiff arrested without probable cause on drug possession and sale charges.

bb. *Lindo v. City of New York, et al.*, 98-cv-9066 (S.D.N.Y.) (settled 11/21/00, $85,000): plaintiff arrested without probable cause; police swore to false felony complaint; district attorney agreed to dismissal of charges.

cc. *Lopez, et al., v. City of New York, et al.*, 93-cv-6516 (S.D.N.Y.) (settled 1/2/96, $80,000): two plaintiffs were arrested without probable cause and unlawfully strip searched; district attorney declined to prosecute.

dd. *Lovell v. City of New York, et al.*, 00-cv-0002 (S.D.N.Y.) (settled 10/20/00, $40,000): plaintiff arrested without probable cause for turnstile jumping based on false statements made by NYPD officer in criminal complaint.

ee. *Mahase v. City of New York, et al.*, 96-cv-6105 (E.D.N.Y.) (settled 6/16/00, $75,000): plaintiff arrested and detained without probable cause; charges dismissed on district attorney's motion due to lack of probable cause.

ff.  *Marino v. City of New York, et al.*, 97-cv-9003 (S.D.N.Y.) (settled 6/4/98, $90,000): plaintiff arrested and strip-searched without probable cause; released when district attorney declined to prosecute case.

gg. *Martinez v. City of New York, et al.*, 96-cv-289 (E.D.N.Y.) (settled 4/12/99, $50,000): plaintiff assaulted and arrested without probable cause when police entered her apartment with a battering ram looking for her son.

hh. *McCaskill v. City of New York, et al.*, 96-cv-3687 (E.D.N.Y.) (settled 7/10/97, $100,000): plaintiff arrested for disorderly conduct without probable cause.

ii.  *Nakajima, et al. v. City of New York, et al.*, 94-cv-857 (E.D.N.Y.) (settled 3/8/95, $51,000): Two plaintiffs arrested without probable cause, while driving in rental car, despite providing a valid rental agreement.

jj.  *Napoli v. City of New York, et al.*, 97-cv-1255 (E.D.N.Y.) (settled 4/9/99, $60,000): Plaintiff arrested and indicted on weapons possession and assault charges based on false testimony by NYPD officers in grand jury. Plaintiff acquitted approximately one year after arrest.

kk. *Nieves v. City of New York, et al.*, 94-cv-1491 (E.D.N.Y.) (settled 4/25/96, $50,000): Plaintiff, a security officer with the City's Department of Business

Services with a Special Patrolman's license, was arrested without probable cause in baseless drug sweep, but never arraigned. Due to the incident, Plaintiff's employer revoked his license. An officer concocted a false story preventing Plaintiff from defending himself at a hearing pertaining to the revocation of his license.

ll. *Paster v. City of New York, et al.*, 95-cv-10316 (S.D.N.Y.) (settled 3/23/98, $115,000): plaintiff arrested without probable cause; charges against him were dismissed.

mm. *Perez v. City of New York, et al.*, 98-cv-2331 (S.D.NY.) (settled 1/16/99, $15,000): plaintiff arrested without probable cause; charges dismissed by court approximately one month after arrest.

nn. *Rojas v. City of New York, et al.*, 96-cv-8728 (S.D.N.Y.) (settled 3/31/97, $800,000): plaintiff arrested without probable cause; police falsely charged plaintiff and testified falsely in the grand jury; plaintiff's conviction was vacated and indictment dismissed.

oo. *Sharp v. City of New York, et al.*, 97-cv-4236 (S.D.N.Y.) (settled 3/17/98, $55,000): plaintiff arrested and strip-searched without probable cause; falsely charged; charges were subsequently dismissed.

pp. *Sierzputowski, et al. v. City of New York, et al.* (E.D.N.Y.) (settled 12/1/97, $55,000): two plaintiffs arrested without probable cause while driving a rental car, despite producing proof of valid rental; plaintiffs in custody for 41 hours until arrests voided.

qq. *Silver v. City of New York et al.*, 97-cv-5384 (E.D.N.Y.) (settled 3/2/99, $40,000): plaintiff arrested without probable cause; charges were dropped approximately four months later.

rr. *Sweazie v. City of New York, et al.*, 99-cv-419 (E.D.N.Y.) (settled 10/20/99, $20,000): plaintiff arrested on weapons possession charges; prosecution continued based on NYPD officers' false statements in felony complaint. Charges dismissed when grand jury voted no true bill.

ss. *Taousse v. City of New York, et al.*, 95-cv-7965 (S.D.N.Y.) (settled 12/4/96, $16,000): plaintiff arrested without probable cause and falsely charged with violating traffic laws; charges were dismissed.

tt. *Tomback v. City of New York, et al.*, 96-cv-3972 (E.D.N.Y.) (settled 2/9/98, $20,000): plaintiff arrested without probable cause; charges dismissed due to lack of evidence.

uu. *Tong v. City of New York, et al.*, 95-cv-7965 (S.D.N.Y.) (settled 10/4/95, $35,000): plaintiff arrested and strip searched for traffic violation, which was later dismissed.

vv. *Udofia v. City of New York, et al.*, 00-cv-4872 (E.D.N.Y.) (settled 1/4/01, $30,000): plaintiff arrested and detained without probable cause; was not

prosecuted.

ww.   *Victor v. City of New York, et al.*, 96-cv-243 (S.D.N.Y.) (settled 6/17/96, $725,000): plaintiff arrested without probable cause; police falsely charged plaintiff and committed perjury in the grand jury; plaintiff's conviction was vacated and indictment dismissed.

xx. *Williams v. City of New York, et al.*, 98-cv-5917 (S.D.N.Y.) (settled 2/1/99, $300,000): plaintiff arrested without probable cause for possessing controlled substance; police falsified evidence to effect unlawful arrest of plaintiff.

yy. *Ziehenni v. City of New York, et al.*, 98-cv-3763 (S.D.N.Y.) (settled 3/5/99, $55,000): plaintiff arrested without probable cause; charges pending for 2 ½ months before they were dismissed by the court. Complaint alleged arrest was made in retaliation for plaintiff's prior CCRB complaint.

269.     The NYPD did not discipline any of the officers involved for their conduct, despite paying out the above settlements.

270.     The aforementioned policies, customs and/or practices of the NYPD regarding, and policymakers' deliberate indifference to, coercion of false statements, fabrications of evidence, and initiation of arrests and prosecutions without probable cause, directly, foreseeably, proximately, and substantially caused the violations of Mr. McCloud's federal constitutional rights in this case and his resulting injuries.

271.     Under the principles of municipal liability for federal civil rights violations, the Police Commissioner (or his authorized delegates) had final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses and suspects and the initiation of criminal prosecutions.

272.     The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a policymaker for whom the City is liable, with respect to compliance by police employees with the above-mentioned constitutional requirements.

273.     During all times material to this Complaint, the Police Commissioners owed a duty to the public at large and to Mr. McCloud, which they knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, practices, training, and discipline sufficient to prevent or deter conduct by their subordinates violating the constitutional rights of criminal suspects or defendants and of other members of the public. 286.

e aforesaid policies, procedures, regulations, practices and/or customs of the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations by the Individual Police Defendants of Mr. McCloud's rights under the Constitution and laws of the United States.

274.     By virtue of the foregoing, under 42 U.S.C. § 1983, Defendant City of New York is liable for the misconduct of NYPD officers which caused Mr. McCloud's wrongful prosecution and conviction and all his consequential damages, including but not limited to his wrongful prosecution, conviction, subsequent imprisonment and parole restrictions, and all other consequential damages.

## FIFTH CLAIM
### Negligence; Negligent Hiring/Training/Retention/Supervision

275.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

276.     Defendant City, through the NYPD, owed a duty of care to plaintiff to prevent the conduct alleged, because under the same or similar circumstances a reasonable, prudent, and careful person should have anticipated that injury to plaintiff or to those in a like situation would probably result from the foregoing conduct.

277.     Upon information and belief, all of the individual defendants were unfit and incompetent for their positions.

278.     The individual defendants' conduct, including fabricating the content of the police reports, failing to pursue alternate suspects including Kendo McDonald, failing to voucher and safeguard the crime scene evidence was negligent, grossly negligent, reckless and intentional.

279.     Upon information and belief, defendant City knew or should have known through the exercise of reasonable diligence that the individual defendants were potentially dangerous.

280.     Upon information and belief, defendant City's negligence in screening, hiring, training, disciplining, supervising and retaining these defendants and the individual defendants' own negligence proximately caused each of plaintiff's injuries.

281.     As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

**SIXTH CLAIM**
**Intentional or Negligent Infliction of Emotional Distress**

282.     The deliberate conduct of the defendants in coercing and fabricating a false confession from a vulnerable and scared young man for a murder they knew he did not commit constitutes the intentional infliction of emotional distress.

283.     In the alternative, defendants' conduct in coercing and fabricating false confessions and covering up the truth breached a duty of care owed to Mr. McCloud as a citizen and as a criminal suspect, which unreasonably endangered his physical safety and caused him to fear for his own safety, constituting the negligent infliction of emotional distress.

284.     Defendants' conduct, falsely implicating Mr. McCloud and subjecting him to public stigma to this day notwithstanding the dismissal of charges against him, caused Mr. McCloud to suffer ongoing, unimaginable emotional distress and traumatic psychological *sequelae*.

## SEVENTH CLAIM
### Violation of Plaintiff's 8-803 Rights

285.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

286.     The actions of defendants violated plaintiff's rights as defined in Section 8-802 of Chapter 8 of the New York City Administrative Code.

287.     As such, immunity is not a defense to the violations of plaintiff's rights and plaintiff demands and is entitled to the relief described in Section 8-805.

288.     As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## EIGHTH CLAIM
### Defamation

289.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

290.     By their conduct, as described herein, defendants are liable to plaintiff for having committed defamation under the laws of the State of New York.

291.     Defendants made false, disparaging and public statements about plaintiff, including but not limited to the false claim that plaintiff admitted to murder.

292.     Defendants conduct in making such false, disparaging and public statements was intentional or at the very least negligent.

293.     As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged, including profound and permanent reputational damage.

## NINTH CLAIM
### Failure to Intervene

294.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

295.     Those defendants that were present for but did not actively participate in the aforementioned unlawful conduct were aware of such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

296.     As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff respectfully requests judgment against defendants as follows:

(a) Compensatory damages against all defendants, jointly and severally;

(b) Punitive damages against the individual defendants, jointly and severally;

(c) Reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1988;

(d) All relief afforded under Section 8-805 of Chapter 8 of the New York City Administrative Code; and

(e) Such other and further relief as this Court deems just and proper.

Dated:          September 11, 2024
                New York, New York


                Elefterakis, Elefterakis & Panek


                _____
                Gabriel P. Harvis
                Baree N. Fett
                80 Pine Street
                38th Floor
                New York, New York 10005
                (212) 532-1116

                *Attorneys for plaintiff Armond McCloud, Jr.*

- 77 -