UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------X

 ARMOND MCCLOUD, JR.


                            Plaintiff,


                -against-                                      **ORDER**

                                                        23 CV 8341 (NRM)(CLP)


THE CITY OF NEW YORK, *et al.,*


                            Defendant.

--------------------------------------------------------X

**POLLAK**, United States Magistrate Judge:


        On November 9, 2023, plaintiff Armond McCloud commenced this action against the

City of New York, Carlos Gonzalez, Marianne Herbert, Thomas Wray, Glen Bove, James

Girdusky, Joseph Croce, Michael Dempsey, Administrator of the Estate of Vincent Greco,

Maureen Kempton, Edward Garnar, Rubin Martinez, Alquimides Arroyo, and John and Jane Doe

1-10, seeking damages pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth, Fifth, Sixth and

Fourteenth Amendments to the Constitution of the United States, and the laws of the City and

State of New York, based upon plaintiff's wrongful conviction on charges of murder in the

second degree and criminal possession of a weapon in the second degree, following a jury trial in

Queens County, for which he received a sentence of 25 years to life on April 15, 1996. (Compl.[1])

Currently pending before this Court is plaintiff's letter motion, dated December 18, 2024, seeking an Order compelling non-party Queens District Attorney's Office ("QDA") to produce certain documents that were withheld from its response to plaintiff's subpoena. (ECF No. 49).

For the reasons set forth below, plaintiff's motion is granted in part and denied in part.

<u>DISCUSSION</u>

In August 2023, plaintiff McCloud was exonerated after having been incarcerated for 29 years for the August 4, 1994, murder of Kei Sunada (hereinafter "the Sunada murder"). (Compl. ¶¶ 24, 36). The only substantive evidence in plaintiff's criminal case, on which his conviction was based, was plaintiff's confession to the crime. (<u>Id.</u> ¶ 41). Plaintiff confessed to killing Sunada after hours of police interrogation, precipitated by the interrogation of: an individual the Court will refer to as the "Witness," who allegedly first implicated plaintiff; an individual the Court will refer to as "Witness 2," who plaintiff claims was an alternate suspect; and Reginald Cameron, plaintiff's eventual co-defendant. (<u>Id.</u> ¶¶ 73, 79, 90, 194). According to plaintiff, the Witness had implicated Witness 2, who in turn implicated Cameron and plaintiff. (<u>Id.</u> ¶¶ 77, 81-83). Plaintiff's indictment was dismissed in 2023 in light of the QDA's Conviction Integrity Unit (CIU)'s determination that plaintiff's confession had been coerced by defendant Gonzalez, who had been involved in coercing false confessions in other cases. (<u>Id.</u> ¶¶ 22-24). In November 2023, plaintiff commenced this action bringing federal and state law claims for violations of his rights.

---

[1] Citations to "Compl." refer to plaintiff's Complaint, filed November 9, 2023 (ECF No. 1).

On March 1, 2024, plaintiff served a subpoena duces tecum on the QDA seeking its file on plaintiff.  (ECF No. 30, Attachment 1).  In response, the QDA produced certain records[2] and provided a privilege log which plaintiff reviewed and from which plaintiff requested certain items.  The QDA has maintained its objections to producing the items sought by plaintiff, but produced the file to this Court for *in camera* review.  The QDA discussed these withheld documents in terms of five categories, which the Court adopts: 1) the transcript of a hearing under C.P.L. § 440.10(1)[3] (hereinafter "the 440 hearing transcript") related to another individual wrongfully convicted as a result of evidence provided by defendant Gonzalez[4]; 2) criminal history reports and other documents withheld on grounds of privacy; 3) sealed criminal case records and privileged material; 4) attorney work product, including investigative notes and drafts; and 5) documents withheld for reasons of privacy and relevance.  (ECF No. 52).  The Court addresses each category separately.

To the extent that documents are produced, all victim, complainant, and lineup viewer identities will be redacted.  Addresses and dates of birth will also be redacted.

A.  Legal Standards

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that parties "may obtain discovery regarding any nonprivileged material that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  Relevancy under Rule 26

---

[2] According to the QDA, it produced 4,068 pages of all non-privileged files. (ECF No. 52 at 1).

[3] C.P.L. § 440.10(1)(g) provides for a motion to vacate a criminal judgment based on newly discovered evidence "which could not have been produced by the defendant at the trial … and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant…"

[4] The first category also includes the sentencing transcript of plaintiff's co-defendant Cameron, who pled guilty and received a sentence of 25 to life.  However, plaintiff has since withdrawn his request for these documents (ECF No. 53, at 5).

has been "'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in th[e] case.'"  Giacchetto v. Patchogue-Medford Union Free Sch. Dist., 293 F.R.D. 112, 114 (E.D.N.Y. May 6, 2013) (alteration in original) (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)).  In reviewing plaintiff's motion, the Court considers that while the scope of discovery is "broad," it is not "limitless."  Fears v. Wilhelmina Model Agency, Inc., No. 02 CV 4911, 2004 WL 719185, at *1 (S.D.N.Y. Apr. 1, 2004).  The party seeking discovery must show that it is not engaging in "merely a fishing expedition."  Carl v. Edwards, No. CV163863ADSAKT, 2017 WL 4271443, at *3 (E.D.N.Y. Sept. 25, 2017) (quoting Barbara v. MarineMax, Inc., No. 12 CV 368, 2013 WL 1952308, at *2 (E.D.N.Y. May 10, 2013)).

"[W]hen a plaintiff sues in federal court to vindicate federal civil rights, 'New York state law does not govern discoverability and confidentiality[.]'"  Howard v. City of Rochester, 758 F. Supp. 3d 109, 121 (W.D.N.Y. 2024) (quoting King v. Conde, 121 F.R.D. 180, 187 (E.D.N.Y. 1988)); see also Crosby v. City of New York, 269 F.R.D. 267, 274 (S.D.N.Y. 2010) (holding that "in cases presenting federal questions, such as here, discoverability, privileges, and confidentiality are governed by federal law, not state law").  Even so, "in the interest of comity, [federal] courts should attempt to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy."  Manzi v. DiCarlo, 982 F. Supp. 125, 131 (E.D.N.Y. 1997) (quotation omitted); see also Owens v. County of Monroe, No. 21 CV 6445, 2025 WL 1902225, at *2 (W.D.N.Y. July 10, 2025) (quoting Manzi v. DiCarlo); Coleman v. County. of Suffolk, 174 F. Supp. 3d 747, 757 (E.D.N.Y. 2016), aff'd, 685 F. App'x 69 (2d Cir. 2017).  State rules may, for example, "illustrate important privacy interests[.]"  Coleman v. County of Suffolk, 174 F. Supp. 3d at 757.  Accordingly, "the policies underlying state

4

evidentiary privileges must still be given serious consideration, even if they are not determinative." Crosby v. City of New York, 269 F.R.D. at 274 (quotation omitted).

However, these state privacy rules "should never be permitted to frustrate the important federal interests in broad discovery and truth-seeking and the interest in vindicating important federal substantive policy such as that embodied in section 1983." Lehman v. Kornblau, 206 F.R.D. 345, 348 (E.D.N.Y. 2001) (internal quotation omitted). Rather than "mechanically apply a state rule where doing so 'would be undesirable and improper,'" Howard v. City of Rochester, 758 F. Supp. 3d at 122 (quoting Coleman v. County of Suffolk, 174 F. Supp. 3d at 757), the Court must instead "balance the deference to be accorded state-created privileges with the need for the information to be protected by the privilege." Crosby v. City of New York, 269 F.R.D. at 275.

In opposing plaintiff's motion to compel the production of certain documents, the QDA cites numerous sources of state and federal law to argue why the documents it withheld should not be produced. Each statutory basis for objection is outlined below as relevant to the particular series of documents sought.

B.  Gonzalez 440 Hearing Transcript

According to the QDA, it withheld from production the 440 hearing transcript related to Detective Gonzalez (Bates Nos. 4519-64) on the grounds that under New York law, transcripts of court proceedings constitute judicial records which must be obtained directly from the court reporter. (ECF No. 52 at 2 (citing New York Judicial Law §§ 300 and 302, and CPLR § 8002)).

Section 300 of the N.Y. Judicial Law provides that the "[s]tenographer must furnish certified transcript of proceedings to parties on payment of fees. The stenographer shall . . .

furnish a certified transcript of the whole or any part of his minutes, in any case reported by him, to any party to the action requiring the same." Jud. Law § 300.  Similarly, section 302 requires the stenographer to furnish transcripts of hearings upon payment of fees and specifies that, when public officials need transcripts, the stenographer is to be paid with public funds. Id. § 302. New York Civil Practice Law and Rules § 8002 provides that stenographers are entitled to a fee for furnishing a transcript. See N.Y. C.P.L.R. § 8002 (stating that "[u]nless otherwise provided by law, a stenographer is entitled, for a copy fully written out from his or her stenographic notes of testimony or other proceedings taken in a court, and furnished upon request to a party or his or her attorney, to the fee set forth in the rules promulgated by the chief administrator of the courts").  To the extent the QDA relies on these provisions, they merely provide plaintiff with an alternative source from which to acquire the transcripts sought; they do not prohibit the QDA from providing plaintiff with copies.  None of these provisions say anything about what the QDA can or cannot disclose.

The 440 hearing transcript, however, is sealed pursuant to N.Y. Crim. Proc. L. § 160.50, and the QDA objects to its production on the grounds that absent a state court order or the written consent of the arrested individual who was the subject of the 440 hearing, these sealed records are protected from disclosure.  (ECF No. 52 at 2-4).  In response, plaintiff argues that he is entitled to information regarding other cases in which Gonzalez obtained false confessions and thus the 440 hearing transcript should be produced, or at the very least the exoneree identified so that plaintiff may seek an authorization from that person to unseal the record.  (ECF No. 53 at 5).

In arguing that the 440 transcript was sealed and cannot be produced, the QDA relies on New York Criminal Procedure Law § 160.50(1), which provides that, "[u]pon the termination of a criminal action or proceeding against a person in favor of such person, . . . the record of such

6

action or proceeding shall be sealed[.]" C.P.L. § 160.50(1). Federal courts have recognized that "[t]he primary purpose of the sealing of records pursuant to § 160.50 is to ensure confidentiality and to protect . . . individual[s] from the potential public stigma associated with a criminal prosecution." Owens v. County of Monroe, 2025 WL 1902225, at *2 (quoting Lehman v. Kornblau, 206 F.R.D. at 347); see also Crosby v. City of New York, 269 F.R.D. at 274.

Despite the consideration that federal courts give to state evidentiary privileges, those privileges do not control, and "[f]ederal courts commonly order production of documents sealed pursuant to Sections 160.50." Crosby v. City of New York, 269 F.R.D. at 275. Federal courts considering whether to order the production of documents sealed pursuant to section 160.50 should weigh the policy interests undergirding the state privilege against the federal interests at stake. See Manzi v. DiCarlo, 982 F. Supp. at 129-30.

Courts have recognized that plaintiffs bringing a federal civil rights action have a "strong interest in obtaining records relevant to" their claims. Owens v. County of Monroe, 2025 WL 1902225, at *4. In these cases, there are "strong federal interests in broad discovery and truth-seeking" which state privilege rules "should not be permitted to frustrate." Crosby v. City of New York, 269 F.D.R. at 274 (internal quotations omitted). Moreover, "[t]he worthy goals of Section[ ] 160.50 . . . as well as a litigant's need for pertinent discovery can usually be honored simultaneously by redaction of information that identifies, directly or indirectly, persons entitled to protection under these statutes." Id. at 275. This is particularly true when "any unsealed documents would be non-public and subject to" a protective order. Owens v. County of Monroe, 2025 WL 1902225, at *5.

Having weighed plaintiff's interest in the documents protected by section 160.50 against any countervailing state policy interests and the privacy of individuals identified in the

7

document, the Court Orders the 440 hearing transcript (Bates Nos. 4519-64) produced but with the name of the exoneree redacted.[5]

C. Criminal History Reports

Among the documents plaintiff has requested are criminal history reports (Bates Nos. 9-33, 67-73, 94, 95, 2362-3026, 4661-4761), including what are known as "rap sheets." The QDA has withheld these documents as privileged material pursuant to 28 U.S.C. § 534(b), 42 U.S.C. § 3789g(b), 28 C.F.R. §§ 20.1, 20.33, N.Y. Exec. L. § 837(8), and 9 N.Y.C.R.R. § 6150.4(b)(6), and on the grounds that disclosure of rap sheets violates the QDA's Memorandum of Understanding with the Division of Criminal Justice Agency.[6] (ECF No. 52 at 3). The QDA also contends that some of the rap sheets are irrelevant to this case and others were contained within case files that have been ordered sealed (see discussion infra). (Id.)

In arguing against disclosure of the rap sheets, the QDA cites a variety of state and federal statutes designed to protect the privacy of individuals associated with criminal proceedings.

i. N.Y. Executive Law § 837(8)

The QDA relies on New York Executive Law § 837(8), which provides that the New York Division of Criminal Justice Services shall "[a]dopt appropriate measures to assure the security and privacy of identification and information data." N.Y. Executive Law § 837(8). According to

---

[5] In referring to the 440 hearing transcript, counsel for the QDA includes in the referenced Bates Nos. document No. 4564, which appears to belong to a different hearing. The Court addresses this document below and does not order its production as part of this batch of documents.

[6] To the extent that the QDA relies on 5 U.S.C. § 552(b)(7)(C), a provision of the Freedom of Information Act that exempts certain records compiled for law enforcement purposes from disclosure under the act if they present, inter alia, privacy concerns, the instant motion to compel is not a request under the Freedom of Information act. Thus, this exception is irrelevant to the dispute.

the New York Appellate Division, this provision, in conjunction with other statutes, protects criminal history reports from public access under the New York Freedom of Information Law, since such access would constitute unwarranted invasions of personal privacy.  See Nix v. New York State Division of Criminal Justice Services, 167 A.D.3d 1524, 1525 (N.Y. App. Div. 2018). One federal court has also held that this statute is designed to "protect RAP sheets from disclosure based on concerns about invasions of personal privacy."  Pane v. Town of Greenburgh, No. 07 CV 3216, 2009 WL 10740041, at *5 (S.D.N.Y. May 14, 2009).  To the extent that N.Y. Executive Law § 837(8) applies to any of the documents at issue, any objection based on this provision would be subject to a nearly identical balancing test to objections under C.P.L. § 160.50(1) – namely, a weighing of the state privilege's purpose in protecting privacy, against any federal interests at issue.  The privacy concerns raised can be addressed through redaction and a protective order.

                  ii.    9 N.Y.C.R.R. § 6150.4(b)(6)

The QDA also cites 9 N.Y.C.R.R. § 6150.4(b)(6), which provides that "disclosure of information contained in the criminal history file, license and employment file and wanted and missing persons file, maintained by DCJS, including any and all information contained in such files" shall "be exempt from public inspection and/or copying[.]"  9 N.Y.C.R.R. § 6150.4(b)(6). Like New York Executive Law § 837(8), the purpose of this provision is to protect certain documents "from disclosure based on concerns about invasions of personal privacy."  Pane v. Town of Greenburgh, WL 10740041, at *5 (noting also that the party seeking to withhold rap sheets had pointed to no case law in which 9 N.Y.C.R.R. § 6150.4(b)(6) or New York Executive Law § 837(8) had served as a basis to withhold documents in a federal action).

In this case, to the extent that 9 N.Y.C.R.R. § 6150.4(b)(6) applies to disclosure in a federal civil rights case, the state law exception would be subject to the aforementioned balancing test of state privacy concerns and federal interests.  Given that the concern expressed by the statute is about public disclosure of certain personal information, a protective order or redactions would suffice to guard against that possibility.

     iii.    28 U.S.C. § 534(b)

In terms of federal authority, the QDA relies in part on 28 U.S.C. § 534, located in the section of the U.S. Code concerning the authority of the Federal Bureau of Investigation.  The statute regulates "[a]cquisition, preservation, and exchange of identification records and information[.]"  28 U.S.C. § 534.  It instructs that the "Attorney General shall . . . acquire, collect, classify, and preserve criminal identification records, crime, or other records."  Id. § 534(a)(1).  These records, or "rap sheets," see U.S. Dept. of Justice v. Reporters Comm. For Freedom of Press, 489 U.S. 749, 752 (1989), are required to be shared with state and local law enforcement.  See 28 U.S.C. § 534(a)(4) (requiring the Attorney General to "exchange such records and information with, and for the official use of, authorized officials of the Federal Government, . . . the States, . . . cities, and . . . other institutions").  However, the statute warns that "the exchange of records and information authorized by subsection (a)(4) of this section is subject to cancellation if dissemination is made outside the receiving departments."  28 U.S.C. § 534(b).  Subsection (f)(1) provides that "[i]nformation from national crime information databases consisting of identification records, criminal history records, protection orders, and wanted person records may be disseminated to civil or criminal courts for use in domestic violence or stalking cases.  Nothing in this subsection shall be construed to permit access to such records for any other purpose."  Id. § 534(f)(1).  To be sure, as one court has noted, this statutory language

10

does not mean that access is never permitted for other purposes.  Alberty v. Hunter, 343 F.R.D. 1, at 13 (D. Conn. 2022) (citing Mathews v. City of Beaumont, No. 1:11CV268, 2012 WL 12906090, at *4 (E.D. Tex. Mar. 13, 2012)).

Although the QDA does not explain in detail its argument for why this statute prohibits it from producing the records sought in this case, it is perhaps concerned that, if it were to share with plaintiff the requested information, its participation in this information-sharing regime would be subject to cancellation since it would have "disseminat[ed] the information outside the receiving department[]."  28 U.S.C. § 534(b).  This same argument, however, has been rejected before.  See Alberty v. Hunter, 343 F.R.D. at 14.  Providing this protected information in discovery does not constitute "dissemination" for the purpose of section 534(b).  Id.  Indeed, a Department of Justice Office of Legal Counsel ("OLC") opinion considered whether the provision prevented agencies from sharing this information with government-authorized private contractors assisting in law enforcement functions.  See Access to Crim. Hist. Recs. by Non-Governmental Entities Performing Authorized Crim. Just. Functions, 22 U.S. Op. Off. Legal Counsel 119, 1998 WL 1751073 (1998).  The OLC Opinion, interpreting the term, stated:

> a strong argument can be made that disclosures of the sort contemplated would not constitute "dissemination" of the information, within the ordinary meaning of that word. Indeed, the dictionary defines "dissemination" to mean "to spread or send out freely or widely as though sowing or strewing seed: makewidespread." Webster's Third International Dictionary 656 (1986). Sharing information with contractors who are assisting in law enforcement and who are subject to carefully drawn controls would not appear to fall within this definition … although the meaning of the phrase "dissemination" may well vary based on context[.]

OLC Opinion, 1998 WL 1751073, at *3.

11

Moreover, as the Court noted in <u>Alberty v. Hunter</u>, "the Supreme Court's understanding of the term . . . demonstrates that "'dissemination' in § 534 is concerned with the availability and broadcast of FBI's CHRI records to the general public," rather than the contemplated discovery production at issue. <u>Alberty v. Hunter</u>, 343 F.R.D. at 15 (citing <u>U.S. Dept. of Justice v. Reporters Comm. For Freedom of Press</u>, 489 U.S. at 753 (noting that, "[a]lthough much rap-sheet information is a matter of public record, the availability and *dissemination* of the actual rap sheet *to the public* is limited") (emphasis added)); <u>id.</u> at 767 (remarking that, "[g]iven this level of federal concern over centralized data bases, the fact that most States *deny the general public access* to their criminal-history summaries should not be surprising") (emphasis added); <u>id.</u> at 771 (noting that "the FBI's policy of granting the subject of a rap sheet access to his own criminal history is consistent with its policy of denying access to all other members of the *general public*") (emphasis added)).

Accordingly, given that the statute is primarily concerned with the availability and broadcast of the FBI's records themselves to the "general public," <u>Alberty v. Hunter</u>, 343 F.R.D. at 15, section 534(b) provides no basis on which production of the requested documents would be prohibited under these circumstances. <u>But see</u> <u>Jones v. City of Elkhart</u>, No. 2:10 CV 402, 2012 WL 2026327, at *4 (N.D. Ind. June 5, 2012) (holding briefly, in a Section 1983 civil rights case against a municipality, that section 534(b) prohibited disclosure where the plaintiff sought the defendant's entire electronic database and tens of thousands of records of warrantless arrests).

> iv.    <u>42 U.S.C. § 3789g(b)</u>

The QDA also relies on 42 U.S.C. § 3789g(b), which states, in relevant part, that "the Office of Justice Programs shall assure that the security and privacy of all [criminal history] information is adequately provided for and that information shall only be used for law

12

enforcement and criminal justice and other lawful purposes."  42 U.S.C. § 3789g(b).  This

provision appears to be plainly irrelevant to the instant dispute because, as one court recognized

in the Section 1983 civil rights context, "that subsection only imposes obligations on the Office

of Justice Programs . . . [and] no direct obligations on the states."  <u>Mathews v. City of Beaumont</u>,

2012 WL 12906090, at *4.

v.    <u>28 C.F.R. § 20.1, 20.33</u>

Finally, the QDA relies on Title 28 of the Code of Federal Regulations, which states that

"[i]t is the purpose of these regulations to assure that criminal history record information

wherever it appears is collected, stored, and disseminated in a manner to ensure the accuracy,

completeness, currency, integrity, and security of such information and to protect individual

privacy."  28 C.F.R. § 20.1.  Section 20.33, also cited by the QDA, furthers this purpose by

regulating the dissemination of criminal history record information: "[c]riminal history record

information contained in the III System and the FIRS may be made available" to a list of

agencies and for a variety of uses, such as "[t]o criminal justice agencies for criminal justice

purposes, which purposes include the screening of employees or applicants for employment

hired by criminal justice agencies."  28 C.F.R. § 20.33(a)(1).  Similarly to 28 U.S.C. § 534(b),

the regulation further provides that "[t]he exchange of criminal history record information

authorized by paragraph (a) of this section is subject to cancellation if dissemination is made

outside the receiving departments, related agencies, or service providers identified in paragraphs

(a)(6) and (a)(7) of this section."  28 C.F.R. § 20.33(b).

Courts appear to disagree on what this provision means for the discoverability of certain

criminal history documents.  Courts in other circuits to consider this regulation have found it to

categorically bar the disclosure of criminal history documents.  In <u>Klatt v. Arpaio</u>, the court held

13

that "28 C.F.R. § 20.33 limits release of criminal history information to specific entities, primarily criminal justice agencies" and that, "[a]s a matter of executive policy, criminal histories are generally treated as confidential and their use is restricted to governmental purposes, with limited exceptions." Klatt v. Arpaio, No. 14 CV 02711, 2016 WL 11663760, at *1 (D. Ariz. July 18, 2016) (noting that as of its amendment in 1999, section 20.33 allows disclosure of this type of information only if federal law permits it; state law permission does not suffice). Several other courts have reached the same conclusion, though their reasoning is fairly summary. See West-Helmle v. Martinez, No. 22 MC 00019, 2023 WL 2167186 (D.N.M. Feb. 22, 2023) (holding that "[p]laintiff is not an entity to which the Second Judicial District Attorney is permitted to disseminate the NCIC report" and that plaintiff "does not cite any legal authority showing that the Second Judicial District Attorney's Office would not be subject to cancellation" from participation in the information-sharing program were it to disclose the information); Johnson v. Gallia County Commissioners, No. 2:20 CV 65, 2021 WL 716621, at *5 (S.D. Ohio Feb. 24, 2021) (holding that section 20.33 "limits the release of criminal history record information to specific entities, which are primarily criminal justice agencies").

There is little guidance within the Second Circuit regarding these federal regulations. In Alberty v. Hunter, neither party addressed 28 C.F.R. § 20.33 and its potential impact on the production request. However, the court seemed to suggest that the regulation did not bar disclosure in this context. Alberty v. Hunter, 343 F.R.D. 1, 12, n. 10 (D. Conn. 2022) (citing State ex rel. W. Virginia State Police v. Taylor, 201 W. Va. 554, 563-64 (1997) (interpreting an earlier version of the regulation in holding that "the pertinent federal regulations do not compel finding [ ] a bar" to non-governmental parties obtaining criminal history information from a subpoenaed governmental agency in a civil action)). The Alberty court ultimately permitted the

plaintiff to discover certain criminal history documents – namely, her own NCIC records. Alberty v. Hunter, 343 F.R.D. at 15.

One court declined to take a position on whether 28 C.F.R. § 20.1, despite providing that the purpose of the federal regulations regarding criminal justice information systems is, in part, "to protect individual privacy," creates an individual privacy right. National Council of La Raza v. Gonzales, 468 F. Supp. 2d 429, 444, n.9 (E.D.N.Y. 2007), aff'd sub nom. National Council of La Raza v. Mukasey, 283 F. App'x 848 (2d Cir. 2008).

More broadly, another court acknowledged these federal limitations on the dissemination of non-conviction data but noted that they do not supersede a court's "constitutional duty … to do justice in criminal prosecutions before it." United States v. Thorne, 467 F. Supp. 938, 940-41 (D. Conn. 1979). The court found that a Connecticut statute mandating the erasure of arrest and court records in cases that culminated in acquittal, was not intended to bar the use of that evidence for a federal prosecution arising from the investigation of a state charge. Id. at 941. Rather, the state has an interest in the integrity of the criminal justice process with respect to unresolved charges. Id. The court ultimately concluded that its constitutional duty mandated it to require the production of such evidence, as production was "authorized by the Supremacy Clause and [would do] no violence to the purpose of the Connecticut statute." Id.

Having considered the delicate balance of a civil rights plaintiff's concerns and the purpose of the above laws and regulations, the Court finds that any concerns arising pursuant to said laws and regulations can be ameliorated by use of a protective order and/or redactions.

Plaintiff seeks the rap sheets of several individuals who provided incriminating information about him or testified against him, in redacted form if necessary, to support his

assertions about the integrity of the investigation in his criminal case. (ECF No. 49 at 3). Plaintiff argues that the rap sheets at issue are relevant to reconstruct the timeline of the investigation and to prove what information the investigators learned, and whether they ignored other suspects or leads. (Id.) The QDA responds that some of the rap sheets were obtained long after plaintiff was arrested in 1994 and convicted in 1996. (ECF No. 52 at 3). Specifically, Bates Nos. 9-33 were retrieved in 2019, and Bates No. 95 was retrieved in 2005. (Id.) Thus, the QDA argues that they would not be relevant to show that for which plaintiff is seeking them. (Id.)

In response, plaintiff contends that he seeks to identify individuals who were potential suspects in the crime for which plaintiff was wrongfully convicted, as well as the identity of individuals with knowledge about the crime and any alternative suspects. (ECF No. 53 at 4). Plaintiff argues that production of the rap sheets in redacted form "to the extent the Court deems necessary" will minimize the impact on privacy interests asserted by the QDA. (Id.) In addition, plaintiff questions why the QDA would be running rap sheets on non-parties in a closed case nine years after the plaintiff's conviction. (Id.) It is for this same reason that the plaintiff seeks discovery of the 2005 Mapquest driving directions. (See discussion infra).

In certain narrow circumstances, courts in the Second Circuit have allowed the disclosure of rap sheets belonging to others than the party seeking them. Perkins v. Le Fevre, 691 F.2d 616 (2d Cir. 1982) (holding that the prosecution was required to turn over rap sheets that called into question a government witness's credibility). While the government might not be required to turn over rap sheets for defense witnesses, United States v. Barroso, 108 F. Supp. 2d 338 (S.D.N.Y. 2000), aff'd sub nom. United States v. Tropeano, 252 F.3d 653 (2d Cir. 2001), a

defendant may be entitled to view the complete rap sheet of a witness testifying against him. See, eg., Smith v. Fischer, No. 07 CIV. 2966, 2012 WL 695432, at *2 (S.D.N.Y. Mar. 5, 2012).

In Perkins v. Le Fevre, the Second Circuit treated a witness's rap sheet as Brady material where the prosecution knew its witness had testified falsely about a criminal defendant, and the defendant specifically requested the rap sheet of that witness. Perkins v. Le Fevre, 691 F.2d at 618-19. The court held that the prosecutor's refusal to turn over the rap sheet for impeachment purposes violated the defendant's due process rights, even though the rap sheet only went to the "collateral matter" of the witness's credibility. Id. at 619-20. The prosecutor was ultimately found to have obtained the plaintiff's conviction through false testimony. Id. at 619.

While plaintiff's request for the production of rap sheets comes long after his trial, he seeks them to challenge the evidence on which his conviction was based. Plaintiff claims that the police officers who investigated the Sunada murder "fabricated inculpatory evidence and suppressed exculpatory evidence" by coercing confessions and fabricating reports, in violation of plaintiff's Fourth and Fourteenth Amendment rights. (Compl. ¶ 173). Thus, to the extent that the rap sheets reflect criminal activity that occurred before or around the time of the Sunada murder, that information might suggest the existence of leads to exculpatory evidence at the time plaintiff was prosecuted, which should have been disclosed to plaintiff. Plaintiff asserts that the investigators coerced certain witnesses to make incriminating statements that investigators knew to be false but that were used against plaintiff in trial anyway, constituting Brady violations. If an individual who associated with or even testified against plaintiff engaged in criminal activity around the time of the Sunada murder, and the investigators knew or should have known about that activity, that fact may have been a missed or ignored lead or provided an incentive for the individual being interrogated to supply false information. Thus, the criminal history reports

17

plaintiff seeks serve a dual purpose: they may go to witness credibility as well as the question of investigative thoroughness.

On balance, the Court finds that the production of rap sheets that reflect criminal activity of witnesses or associates of plaintiff around the time of plaintiff's arrest and leading up to plaintiff's conviction would promote the purposes of <u>Brady</u> and the federal civil rights policies, and outweigh the state law concerns discussed above. Thus, the Court Orders the production of certain rap sheets, indicated below, that were retrieved prior to plaintiff's April 15, 1996 conviction. To the extent that any documents within this category contain the names of the individuals to whom the criminal histories belong, they will be produced to plaintiff under a protective order to prevent public dissemination. All other personal identifying information in these documents, such as addresses and individuals' ages, shall be redacted.

Bates Nos. 67-73 contain criminal history information for a witness against plaintiff in plaintiff's criminal case (the "Witness"), whose record was retrieved on February 23, 1996, and for two apparent associates of the Witness, whose records were retrieved on February 21, 1996. The Witness allegedly provided the initial tip to the police on which the police based their decision to arrest plaintiff. (Compl. ¶ 120). On the day the Witness gave the police incriminating information about plaintiff, plaintiff's co-defendant, and another individual, the Witness had been brought into the police station for questioning about an unrelated robbery. (<u>Id.</u> ¶ 73). He spoke with multiple police officer defendants and claimed that plaintiff had committed the Sunada murder. (<u>Id.</u>) The Witness was sixteen years old and facing charges himself at the time that he was interrogated. (<u>Id.</u>) Along with his claim that the defendants coerced the Witness, plaintiff claims that defendants improperly relied on information from the Witness in deciding to arrest plaintiff. (<u>Id.</u> ¶¶ 73, 74). Indeed, the information provided by the Witness was

later found to be insufficient probable cause for arrest.  (Id. ¶74).  Plaintiff alleges that the Witness made incriminating statements about plaintiff in exchange for leniency in his own criminal case.  (Id. ¶ 73).  As a result, information about the Witness's criminal record leading up to plaintiff's conviction may be relevant to plaintiff's claims that investigators withheld exculpatory witness information.  (Id. ¶ 175).  The Court Orders Bates Nos. 67-68 to be produced.

Given that plaintiff seeks the criminal history information of other potential suspects, to determine whether investigators ignored these individuals and other possible leads, as well as to reconstruct the timeline of the investigation, the Court also finds the criminal history information of the Witness's apparent two associates relevant to this end.  Bates Nos. 69-73 are Ordered produced.

Bates Nos. 2371-73, which contain criminal history information for another witness ("Witness 2"), were retrieved in January 1995.  These records list charges pending against Witness 2, who incriminated plaintiff's co-defendant in the Sunada case, Reginald Cameron, while under interrogation by defendant police officers for the Sunada murder.  At the time of the Sunada murder, Witness 2 was on probation following an arrest for a separate armed robbery he had committed with Cameron.  It is unclear whether Witness 2's criminal history was disclosed to plaintiff before plaintiff's conviction for the Sunada murder.  Plaintiff suggests that the uniform account of the murder that Cameron, Witness 2, and plaintiff all reportedly gave under interrogation was fabricated evidence "based on the interrogators' knowledge of Cameron and [Witness 2's] criminal history and not the actual facts of the crime."  (Compl. ¶ 127).  Under these circumstances, the Court finds that Witness 2's criminal history is relevant to the question

of whether <u>Brady</u> evidence existed and was withheld from plaintiff leading up to plaintiff's conviction.  Bates Nos. 2371-73 are thus Ordered to be produced.

Bates Nos. 2967 and 2971 are records of Witness 2's probation violation based on his rearrest for a robbery and assault that he allegedly perpetrated just two months after the Sunada murder and more than a year before plaintiff's trial.  The Court finds that these documents could potentially constitute evidence relevant to plaintiff's claim about ignored investigative leads. Accordingly, the Court Orders these Bates Nos. 2967 and 2971 to be produced.

Bates Nos. 2644-46 are rap sheets, retrieved in February 1996, which appear in the Bates range identified by the QDA as containing sealed records from one of two cases against Witness 2 (discussed further <u>infra</u>).  They contain criminal history information for a person who appears to be an associate of Witness 2 and may be relevant to determining whether investigators considered this associate as a potential lead in plaintiff's case.  Accordingly, the Court Orders Bates Nos. 2644-46 to be produced.

Regarding rap sheets obtained after plaintiff's April 1996 conviction, plaintiff's motion is denied without prejudice to renew once plaintiff articulates a more fulsome reason than "to plan and conduct discovery" (ECF No. 53 at 5), for seeking those rap sheets.  Bates Nos. 12 to 33[7] and 95 are copies of plaintiff's co-defendant Reginald Cameron's rap sheet, which were, according to the QDA, retrieved in 2019 and 2005, respectively.  (ECF No. 52 at 3).  It is unclear who obtained these rap sheets and for what purpose.  Absent further information as to what

---

[7] Bates Nos. 9-11 appear to be a partial record referring to an individual who was arrested in 2018. Since this individual does not appear to have any relationship with the plaintiff or any of the other individuals addressed above, the relevance of this partial record is unclear.  It will not be produced at this time.

would be gleaned by reviewing these past charges and convictions, which occurred after the murder for which plaintiff was convicted, the Court declines to order them produced at this time.

As it is unclear when Bates No. 94 was obtained, though it is a copy of a criminal history report pertaining to Witness 2, the Court does not order it produced at this time.

D. Sealed Records and Privileged Materials

Plaintiff also seeks production of records sealed pursuant to Section 160.50 of the New York Criminal Procedure Law, addressed in depth supra. These documents are within the Bates ranges 2362-3026, 4661-4716, 6147, 6260-61, and 6265-7316.

To justify withholding these documents, the QDA cites the requirement set out in Section 160.50 that "upon the termination of a criminal action or proceeding against a person in favor of such person . . . the record of such action or proceeding shall be sealed." C.P.L. § 160.50. (ECF No. 52 at 4). As discussed, this provision prohibits the QDA from disclosing records sealed pursuant to it, absent the consent of the arrested individual or a court order from a New York State Court. (Id. (citing N.Y.C.P.L. 160.50(1)(d)(i), (ii); Fernandez v. the State of N.Y., 79 Misc.3d 1235(A), 2023 WL 494086, (N.Y. Ct. Cl. 2023)). While the QDA recognizes that this is a federal case, it urges this Court, in the "spirit of comity," to give "'serious consideration' to state evidentiary privileges and the policy interests embodied in these privileges." (Id. (citing cases)). As with the criminal history reports, to the extent any of the documents withheld from production were sealed, the Court must weigh the plaintiff's interest in the document against any countervailing state policy interests and the privacy of individuals identified in the document.

In addition to being sealed, the QDA notes that some of the documents were withheld because they contain rap sheets, grand jury material, victims' medical records, and attorney work product.  (ECF No. 52).

      a)  <u>Grand Jury Materials</u>

According to the QDA, Bates Nos. 2362-3026 contain certain grand jury materials which may not be disclosed absent a written order of the court overseeing the grand jury.  (<u>Id.</u> at 5).

Under New York Law, "[g]rand jury proceedings are secret" and may not be disclosed except "upon written order of the court."  N.Y. C.P.L. § 190.25(4)(a).  However, "federal law, and not state law, governs the scope of the privileges contested in this case."  <u>Ruther v. Boyle</u>, 879 F. Supp. 247, 249 (E.D.N.Y. 1999).  Accordingly, "[t]he law governing disclosure of state grand jury proceedings attempts a delicate balance among competing interests" – namely, "injustice, comity, and secrecy."  <u>Frederick v. City of New York</u>, No. 11 CV 469, 2012 WL 4947806, at *7 (S.D.N.Y. Oct. 11, 2012).  "[I]n evaluating applications to unseal state grand jury minutes, federal courts have required the same demonstrations of 'particularized need' required for the unsealing of federal grand jury minutes."  <u>Myers v. Phillips</u>, 04 CV 4365, 2007 WL 2276388, at *2 (E.D.N.Y. Aug. 7, 2007); <u>see also</u> <u>United States v. Procter & Gamble Co.</u>, 356 U.S. 677, 683 (1958).  To demonstrate particularized need, "'the party seeking grand jury material must show (1) that the material they seek is needed to avoid a possible injustice in another judicial proceeding, (2) that the need for disclosure is greater than the need for continued secrecy, and (3) that the request is structured to cover only material so needed.'"  <u>Owens v. County of Monroe</u>, 2025 WL 1902225, at *6 (quoting <u>Ruther v. Boyle</u>, 879 F. Supp. at 250); <u>United States v. Woodberry</u>, 546 F. Supp. 3d 180, 190 (E.D.N.Y. 2021) (noting that, "[i]n determining whether disclosure of information regarding the grand jury's proceedings is

appropriate, courts weigh the need for disclosure against the public interest in maintaining

secrecy over such proceedings"). Given the gravity of unsealing grand jury information,

"[c]ourts have repeatedly recognized that the showing required is substantial." Frederick v. City

of New York, 2012 WL 4947806, at *7 (internal quotation omitted); see also Thomas v. Mason,

No. 17 CV 626, 2018 WL 11247055, at *3, n.3 (N.D.N.Y. June 25, 2018) (noting that "the

burden . . . is a heavy one, and it rests with the party seeking disclosure").

The Supreme Court has identified the following considerations for courts to consider

when balancing the need for disclosure against the interest in maintaining secrecy:

> (1) to prevent the escape of those whose indictment may be
> contemplated; (2) to insure the utmost freedom to the grand jury in
> its deliberations, and to prevent persons subject to indictment or
> their friends from importuning the grand jurors; (3) to prevent
> subornation of perjury or tampering with the witness who may
> testify before [the] grand jury and later appear at the trial of those
> indicted by it; (4) to encourage free and untrammeled disclosures by
> persons who have information with respect to the commission of
> crimes; (5) to protect [an] innocent accused who is exonerated from
> disclosure of the fact that he has been under investigation, and from
> the expense of standing trial where there was no probability of guilt.

Douglas Oil Co. of Ca. v. Petrol Stops Nw., 441 U.S. 211, 219 n. 10 (1979) (internal quotation

omitted). "In particular, the Court has emphasized that secrecy in the grand jury context serves

to encourage witnesses to testify freely, without fear of retaliation." Anilao v. Spota, 918 F.

Supp. 2d 157, 172-73 (E.D.N.Y. 2013).

In weighing these interests, courts "in this Circuit have consistently held that

'[s]peculation and surmise as to what occurred before the grand jury is not a substitute for fact.'"

Owens v. County of Monroe, 2025 WL 1902225, at *7 (quoting United States v. Woodberry, 546

F. Supp. at 190 (citations omitted)); see also Burno v. Coveny, No. 18 CV 1522, 2020 WL

1812460, at *2 (E.D.N.Y. April 9, 2020) (noting that "[m]ere speculation about misconduct . . . does not justify unsealing grand jury materials" (internal quotation omitted)).  District courts also "must exercise substantial discretion as they apply [this test] to the facts of each case."  See In re Petition of Craig, 131 F.3d 99, 104 (2d Cir. 1997) (remarking that "[t]he discretion of a trial court in deciding whether to make public the ordinarily secret proceedings of grand jury investigation is one of the broadest and most sensitive exercises of careful judgment that a trial judge can make").

Having reviewed the grand jury materials within Bates range 2362-3026, the Court finds that the proceeding reflected in these documents relates to a different alleged robbery – not the crime for which plaintiff was convicted – and while the defendant involved, Witness 2, may have been a potential suspect in plaintiff's case, he was ultimately acquitted of the charges that were the subject of this grand jury proceeding.  The Court has weighed the plaintiff's need for these unrelated grand jury proceedings and finds that the policies behind grand jury secrecy outweigh the plaintiff's need to fish through this transcript, which neither relates to plaintiff's case nor involves defendant Gonzalez.  Moreover, as discussed below, the Court is Ordering the partial disclosure of other non-grand jury materials relating to this case.  Disclosure of these other records should provide plaintiff with sufficient relevant information about this case to allow further investigation.

b. Health Records

The QDA withheld certain records in Bates range 2362-3026 based on privacy concerns, such as those set forth in New York Public Health Law §§ 2803-c(3)(f), 2805-g or HIPAA, 42 U.S.C. §§ 1320 et seq.  The QDA contends that certain of the documents withheld from production contain health information related to various crime victims, the disclosure of which is

24

prohibited pursuant to state law.  (ECF No. 52 at 5).  N.Y. Pub. Health § 2803-c(3)(f) provides

that "[e]very patient shall have the right to have privacy in treatment and in caring for personal

needs, confidentiality in the treatment of personal and medical records, and security in storing

personal possessions."  N.Y. Pub. Health § 2803-c(3)(f).  Section 2805-g requires hospitals to

maintain for public inspection certain records pertaining to the hospital facility, but notes:

> Nothing contained in this section shall be construed or deemed to
> require the public disclosure of confidential medical, social,
> personal or financial records of any patient. The commissioner shall
> adopt such regulations as may be necessary to give effect to the
> provisions of this section and to preserve the confidentiality of
> medical, social, personal or financial records of patients.

N.Y. Pub. Health § 2805-g(3).

Neither of these provisions, on their face, seem to prohibit the disclosure of medical

information as part of the discovery process.  Nonetheless, even if either or both provisions did

prohibit those disclosures, they would be subject to the same balancing test as all state

evidentiary privileges in federal court.  These statutes are clearly designed to protect patient

privacy, and that interest must accordingly be weighed against federal interests in truth-seeking

and the protection of federal civil rights.  However, these interests need not necessarily conflict:

as courts have noted, if the documents are disclosed under a protective order, state privacy and

federal truth-seeking interests can be simultaneously honored.  Cf. Crosby v. City of New York,

269 F.D.R. at 275 (making this point with respect to C.P.L. § 160.50(1)); Owens v. County of

Monroe, 2025 WL 1902225, at *5 (same).

Moreover, HIPAA is no bar to production in the instant case.  "Under [HIPAA] and the

regulations promulgated thereunder, disclosure of patient records in legal proceedings is

permitted if ordered by the court *or* if made pursuant to a qualified protective order."  Jacobs v.

Connecticut Community College, 258 F.R.D. 192, 197 (D. Conn. 2009); see also 45 C.F.R. §

164.512(e)(1); National Abortion Federation v. Ashcroft, No. 03 CV 8695, 2004 WL 555701, at

*6 (S.D.N.Y. 2004) (holding that "[t]he privacy provisions promulgated under HIPAA . . . permit

disclosure of health information without patient consent pursuant to a qualified protective

order").  The Jacobs court concluded that "discovery requests issued to non-parties properly seek

protected health information as long as the requests are made under a protective order that

prohibits the use of the protected information outside the litigation process and requires the

return or destruction of the records, including all copies made, at the conclusion of the

litigation." Jacobs v. Connecticut Community College, 258 F.R.D. at 197 (internal quotation

omitted).

The health records in Bates range 2362-3026 relate to victims of a robbery allegedly

committed by Witness 2 on October 20, 1994.  While plaintiff seems willing to receive

documents pursuant to a protective order, the Court has reviewed the medical records at issue

and finds they have no relevance to plaintiff's case or the issues for which plaintiff is seeking

discovery.  Like the grand jury materials, the medical records within the Bates range at issue

concern victims of an unrelated crime alleged to have been committed at a different time.

Although the underlying crime allegedly involved another suspect in plaintiff's case, there is no

conceivable reason why plaintiff would need the treatment records, x-rays, or details about

medical conditions of victims in a wholly unrelated matter.  Accordingly, plaintiff's motion to

compel production of any medical records in Bates range 2362-3026 is denied.

c. Sealed Criminal Case Documents

Plaintiff seeks production of sealed records within the Bates ranges 2362-3026, 4661-

4716, 6147, 6260-62, 6265-6316, which the QDA describes as concerning criminal cases against

people related to the instant case.  (ECF No. 52 at 3).  According to the QDA, Bates ranges 2362-3026 and 4661-4761 relate to two criminal cases against a person connected to this matter, both of which ended in acquittal; Bates No. 6147 contains information on a sealed case of another individual connected to this matter; Bates range 6260-61 is about an unrelated robbery committed by a witness connected to this matter; and Bates range 6265-6316 is related to a witness connected to this matter who was prosecuted for an "alleged crime."  (Id.)

Having conducted its *in camera* review, the Court finds that these documents primarily relate to the individual the Court is referring to as Witness 2.  Specifically, the documents concern two robberies allegedly committed by Witness 2 – one on August 1, 1994, a few days before the Sunada murder, and the other on October 20, 1994.

Among the records contained in Bates range 2362-3206, there are copies of the criminal court complaint and indictment for the October robbery, interview reports, orders of protection, grand jury records, witness lists, attorney notes on evidence, victims' medical records, lineup photos and mug shots, copies of case law and court decisions, motion practice, pre-trial hearing transcripts, and numerous duplicates.[8]  (Pl. Ex. 1 at 4).  The Bates range 2362-3026 also contains rap sheets, the production of which is addressed supra.

Other than two documents mentioned below, there are no references to plaintiff in these documents.  However, as discussed, Witness 2 was interrogated by the investigators in plaintiff's criminal case, and, ultimately, Witness 2 incriminated plaintiff and plaintiff's co-defendant, Reginal Cameron.  (Compl. ¶¶ 81-82).  Based on its *in camera* review, the Court Orders the

---

[8] There are numerous duplicates throughout the withheld documents.  The Court does not Order duplicates produced, unless the documents themselves contain notes or comments that render them different from the copies the Court explicitly Orders produced.

copies of the complaint and January 1995 indictment in Witness 2's October robbery case to be produced (Bates Nos. 2403-06). The Court also Orders the documents in Bates Nos. 2379-84 produced, which relate to the October robbery and which identify Witness 2 as a "witness for the prosecution" in an ongoing homicide case as of December 1, 1994. The Court also Orders produced Bates Nos. 2939-42, which contain the case chronology of the October 1994 robbery and indicate Witness 2's acquittal of that robbery in February 1996. To the extent the names of any victims appear in these documents, the Court Orders them to be redacted.

Bates No. 2964 is an order unsealing the 1993 indictment of Witness 2 for robbery, which led to the probationary period Witness 2 was serving at the time of the Sunada murder. This unsealing order was issued in connection with plaintiff's criminal case. Bates No. 2965 is a page from an order in the same case. Also within the Bates range withheld by the QDA are Bates No. 2961, a page from the CIU's findings and recommendation of vacatur of plaintiff's conviction, and Bates No. 2962, which appears to be a page of notes regarding the creation of that report. As these documents are explicitly related to plaintiff's own criminal case, the Court Orders them to be produced.

Bates Nos. 2362-67 consist of photographs from a lineup conducted in connection with the October 1994 robbery. Bates Nos. 2674 and 2677 are documents that appear to correspond to that lineup, indicating that one of the victims identified Witness 2, and the other did not. For the same reasons as the other identified documents related to this robbery, the Court finds these documents relevant to plaintiff's Brady claims. The Court Orders Bates Nos. 2362-67, 2674, and 2677 produced, subject to a protective order to protect the identities of any other individuals depicted in the lineup other than Witness 2, and with the names of any victim, complainant, or lineup viewer redacted.

28

Within Bates range 2362-3026 there are also several documents relating to the 1993 criminal case against Witness 2 and Cameron.  That case involved the armed robbery, allegedly committed in the same building as the Sunada murder (Compl. ¶ 127), for which Witness 2 was on probation at the time of the Sunada murder.  Bates No. 2681 contains arrest information for both Witness 2 and Cameron, retrieved in October 1994.  Bates Nos. 2970 and 3009-12 are other documents and reports from the 1993 case.  The Court finds these documents relevant given that they indicate criminal activity between plaintiff's co-defendant, Cameron, and Witness 2, who was, according to plaintiff, an alternate suspect in the Sunada murder.  The Court Orders Bates Nos. 2681, 2970, and 3009-12 to be produced.

As mentioned above (see supra, n. 5), the withheld documents include Bates No. 4564, which is one page of a court proceeding transcript in which Cameron is introduced and states his age and address.  The Court does not find that this document states any information relevant to plaintiff's claims, certainly not relevant enough to justify unsealing this transcript.  The Court denies plaintiff's motion to compel as to this document.

The remaining documents in the Bates range 2362-3026 are files in Witness 2's case that are not relevant to plaintiff's criminal case.  These include arrest worksheets, notices, family information, and case law, as well as medical records and grand jury material already addressed above.

Upon review, Bates Nos. 4661-4716 do not appear directly connected to any of the defendants in the instant case or the witnesses against plaintiff in plaintiff's criminal case.  These barely legible documents appear to relate to a crime allegedly perpetrated by a John Doe, who was arrested for armed robbery on August 8, 1994, the same day plaintiff was arrested.  However, the QDA states in its privilege log that this Bates range contains records about "one

person related to this matter." (Pl. Ex. 1 at 5). The Court thus finds these documents relevant and Orders them produced, but with identifying information, including the identity of the complainant and any names attributed to the John Doe, redacted. The Court's *in camera* inspection revealed that there are no rap sheets in the Bates range 4661-4716.

Bates No. 6147 is a handwritten note relating to the case against Witness 2, which does not appear to have any bearing on the instant case. The Court denies plaintiff's motion to compel as to this document.

Bates Nos. 6260-61 and 6265-6316 are records relating to the August 1, 1994, robbery allegedly committed by Witness 2. Bates No. 6260 is a report about a photo array, conducted on August 8, 1994 in regards to that robbery, with the complainant's name and contact information redacted. Bates No. 6261 is a report about a physical lineup, conducted on August 9, 1994 in regards to the same robbery, with the same complainant's name and contact information redacted. The lineup and photo array both took place in the same timeframe as the alleged coercive interrogation of Witness 2. Plaintiff claims that the complainant's identifications of Witness 2, who appeared in the photo array and lineup, were known to defendants but never disclosed to plaintiff, constituting Brady evidence. (Compl. ¶¶ 76, 175). Both reports are duplicated several times, bearing varying degrees of redaction. To protect the privacy of the complainant, the Court Orders only these redacted versions (Bates Nos. 6260 and 6261) produced, subject to a protective order.

The Court now turns to Bates range 6265-6316. Bates Nos. 6301 and 6302 are photographs of an individual, presumably a person of interest for law enforcement purposes, taken on August 10, 1994. It is not stated who the individual is, but given the date of the photographs, plaintiff's assertion that the identifications of Witness 2 were never disclosed to

plaintiff, and the location of these documents within a file about Witness 2, these photographs may well go to plaintiff's <u>Brady</u> claim and are thus Ordered produced, subject to a protective order.

Bates No. 6307 is a record of Witness 2's sentencing to time served and probation in April 1994, for two counts of robbery. The Court finds this record relevant to plaintiff's claim that Witness 2 may have been coerced into incriminating plaintiff. (Compl. ¶¶ 81-83). This document is Ordered to be produced.

Also included in these documents, which are chiefly about Witness 2, are Bates Nos. 6299 and 6300, which are arrest records of the Witness who gave the defendant police officers the initial tip incriminating plaintiff on August 8, 1994. (Compl ¶ 120). For the same reasons that the Court is Ordering production of that Witness's rap sheet, the Court Orders these documents produced, but with the Witness's address redacted.

The remainder of Bates range 6265-6316 consists of duplicates, as well as documents the Court does not deem sufficiently relevant to plaintiff's claim to warrant production. Plaintiff's request for production is denied as to the remaining documents in this range.

E. <u>Attorney Work Product</u>

The QDA has withheld from production Bates Nos. 66, 283-445, 446-456, 457, 462-503, and 2362-3026 on grounds of the attorney work product doctrine. (ECF No. 52 at 6). These documents, largely consisting of handwritten notes, relate to plaintiff's own criminal case, as well as the two unrelated criminal cases against Witness 2. The QDA asserts that even though it is not a party to this civil litigation, it may invoke work product protection under Rule 26(b)(3). (<u>Id.</u> at 6). In response, plaintiff argues that the prosecutor's criminal file is not protected by the

31

work product doctrine when subpoenaed for use in a subsequent civil proceeding because the prosecutor is not a party to the civil action.  (ECF No. 53 at 2 (citing Gonzalez v. City of N.Y., No. 08 CV 2699, 2009 WL 2253118, *2 (E.D.N.Y. July 28, 2009))).  Moreover, plaintiff argues that the concerns underlying the Hickman doctrine are not implicated here because the documents at issue are related to a separate litigation and were generated well after the plaintiff's conviction.  (ECF No. 53 at 2 (citing Gonzalez v. City of N.Y., 2009 WL 2253118, at *4)).

The work product protection doctrine shields from discovery certain documents prepared "because of the prospect of litigation," creating a "zone of privacy" that allows an attorney to prepare for litigation "free from unnecessary intrusion by his adversaries."  United States v. Adlman, 134 F.3d 1194, 1196, 1202 (2d Cir. 1998) (citing Hickman v. Taylor, 329 U.S. 495, 510-11 (1947)).  Although the QDA is not a party to these proceedings, courts have extended this protection to non-parties where the non-party "has interests that are likely to be affected in the litigation."  Bellamy v. City of New York, No. 12 CV 1025, 2015 WL 13855637, at *1 (E.D.N.Y. May 22, 2015) (finding that "the conduct of the [QDA] form[ed] the basis of some of the claims for which the plaintiff [sought] to hold the City of New York liable, and in that sense that office has the same interest as if they were a party").  Accordingly, the QDA is entitled to invoke the work product exception to the extent that it is necessary to achieve the underlying purposes of the doctrine.  See Jean v. City of New York, No. 09 CV 801, 2010 WL 148420, at *2 (S.D.N.Y. Jan. 12, 2010); Gonzalez v. City of New York, 2009 WL 2253118, at *3.

Courts have recognized three specific purposes for the work product doctrine:  "(1) protecting an attorney's ability to formulate legal theories and prepare cases; (2) preventing opposing counsel from 'free-loading' off an attorney's work; and (3) preventing interference with ongoing litigation."  Bellamy v. City of New York, 2015 WL 13855637, at *1 (citing Abdell v.

City of New York, No. 05 CV 8453, 2006 WL 2664313, at *4 (S.D.N.Y. Sept. 14, 2006)); see also Hickman v. Taylor, 329 U.S. at 510-11; Gonzalez v. City of New York, 2009 WL 2253118, at *3. In cases such as this – where a plaintiff was wrongly incarcerated for murder – "[a]t a minimum the third purpose above remains alive because there is no statute of limitations on murder . . . and a prosecution of the participants in the murder . . . may yet be commenced if further information comes to light." Bellamy v. City of New York, 2015 WL 13855637, at *1. The QDA may, therefore, assert work product protection for any documents prepared in anticipation of litigation.

However, the work product protection is not absolute, and "disclosure of work product may be ordered if the party seeking it can demonstrate substantial need for the information and an inability to obtain the information, or a substantial equivalent of it, by other means without undue hardship." Jean v. City of New York, 2010 WL 148420, at *2; see also Bellamy v. City of New York, 2015 WL 13855637, at *1. Even if plaintiff can make a showing of substantial need, however, so-called "core" work product – i.e., an attorney's opinions, mental impressions, conclusions, and legal theories – is given uniquely strong protection. Indeed, "at a minimum such material is to be protected unless a highly persuasive showing [of need] is made." In re Grand Jury Proceedings, 219 F.3d 175, 190-91 (2d Cir. 2000) (quoting United States v. Adlman, 134 F.3d 1194, 1204 (2d Cir. 1998)). Given that "core" work product is protected to a greater degree than ordinary work product, protection can be granted for the former even when denied for the latter. Jean v. City of New York, 2010 WL 148420, at *2.

Apart from arguing the inapplicability of the work product doctrine to the documents in the QDA's files, plaintiff also contends that he has a "substantial need for it." (ECF No. 53 at 2 (citing Fed. R. Civ. P. 26(b)(3)(A)(ii); Strauss v. Credit Lyonnais, S.A., 242 F.R.D. 199, 237

(E.D.N.Y. 2007))).  Plaintiff argues that the events at issue in this case date back over 30 years, during which time the witnesses "are almost certain to have memory lapses or failures."  (ECF No. 53 at 3 (citing Estevez v. Matos, 125 F.R.D. 28, 32 (S.D.N.Y. 1989) (holding that a witness's "present lack of recollection makes it impossible . . . to obtain the substantial equivalent of her contemporary version of material facts by other means"))).  Furthermore, plaintiff notes that the lead detectives in plaintiff's case – Gonzalez and Herbert – were not cooperative with the QDA at the time of the reinvestigation into plaintiff's criminal conviction and are not likely to be any more cooperative in this civil case; thus, statements and evidence provided to prosecutors in the 1990s become "even more vital."  (ECF No. 53 at 3).

Plaintiff argues that his legal claims focus on whether the QDA relied on false evidence, and the extent to which the prosecution was aware of undisclosed Brady material.  (Id.)  For this reason, plaintiff seeks evidence of the mental impressions of the ADAs – "what they knew when, and whether they were misled or pressured by the individual defendants, and how any police misrepresentations impacted the ADA's decision to prosecute (and exonerate) plaintiff – are squarely at issue."  (Id. at 4).  In other words, plaintiff seeks core opinion work product and argues that the notes and other documents withheld as work product "may reveal hidden leads and avenues for civil discovery . . . and should be disclosed."  (Id. at 3, 5).

The Court now turns to the specific items for which the QDA claims work product protection.  Bates No. 66 is described in the privilege log as "Draft memo seeking opportunity to meet and interview an unidentified inmate regarding case and contains information on an inmate connected to an unrelated homicide case."  (Pl. Ex. 1 at 1).  Apart from providing the identity of the inmate interviewed and the name of the subject of the unrelated investigation, there is no further information contained within this document.  There is no indication of whether this

interview was ever conducted or why the draft request, prepared years after the plaintiff's case was closed, was even in this particular case file.  In the absence of further information, it is unknown if the individual to be interviewed was a cooperating witness whose identity should be protected from disclosure.  There is also no evidence that this interview was related to plaintiff at all.  For this reason, the Court denies the request for production as to both the identity of the inmate and the name of the subject of the unrelated investigation.

Bates Nos. 283-445 and 462-503 are the notes of the trial prosecutor and another ADA regarding the evidence in the Sunada case.  (Pl. Ex. 1 at 2).  These documents include potential witness lists, handwritten drafts for pretrial motions, memoranda of law, and copies of printed case law, as well as notes relating to defendant Gonzalez and other witnesses.  Having reviewed the requested documents *in camera*, the Court finds that they are clearly relevant to plaintiff's claims and show, to some extent, what the trial prosecutor knew and considered in pursuing the charges against plaintiff.  Plaintiff has no other way of obtaining information about what the prosecution knew about any coercive measures used in the 1994 investigation.  Thus, to the extent that any work product protection would apply, plaintiff has shown a substantial need for this material, sufficient to overcome that protection.  The QDA is Ordered to produce Bates Nos. 283-445.

Bates Nos 462-503 are also prosecutorial notes regarding evidence in the Sunada case. (Id.)  This Bates range contains a prosecutor's notes pertaining to defendants Gonzalez (Bates Nos. 462-67, 497, 502-03), Dempsey (Bates Nos. 470-71, 500, 502-03), Wray (Bates Nos. 472-76, 498-99), Croce (Bates Nos. 477-80, 500, 502-03), Arroyo (468-69, 481-83, 500, 502-03), and Herbert (Bates Nos. 484-97, 500).  This range also contains an evidence list from December 1994 (Bates No. 501).  For the same reasons that Bates Nos. 283-445 are Ordered produced, the

Court Orders all of these documents produced, finding that plaintiff's need for this information outweighs the need for work product protection.

Bates Nos. 446-456 also pertain to the Sunada case and consist of a prosecutor's notes in selecting the jury. Having reviewed these notes, the Court finds they have no relevance to the claims pending in this matter and denies plaintiff's request for production as to these documents.

Bates No. 457 is described by the QDA as handwritten notes by a trial ADA containing investigative steps. (ECF No. 52 at 7). Although the QDA argues that these notes by an ADA about how to prosecute his own case are "of no moment" (Id.), the notes relate to the Witness who tipped defendants off as to plaintiff while under interrogation, and are thus relevant to plaintiff's claims. Again, due to the dearth of other information about what prosecutors knew about defendants' conduct at the time, plaintiff has a substantial need to examine this document, which outweighs the asserted work product protection. The Court Orders Bates No. 457 produced.

Finally, the QDA argues that the documents within Bates range 2362-3026 "include attorney work product." (Id. at 5). Upon review, the Court finds that any relevant documents within this range have been dealt with in the above categories and are not precluded by work product protection. In other words, there are no documents the Court deems should be produced, that the Court has not already addressed above. The majority of the documents within this range are precluded by other reasons, such as their tenuous relevance, or their containing victim medical information or grand jury information. Certain documents, which indeed contain attorney work product, relate to details of the October 1994 robbery that Witness 2 allegedly perpetrated (Bates Nos. 2437-46, 2532-36, 2542, 2568-74, 2576-82, 2582-89, and many

duplicates), but the Court finds those details to be beyond the scope of relevance to plaintiff's claims about ignored leads, <u>Brady</u> material, or coerced confessions.

### F.    Privacy and Relevance

Plaintiff requests production of a document, which the QDA withheld on grounds of privacy, that reflects MapQuest driving directions generated in 2005 to an unknown residence (Bates Nos. 78-80).  (<u>See</u> ECF No. 52 at 5).  To the extent plaintiff is seeking this information to prove what the investigators learned and whether they ignored leads, the QDA argues that this 2005 document is irrelevant to the initial investigation, that it is unknown whose address is shown, and that disclosure would violate the privacy of the individuals living there.  (<u>Id.</u>)  The Court agrees with the QDA's reasons for withholding these directions, given that it is unclear whose address is listed, and even if it belongs to a witness, it would be improper to disclose it without first obtaining that individual's authorization.  Plaintiff's request for production of the MapQuest driving directions is denied.

<u>CONCLUSION</u>

In conclusion, the Court grants plaintiff's request for an Order compelling the QDA to produce Bates Nos. 67-73, 283-445, 457, 462-503, 2362-67, 2371-73, 2379-84, 2403-06, 2644-46, 2674, 2677, 2681, 2939-42, 2961-62, 2964-65, 2967, 2970-71, 3009-12, 4519-64, 4661-4716, 6260-61, 6299-6302, and 6307.  Plaintiff's request for production of the remaining items listed in the privilege log is denied.  Duplicates of documents are not ordered produced, unless the documents themselves contain notes or comments that render them different from the copies the Court explicitly Orders produced.

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
September 23, 2025

_/s/ Cheryl L. Pollak_
Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York