UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

ARMOND MCCLOUD, JR.,         .    Docket No.
                             .    1:23-CV-08341-NRM-PCG
        Plaintiff,           .
                             .
            v.               .    Brooklyn, New York
                             .    Wednesday, April 22, 2026
CITY OF NEW YORK, ET         .
AL,                          .
                             .
        Defendants.          .
  . . . . . . . . . . . . . . . .

TRANSCRIPT OF TELEPHONE CONFERENCE
BEFORE THE HONORABLE PEGGY CROSS-GOLDENBERG
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          Elefterakis, Elefterakis & Panek
                            GABRIEL PAUL HARVIS, ESQ.
                            80 Pine Street
                            38th Floor
                            New York, New York  10005
                            212-532-1116

For the Defendants:         NYC Law Department
                            JOANNE M. MCLAREN, ESQ.
                            100 Church Street
                            New York, New York  10007
                            212-356-2671


Transcription Service:      Superior Reporting Services LLC
                            P.O. Box 11
                            Winfield, PA 17889
                            865-344-3150


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

P R O C E E D I N G S

THE CLERK:  Civil cause for telephone conference, docket number 23-cv-8341, McCloud, Jr., versus the City of New York et al.

Before I ask the parties to state their appearance for the record, the parties are asked to state their name each time they speak.  Speak one at a time and stay muted when they are not speaking.  The parties can utilize star six to mute and unmute as needed.

Now, will the parties please state their appearance for the record, starting with the Plaintiff.

MR. HARVIS:  Good morning, Your Honor.  This is Gabriel Harvis of Elefterakis, Elefterakis & Panek, appearing on behalf of Mr. McCloud.

THE COURT:  Good morning, Mr. Harvis.

MS. MCLAREN:  Good morning, Your Honor.  Good morning, Mr. Harvis.  This is Joanne M. McLaren from the office of the Corporation Counsel of the City of New York, representing the Defendants in this action.

THE COURT:  Good morning, Ms. McLaren.

Thank you both for joining us.

We have, I think, a number of discovery-related matters to discuss today.  I have your most recent status reports.  The most recent joint letter that you have submitted.

So I guess what I would like to do is start with Mr. Harvis and just get any sort of update or overview of where things stand from your perspective.

And then I'll hear from you, Ms. McLaren.

And then we'll take the outstanding issues one by one, and hopefully we can resolve most of them while we're on the phone today.

So, Mr. Harvis?

MR. HARVIS:  Thank you, Your Honor.  Thank you so much.  Gabriel Harvis.  Thank you.

So yeah.  Just as a basic overview, I know this has appeared in some court submissions, so I apologize for being duplicative at all.

But basically, we had a very slow going of this case for the first 18 months.  This was largely prior to Ms. McLaren's appearance in the case.  Her predecessor counsel, Ms. Holohan, had a series of unfortunate and really tragic life events befall her.  And so as a result of that, we kind of never got the case off the ground.

And then when Ms. McLaren stepped in, there were some, you know, several sort of disputes related to what we would consider preliminary discovery in a case like this that really hadn't come to a head.  Largely because we had been, I don't want to say thwarted, but it had been difficult for us to finalize the conferral process in order to get the

disputes before Judge Pollak.

So that process was not as smooth as we would have preferred. And as a result, you know, we finally got the matters before Judge Pollak in the form of a -- it was a, you know, a motion to compel that resulted in an order on December 29th. We view that order as unambiguously rejecting much of the discovery response, you know, language that the Defendants had put in their responses. You know, much of it was expressly overruled.

In particular, we view Judge Pollak as having ordered on page 9 that Defendants provide the requested disciplinary, you know, and personnel records, which were -- we made a comprehensive request as we normally do. And we based that on our, you know, the practices in the Eastern District and many other cases that we've been involved in. And also the gravity of this case, which is, you know, involves someone who has spent more than 29 years, almost 29 years, in prison. And suffered some of the most egregious and severe sort of, you know, tragic stuff that can happen to someone when they're in prison, and they're vulnerable.

And so we view this case as having a particularly compelling basis for discovery, even more so than a regular civil rights case.

So anyway, we were appreciative of Judge Pollak's order on December 29th. And then since then, we've been kind

of working to try to gain compliance with that and try to tie everything up on a document, on the document side, so that we can figure out whether we need to call back any of the witnesses.  Because we have deposed the nine living defendants.

But we did so, you know, notably without the squad blotter, which was maintained at the 110th Precinct and was intended -- you know, it's sort of, like, a command log for the detective squad.

So the idea is that in a case like this, where there is an eight-hour period where no notes were taken, and all of these interrogations took place, and all of these statements were obtained.  You know, some of the defenses that we're already seeing have to do with the timing.

For example, Detective Gonzalez claims that he wasn't even in the precinct for certain early parts of the interaction, and therefore, like, he couldn't have coerced people.

And, you know, the problem is that we're missing the most vital document that would be necessary for us to sort of pressure test and determine for sure what the exact timing was of the evening.  So we view the, you know, the squad blotter as being particularly vital and missing.

And then also the disciplinary files for the officers.  You know, we, again, page 9 of Judge Pollak's

order on December 29th, we believe clearly overruled the objections and required those to be produced.  We still don't have any of those files.

So really, it's the files in the blotter are the key actual documents that we're, you know, obsessing over and trying to obtain.  And then that kind of brings us to the related issue of the searches.

You know, we cited a case, I think, from the District of Connecticut, which holds that, you know, in order for us to be able to evaluate and for the Court to evaluate the sufficiency of the search, there has to be information about, you know, who searched, the nature of it, the length of it, where it was done, just basic facts.

And we haven't gotten anything in that connection. All we've gotten is conclusory statements from NYPD Counsel that certain documents just simply couldn't be located, you know, flat out.

And then in terms of the individual defendants, Judge Pollak was very clear that each of them had to go back and, you know, take a look and see whether they have any documents related to this case.

And what we received in response were these sort of generic verifications that just say that they have reviewed the discovery responses.  And so we don't view those as having been compliant with the December 29th order.  And so

you know, we also want those.

And then, you know, sort of underlying all of that is the fact that the discovery responses that were at issue in the December 29th order, you know, were basically boilerplate, cut-and-paste responses, not providing any information, not providing any substantive response in most cases. And yes, we did get the order from Judge Pollak, and theoretically, that would, you know, overcome some of the issues in terms of the sufficiency of the responses, but we've never been provided with corrected responses that actually provide the information we were seeking.

So that's a lot of what's going on in terms of that first set of demands and responses and the December 29th order. And then, if I may continue just briefly, I'll just include the more recent developments, and that's, we did file a joint letter at docket 78. And that had to do with just, again, us attempting to --

The issue of the disciplinary files was not really fully ripened before Judge Pollak, because while we had made the request in our demands, we hadn't had the depositions yet. We weren't able to say specifically which files were being withheld. So that issue ripened, and we then, pursuant to the Court's rules, filed a joint letter addressing that, the issue of the underlying disciplinary files, the issue of Gonzalez, who is the key detective here, because he is the

person whose misconduct was principally underlied the Queens DA's office's decision to exonerate, along with some other factors.

And so you know, what we learned, and this is redacted in docket 78, so I'll just tell the Court now, that what we learned in the course of the run-up to and the taking of Gonzalez's deposition, is that he had been repeatedly criticized by his supervisors for not being able to write reports correctly, not being able to exercise good investigatory judgment.

And so that's so important, because one of the main errors that he made in this case is that -- and this is an area of dispute, so I'm not characterizing this as Defendant's position.  But from Plaintiff's position, and I think from the Queens DA's position, Gonzalez wrote down in several key documents that the body was found and that the crime happened in the hallway.

And in reality, you know, the Queens DA's investigation proved scientifically, you know, based on expert testimony beyond what the Queens DA viewed as a shadow of a doubt, that the crime completely took place in the stairwell.  And so that allowed the DA to conclude that the confessions, you know, largely authored by Gonzalez and some of the other defendants, that they put the crime as happening in the hallway, based upon their misunderstanding of the

facts, and that's a quintessential clue that a confession may be false, when you have a so-called false said fact like that.

And so we view that evidence establishing that Gonzalez, prior to his assignment to the Central Park Five case, prior to his assignment to the Utah Tourist Johnny Hincapie, you know, Watkins case. And certainly prior to his assignment to this case in 1994, the City was already on written notice from multiple supervisory officers that Gonzalez had an issue.

He testified that he never got any supplemental training on report writing; that he was never counseled on it; that, you know, no steps were taken by the City, according to him, to take any action in response to these repeated criticisms.

So we view that as being -- you know, in terms of failure to train, failure to supervise, Monell, like that is, in our view, sort of a whole new dimension to this case that was opened up on the basis of Gonzalez's deposition testimony.

And so following up on that, because he was a correction officer before he was a police officer, we made a request for his records, employment records, from the Department of Correction, where officers are also required to write reports. And it would certainly be highly relevant if

there had been even earlier notice to the City that he had deficiencies in his report writing.  So that was the other category at issue in our motion.

And then the third category, which has been resolved to some extent, is the scope of the inspections that we should be permitted to conduct here.  We served a notice of inspection for the 110th Precinct, which is where all these interrogations took place at the initial conference back in February of 2024.  You know, and again, there has been -- there was that whole latency period.

And then finally, we started discussing it, and pretty soon it became clear that it was going to be difficult for us to agree on exactly what should be inspected.  Part of that issue is that the record is somewhat unclear, because all we have is this trial testimony from 30 years ago about which rooms people were in.  And we're comparing it to the modern-day blueprints and trying to figure out which room is which.

And we're not trying to go into any rooms that are not relevant.  We just don't want to miss a room and then, you know, take photographs and then find out later that it was the wrong room or we didn't get the right room or something like that.

So that has been sort of resolved, because the Defendants have told us now more recently that there is

no -- no records are stored at the 110th Precinct, because part of our notice had said we want to inspect where the interrogations happened, and then also where the records are stored.

And this is highly relevant because there is this open issue of the squad blotter. And so they recently told us that the squad blotter and all other records, you know, going back to that era, are not stored at the precinct. We immediately asked them where they are stored, but they haven't told us yet.

And so we kind of view that issue as dovetailing with the deficiencies in the search affidavits, because we can't possibly take further steps to find out where these missing documents are if nobody's telling us where they're stored or what places have been looked for them.

And I would just draw Your Honor's attention to the Martinez case, which we litigated before Judge Pollak and Judge Morrison, actually, you know, several years ago, where there was a very similar issue.

You know, we were going around and around with Defense Counsel. They were telling us that they had searched for things, but that they couldn't be located in a very perfunctory way. And then when the Court finally got involved and peeled back a little bit of the layers, it turns out all these documents did exist. They were then produced

late.

It was another situation where we had to reopen all the depositions and do a whole, you know, song and dance. And so we're just trying to stay ahead of that, avoid it, and just try to, you know, get the discovery we need to move on to hopefully the expert phase of this case sooner rather than later. And with that, I think I've said it all.

THE COURT: Okay. What was your other case with Judge Morrison and Judge Pollak that you mentioned?

MR. HARVIS: It's called Rosie Martinez. The docket number is 16-cv-79.

THE COURT: Okay. I have some follow-up questions, but I think it might make sense if we hear from the City, and then hit them sort of as we go through each issue.

But thank you for that overview. I appreciate that, Mr. Harvis.

Ms. McLaren, let me hear from you, and then we can go step by step.

MS. MCLAREN: Thank you, Your Honor. Yes. This is Joanne McLaren.

That was a lot that was covered. I will try and respond to everything, although as Your Honor said, we're going step by step.

THE COURT: Yeah. Don't feel the need to respond to everything. If you want to give me an overview from your

perspective, and then we can go through each, you know, each piece, piece by piece.  I mean, I think there are a couple sort of big categories, but you tell me what you think I should know, and then we'll go from there.

MS. MCLAREN:  Understood.  First of all, just as an overview, you know, I do not want Detective Carlos Gonzalez unfairly disparaged.

He was one of 50 officers involved in the Central Park Five.  The People arrested in that case all gave confessions, and notably, they were all in the presence of a parent or guardian.

Gonzalez was one of the detectives on the Hincapie case.  He was in the room for a minute or two when the transit detective took the statement.

Here, two people gave statements.  Reggie Cameron (ph) and Kendall McDonald (ph), before Detective Gonzalez came to the precinct, at which time Armond McCloud gave a statement.  That statement was then repeated.  He was questioned about that statement by an ADA, whose deposition has been noticed in this case.

With reference to Carlos Gonzalez's report writing, you know, in any annual review, there's always going to be places where somebody will say, oh, you can do better. There's never been any, any indication of dishonesty with Carlos Gonzalez.  There is a few references that, you know,

he needs to improve his administrative skills.  I'm not even sure what that means.

But with respect to the false said fact in the hallway versus stairwell, there is some reports made by Carlos Gonzalez, where it refers to the crime in the stairwell, some in the hallway.

We're talking about, you know, the body was right at the threshold, right, of the -- what we would now call the hallway where doors, apartment doors, lead off.  And then we would have this sort of fire door into the stairwell proper.  That's where the body was.

So we're arguing over semantics.  Nobody is saying that Carlos Gonzalez was mistaken about where the body lay.  And he told people to write a completely inaccurate location where the body was, and then that this could be somehow used to suggest that he procured a false confession.

We're all talking about the same thing.  Carlos Gonzalez saw the blood.  He saw the bullet hole in the wall.  He knew where the body was, right.  And the confessions reflect where the body -- I mean, he was alive at the time --

THE COURT:  Ms. McLaren, I'm sorry.  Ms. McLaren, I do just want to --

MS. MCLAREN:  Okay.  I'm sorry.

THE COURT:  It sounds to me like you are defending this conviction, and I just want to make sure we're all at

the same starting point that the Queens District Attorney's Office, conviction integrity unit, made a determination that Mr. McCloud's confession was false and had been coerced by Gonzalez, who had been involved in coercing other confessions, right?

MS. MCLAREN:  That's what the DA's office -- the person at the DA's office, that was their conclusion.

I am just responding to the administrative and the issues with Gonzalez's -- you know, the report writing.  I was putting that into context.

THE COURT:  Okay.  But like you said, he knew where the body was, and it sounds like where he said the body was is not where the body was.  So whatever he knew might be different than what he wrote and might be different than the false confession contents, right?

MS. MCLAREN:  I'm sorry.  I just want to make clear that the hallway and the stairwell that, you know, everybody -- the location, they're right beside each other.

THE COURT:  Okay.

MS. MCLAREN:  We're talking about a door.

THE COURT:  Okay.

MS. MCLAREN:  Okay.  So with respect to personnel files about Gonzalez and the co-defendants, we have produced them in their entirety.  The disciplinary records we produced all --

THE COURT:  Just so I make sure that we're on the same page and being precise.  So personnel files for all defendants, you have produced all of them?

MS. MCLAREN:  Except, I believe, there were two that were destroyed in Hurricane Sandy, or they can't find as a result of flood damage from Hurricane Sandy.

THE COURT:  Okay, and which two are those?

MS. MCLAREN:  Bove.  And, I believe, Wray.

THE COURT:  Sorry.  Say that again.

MS. MCLAREN:  Bove, B-O-V-E, and I believe, Wray.  But we produced those files in their entirety.  There are no more personnel files.

THE COURT:  Now, when you say personnel files, does that include disciplinary records?

MS. MCLAREN:  No.

THE COURT:  Okay, so what is the status of disciplinary records?

MS. MCLAREN:  Right.  So in the order and in multiple occasions, Judge Pollak is referring to producing the summaries, and that my predecessor had said that she would produce summaries, which is how we generally start the CPIs (ph).  The resumes.

And Judge Pollak asked us to confirm whether we produced them.  I reproduced.  I just did that production, the disciplinary production, again from scratch, right,

because I'm not sure what my predecessor had done or what the thought process was.  Better safe than sorry.  I'm just going to redo the entire thing.

THE COURT:  Okay.  So first of all, let me say I appreciate that.  And you undertaking to make sure that you are reproducing everything.

What are you talking about?  Their disciplinary records?

MS. MCLAREN:  Yes.  Yes.

THE COURT:  You said summaries, so --

MS. MCLAREN:  So I produced the CPI, the CCRB, the indices, right.  They tell you what the basis.  The summary.

So instead of only -- instead of redacting, which we would usually do, cases that are older than 10 years prior to the incident at issue, or redacting issues that do not go to honesty or similar allegations to that in the complaint. I redacted none of that.  I produced them in their entirety.

And then Mr. Harvis could go through and determine if there were any files mentioned there that he wanted us to locate.

THE COURT:  Okay.  So just again, when you say produce in their entirety, you don't mean you produce the file in its entirety?  You mean you produced the index.

MS. MCLAREN:  No (indiscernible) no.  The indices. Yes.

THE COURT:  Right.  So not the actual contents of the file, but the index, which references what complaint numbers, complaint file names?

MS. MCLAREN:  Yes.  And a brief summary.

THE COURT:  Okay.  And then you are saying that puts the ball in Mr. Harvis' court to ask for further information on particular summaries?

MS. MCLAREN:  Yes.

THE COURT:  Okay.  And has he requested that?

MS. MCLAREN:  Yes.

THE COURT:  Okay.

MS. MCLAREN:  He's requested certain ones that were questioned about in depositions or from the records.  As soon as those specific requests were made, I asked the police department.

The records are very old.  They're not electronically filed.  I follow up with these requests frequently.

But as of right now, none of them have come back from the police department.

THE COURT:  And does that mean you don't have an answer yet, or you have an answer that says we can't find them, or we're still looking, or what?

MS. MCLAREN:  No.  They're still looking.  No. They've not said that they can't find them.

THE COURT:  Okay.

MS. MCLAREN:  I'm hopeful that he will.  It's a labor-intensive endeavor.

THE COURT:  Okay.

MS. MCLAREN:  And no.  I have definitely not had --

THE COURT:  Okay.

MS. MCLAREN:  -- that they're not coming.

THE COURT:  Okay.

MS. MCLAREN:  I can't say that they are, but I am assuming that they are.

THE COURT:  Okay.  Okay.  So that's disciplinary records.

MS. MCLAREN:  Yeah.  The squad blotter, again, it's a function of the passage of time.  They don't keep documents forever.  The squad blotter, which is essentially the, I believe, the command log for the detective squad.  We have requested that when it became apparent in depositions that there was this other log.  And the police department has searched the precinct, their off-site storage, and has been unable to find any such thing for this time period.

We produced the command log and all the pages from the command log, but not from the squad.

THE COURT:  So where did they find the command log?

MS. MCLAREN:  I believe that that was in off-site storage.

Superior Reporting Services LLC
P.O. Box 11 Winfield, PA, 17889
transcripts@superiorreporter.com

THE COURT:  And they searched the same location for the squad blotter and couldn't find it?

MS. MCLAREN:  Yes.  They have searched extensively and couldn't find it.

THE COURT:  And have you produced something that, you know, that delineates where people look for the squad blotter, where they were unable to find it?

MS. MCLAREN:  No.  The police department has put in, I believe, an extraordinary amount of time on this, as have I.  They did a declaration, and they prepared that consistent with the order.

You know, Judge Pollak, I think, envisioned that certain documents would not be found.  And she asked us to put in a declaration what could and could not.

And so we were maintaining a list, and obviously changing the language as documents either got found or got confirmed that we couldn't find them.  And so the declaration just says that this squad blotter could not be found.

Where I got further documentation -- for example, I'm not saying this is with the blotter, I'm just saying, that's where I got further details.  Like, for example, with the Hurricane Sandy issue.  I would produce the underlying document that I received from our civil litigation unit, giving that further information.

But I believe that with some other items, including

the blotter, we wrote that after an extensive search or after searches have been made.  I believe that the lawyer from the police department wrote that it was after an extensive search, and she said that she could not find the squad blotter.

THE COURT:  Okay.

MS. MCLAREN:  Along with some other items.

THE COURT:  Okay.  Anything else you want to tell me in overview before we go --

MS. MCLAREN:  Just with respect to the corrected responses, Your Honor, with the discovery.  When Judge Pollak said that objections to certain requests had been waived because my predecessor had not sufficiently articulated the objections, I did not redo the discovery responses, you know, the document responses and objections to discovery responses. I didn't redo that document, deleting objections.  I produced documents in response.  I produced the substance.

Where she said that documents were waived, I produced the documents, and I think I made clear in my declaration in response, dated January 23rd, 2026, what I had done and what documents we were producing in response.

THE COURT:  Okay.  Okay.  Well, we'll come to that point at the end.

I mean, I want to hear from Plaintiff if there are specific questions that they have regarding your responses,

but I think in -- you know, it would be an issue of form over substance to say that you had to go back and actually, you know, delete the sentence that Judge Pollak said, you know, was improper and reserve that.  I would much rather have you spending your time, as you said, producing the documents and actually getting to the substance.

So at the same time, if there are particular questions that Plaintiff has or something that's not clear in your responses, then, you know, we'll need to clarify that.

But I'm not sure that she envisioned you necessarily, you know, just redoing the document as opposed to, you know, producing what she asked for.

So okay.  Well, let's go through some of these issues in more depth.  I have things in a little bit of a different order, but maybe we can take this question of the squad blotter and, you know, the unfound documents, for lack of a better word, as well as the precinct inspection.

Let me ask you, Mr. Harvis, are there other -- well, taking, you know, Ms. McLaren's representation that she has been told that both the precinct and the offsite storage location where these files would have been kept had been searched, thoroughly searched, and the documents were not found.  The document, specifically the squad blotter.  Where do you suggest, Mr. Harvis, that they search, or what are you looking for here?

MR. HARVIS:  Thank you, Your Honor.  Gabriel Harvis again.

Yeah.  I mean, you know, we're not looking for them to produce something that doesn't exist, obviously.  And so it's really just a question of the sufficiency of the disclosure about what was searched.  I mean, they're saying off-site storage.  That's a very generic term.

You know, I don't know what that means.  And I would like to know where that is.  And I would like to know if we can go and take a look for ourselves, just like Rule 34 contemplates when, you know, you have a key document, and they're saying it can't be found, but, you know, here is where it's normally kept.

I'd like to just -- I think it would be appropriate if we want to, pursuant to our initial notice, for us to be allowed to go and confirm that or see what's going on there and see if there is an area that obviously hasn't been checked or something like that, or you know, that sort of thing.  But to start with, I just want more disclosure around where they actually looked.

THE COURT:  Okay.  Ms. McLaren, when do you think you can get those details?

MS. MCLAREN:  So is Your Honor sort of envisioning a declaration with just the specifics of where it was searched and when?

THE COURT: I mean, I think so. I think that's a fair starting point.

MS. MCLAREN: I can liaise with the police department. Could I say two weeks? I don't know if it will take as long as that. And obviously, if we can get something sooner, we will.

THE COURT: Yes. I think two weeks is fine.

Okay. And there may be other things that we add to this declaration, so we can revisit the timing at the end.

Okay. So I would like a declaration that gives more disclosure about where these records were, you know, were searched for, and where, when, and who, I guess. And if there are other locations where similar records have been stored or moved or located, you know, what the plan is for searching those locations.

At this point, Mr. Harvis, I'm not going to grant a request to inspect those locations. Let's find out what they are and what the details are. And then, you know, there will be much for the parties to meet and confer about, I think, after today.

And if that's something that you all can come to an agreement, in terms of inspecting the off-site location, great. If not, you know, then I can consider a more targeted request once we know what the location is. Does that make sense?

MR. HARVIS:  It does.

THE COURT:  Okay.  Okay.  So I think that's all we can do with respect to the blotter today, unless I'm mistaken.

Is there something else there, Mr. Harvis?

MR. HARVIS:  No.  This is Gabe Harvis.  No.  That, I believe, covers it in terms of the blotter.  Thank you very much.

THE COURT:  Okay.  So let me move to the disciplinary files.  If I understand, putting together what you both said, you haven't received the underlying files, but Ms. McLaren has produced the indices and the summaries.

You've replied with requests for 31 underlying files, and that's where we are, right?  We're waiting for those to be produced; is that correct --

MR. HARVIS:  Sorry.  I don't mean to interrupt, Your Honor.  This is Gabe Harvis again.  Yeah.  Broad strokes, that is correct.  I mean, a couple of just minor points I would just want to touch on, and this came up in our docket 78 joint letter that's pending now.

THE COURT:  Yep.

MR. HARVIS:  It's true that indices have been produced.  It's true that the CCRB, the CPI, and what's called the concise officer histories have been produced.

THE COURT:  Okay.

MR. HARVIS:  There is something called the comprehensive officer history, which, as the term implies, is different than the concise one, and actually provides information on each of the complaints.

Whereas the concise, it just gives a category.  You know, this relates to other misconduct.  You don't have anything regarding the substance, so it's really impossible for us or the Court to truly decide whether a complaint is responsive or not, or discoverable, I guess, I should say.

And then that's one piece of it.  So we do want those, and that's something that we normally would get, like, in a 24-hour in jail case, so I certainly think it's something that we should be given here.

And we also, by the way, got it in the Hincapie case, when that case was litigated.

THE COURT:  Sorry.

MR. HARVIS:  And then I just wanted to say --

THE COURT:  Tell me how you describe the category.  The comprehensive officer?

MR. HARVIS:  Yep.  Comprehensive officer history.  And it's just a printout that the police department can run for each officer.  So that's one thing.

And then I just wanted to -- just because it didn't come up in the most recent colloquy.  Just again, our reading of the December 29th order is slightly different than what

Ms. McLaren is saying. We don't believe that Judge Pollak was saying that there should be this process where they give us some indices and then we come back.

We read the sentence on page 9 that says Defendants are ordered to produce the requested disciplinary and personnel records limited to complaints of a similar nature and misconduct relevant to credibility, whether substantiated or not.

There is no question that the requested records were files. So when the Court is ordering those to be produced. We don't think there's any ambiguity there. We think that this is, you know, a court order where this should have been done by January 23, and it's now April 22.

THE COURT: But in your mind, would the comprehensive officer history satisfy that order, or --

MR. HARVIS: No. Because we are asking for the files. The officer history just allows us to basically double-check whether all the files have been turned over, because it just gives us enough information to be able to make a meaningful assessment of each case.

THE COURT: Okay. And so what, beyond the 31 underlying files that you specifically requested, are you looking for here?

MR. HARVIS: The comprehensive personnel histories for each officer.

THE COURT:  Well, I want to -- it sounded to me from Ms. McLaren's comments that there is a difference between personnel history and disciplinary history, or at least files are kept differently.  And I know that --

MR. HARVIS:  I can speak to that, Your Honor.

THE COURT:  What?

MR. HARVIS:  I was just going to say -- no.  I'm saying I can, I can speak to that if Your Honor would like.

THE COURT:  Okay.

MR. HARVIS:  Just that it is -- I mean, it's true that there is a, you know, personnel file, which has the performance evaluations in it.  And then there is the disciplinary records related to complaints, either you know, internal complaints or from civilians.  But the comprehensive personnel history from the -- it's an IAB document, I believe.  And it definitely captures both personnel and disciplinary complaints all in one.

The only thing that, to my knowledge, wouldn't be on there would be like CCRB complaints that don't get pulled into IAB, but everything that's sort of processed by the police department related to each officer should be in there.

THE COURT:  In the comprehensive officer history?

MR. HARVIS:  Yes.  Not the substance of the files, but disclosure of what each file is about.

THE COURT:  Right, right, right.  Okay.  Okay.

MS. MCLAREN:  Can I --

THE COURT:  Hold on one second.

MS. MCLAREN:  Okay.

THE COURT:  I heard Ms. McLaren to say that they have produced everything with respect to personnel files, other than the two that were destroyed in Sandy.

So is what your -- you have the underlying personnel files?  You don't have the underlying disciplinary or CCRB files, right?

MR. HARVIS:  That's correct.  Or the comprehensive personnel history documents.

THE COURT:  Or the comprehensive officer history.  Okay.  Got it.

Okay.  Ms. McLaren?

MS. MCLAREN:  First of all, I would just -- I know Mr. Harvis suggested that there was no ambiguity in Judge Pollak's order.  I just want to respectfully disagree.

The disciplinary records were mentioned on five or six different occasions during the order.  Judge Pollak referred to the fact that my predecessor said that she was producing summaries and asked us to confirm that the summaries were produced.

In Defendant's position, we have never been required to produce all underlying files over this 30-year period.  And the Plaintiff is saying that we should produce

all discovery responses up until -- disciplinary records up until the time of Mr. McCloud's release from incarceration.

That was absolutely not our reading of the order. And, you know, records, the word "records," I think it was used loosely on occasions in the order where it was clear that Judge Pollak was talking about the indices.

We have not requested, and I have no idea how long it would be to get underlying files for a 30-year period, but that has never been our practice.

So I just wanted to clear that up. We thought we were in full compliance with the order. In fact, more than, because we made no redactions. We turned over the entire indices.

When Mr. Harvis first mentioned the comprehensive history, I requested that from our civil litigation unit, from the police department. I have been told that we don't have such things.

I'm not sure if there's a difference in terms, but what we have produced does show a description of the incident. For example, one of the files he has requested for Detective Wray talks about intimidation of a witness after somebody broke into somebody else's house. There is a little blurb talking about the nature of the incident, or somebody potentially used a firearm unauthorizedly. There's an alcohol incident.

And all those files that are potentially, you know, relevant or significant, we have ordered.  Where it's a lost memo book, lost metro cards, you know, we haven't, but we've ordered the ones that Mr. Harvis has identified as being of interest --

THE COURT:  So the indices and summaries that you provided, do those capture personnel and disciplinary issues?

MS. MCLAREN:  They're disciplinary.  I mean, I guess if somebody's -- I mean, you could sort of characterize something as both personnel and disciplinary, but it's disciplinary records --

THE COURT:  Okay.  So it sounds like the comprehensive officer history is a sort of standard part of discovery in these kinds of cases.

So is it a terminology issue, Mr. Harvis, or what do you say to the response that Counsel has been told that those don't exist?

MR. HARVIS:  Well, what I would say -- just two things very briefly, Your Honor.  One is, I mean, I can pull it up from the Hincapie case, where I have the comprehensive personnel file for Gonzalez and all the other officers involved in that case.  And it's under a protective order.  It's a little complicated, but certainly the law department's files on Hincapie would have the same document in its production file showing that it was produced to us.

Superior Reporting Services LLC
P.O. Box 11 Winfield, PA, 17889
transcripts@superiorreporter.com

And perhaps Ms. McLaren can bring that to the civil litigation unit and show them, and they can say -- and just say, hey, you know, this document you printed out a few years ago for the Hincapie case, can you do the same thing for these other officers?  I think that would clear it up.  So that's my suggestion there.

THE COURT:  And tell me --

MR. HARVIS:  Yeah.

THE COURT:  -- without obviously disclosing, you know, anything in violation of the protective order, the documents have a title?

MR. HARVIS:  Yep.  Comprehensive personnel history.  It says that at the very top.  It's a standard document.  In fact, to my mind, it's more commonly produced than the concise one --

THE COURT:  Okay

MR. HARVIS:  -- because it is more comprehensive and it has more information on it.

THE COURT:  Okay.  So comprehensive personnel history of the Defendants.  That's what we're talking about?

MR. HARVIS:  That's right.  Yes.

THE COURT:  Okay.

MS. MCLAREN:  And I used that exact term following a discussion with Mr. Harvis, and I put in another request for that, which is still pending.

So obviously, when we get that, if we get that -- hopefully it's when rather than if -- I will turn that over immediately upon receipt.

THE COURT:  Okay.  So I am going to order the Defendants to turn over the comprehensive personnel history of the individual defendants.

Ms. McLaren, I know to some extent you're the middle person.  You know, you're asking people for things. This is not all maintained in your office.  But whatever you need to do to speak to the folks who have produced things like this before, and that may require you, you know, doing some sort of chain of command digging in your own office to find out who is the person who knows how to get these, as opposed to simply filing a request, you know, into the ether.

But I am going to order the Defendants to produce those.  And we'll talk about a deadline, I guess, as we -- you know, before we end.  But I don't want there to be any ambiguity there.  Do you understand?

MS. MCLAREN:  Absolutely.  Yes, Your Honor.

THE COURT:  Okay.

MR. HARVIS:  Your Honor, may I just jump in for one second?  I just I pulled up the document.

And just, Ms. McLaren, for your assistance, in the Hincapie litigation, the Gonzalez comprehensive officer history was produced at the Bates numbers D1334 through

D1341.

MS. MCLAREN:  Perfect.

MR. HARVIS:  Thank you.

MS. MCLAREN:  I will make sure that we get them.  I mean, I have been trying to follow, and I know they're working on multiple requests, but I will definitely make this clear.

THE COURT:  Okay.  I appreciate both of you and your attention to the details there.

Okay.  The next thing I have on my list has to do with the individual defendants and their certification that they have searched for responsive documents.  I'm not sure I've seen, or if I did, I apologize.  It was earlier on in my review of this case, but I'm not sure I've seen what they, you know, attest to in terms of having reviewed the City's responses.

Mr. Harvis, is there a particular language that you are looking for the individual defendants to sign off on in terms of what they've searched for?

MR. HARVIS:  It's just what's put in the -- it's just exactly what Judge Pollak ordered them to say.

So I can tell the Court where -- it says on page -- this is on page 16 of docket 72.  It's under the category J, affirmations.

THE COURT:  Yeah.

MR. HARVIS:  It says, "As set forth above, Defendants are ordered to confirm by way of declaration no later than January 23rd that they have conducted a search --

THE COURT:  Okay.  Nope.  I got it.  I got it.

MR. HARVIS:  -- for responsive documents."  Yeah.

THE COURT:  So your issue is they have said that they have reviewed the City's responses, but not that they have conducted a search on their own and have either been unable to find them or have produced them.  So it's that second part that you want, right?

MR. HARVIS:  Yeah.  And I also, I just don't want to say affirmatively that we have gotten one from all nine defendants.  I just, I'm not sure --

THE COURT:  Okay.

MR. HARVIS:  -- off the top of my head if that's correct or not.

THE COURT:  Okay.  So, Ms. McLaren, I think that's pretty unambiguous in Judge Pollak's order.  And so how long will it take you to get confirmation from the individual defendants along the lines of what Judge Pollak ordered by January 23rd?

MS. MCLAREN:  Yes.  There had been conversations with Mr. Harvis before the order that we were doing this, I think even with my predecessor, and someone who was assisting me on this case took that, that she would do the

verifications, and she used the standard ones.

And we thought that they were compliant with the order because by implication, the verification -- they couldn't verify that the requests were true unless there -- you know, if there were any other outstanding documents that they had.  And the one person who did have documents, she produced them.  And we made that clear in her verification.

But to avoid ambiguity, we'll do another set of verifications.  It may take a couple of weeks.  I don't know who is out of town, who is around, but we can do them.  I already did one for Lieutenant Bove.

Again, the Plaintiff covered all of this in his deposition and asked all of them whether they had documents at home.  None of them do.  But I will provide verifications.

I'll just do them again myself.  But the language from -- the verifications have already been sent out before Judge Pollak's order, I believe.

THE COURT:  Okay.

MS. MCLAREN:  But we'll do them again in the next couple of weeks.

THE COURT:  Okay.  So I do think that -- you know, look, I'm trying to strike the balance here, you know, as rule one tells us we're supposed to do between, you know, lots of competing considerations.  And I know that with a

case this old, you know, unfortunately, there are going to be situations where we might not be able to find certain documents.

So I don't want to make either party jump through hoops unnecessarily, which is why I, you know, I said earlier, I wouldn't necessarily have expected you to reproduce, you know, your document responses, deleting, you know, the sentence that Judge Pollak said was improper.

But I do think there is a difference in substance in someone saying, you know, on my -- on information and belief, I believe these responses are correct.  And certifying, I have searched for documents and haven't found any.

So someone may think they have nothing, but if they haven't actually engaged in the search, then we can't be sure.  So I do think this is a situation where it's proportional to the needs of the case.  It's not unduly burdensome.

And so I am going to ask you to get certifications from the Defendants in a way that comports with Judge Pollak's -- you know, page 16 of Judge Pollak's order that they have conducted a search for responsive documents and have either produced them or have been unable to find them.

I understand that you're -- that there is, you know, multiple folks that you'll have to get that

certification from.  And so I think two weeks is reasonable.

If there is a particular reason that you're unable to get a response from one individual, for example, if they're on vacation, I hope the parties will be able to meet and confer about that and get them done as soon as possible.

Any questions about that, Ms. McLaren?

MS. MCLAREN:  No.  I think that's perfect.  Thank you.

THE COURT:  Okay.  Mr. Harvis, does that address that issue?

MR. HARVIS:  It does.  It does.  I just, there are two issues that are related that I just wanted to get clarification from the Court about --

THE COURT:  Okay.

MR. HARVIS:  -- if that's okay?

THE COURT:  Yeah.

MR. HARVIS:  One is we keep talking about these -- the discovery responses and the waived objections. And I'm not suggesting that somebody should go through the trouble of pulling out, you know, objections and then reproducing them without them.  I'm not trying to do any kind of form over substance anything.

THE COURT:  Okay.

MR. HARVIS:  I'm more thinking about the interrogatories where the objections were presented, and then

no substantive response at all was provided.  And they rested on their objections.

In that situation, it's impossible for me to understand how it's appropriate for them to get an order like that, saying that the objections shouldn't have been put there, and then nothing else happens.  I mean, that just basically frustrates our Rule 33 ability to get interrogatories answered.

And so in that, for those, I do think that they should be required to supplement to the extent that it relates to interrogatories.  That's one issue.

And then the other issue is just that, you know, Ms. McLaren is saying that the time period is not from, you know, 10 years prior to his arrest in 1994 until he was released from prison, which is what I understand very naturally to be the time period that we're talking about, because that's exactly when the damages span.  And traditionally, it's 10 years prior for these disciplinary records.

And so that brings me 1984 to 2023.  And if that's not the time period, I'd like to know what is.  And I'd like to just have some clarity around what time period we're agreeing is the relevant period.

THE COURT:  Okay.  Both fair questions.  Before we take up the time period, let me ask you, are there -- in

terms of the interrogatory responses that you think they should supplement, do -- and maybe this is just the way that I've taken notes on the matter, because I have your -- the document requests that were at issue in Judge Pollak's order. But what are the interrogatories that you think Defendants need to supplement because they have not responded at all?

MR. HARVIS:  Yeah.  I'm just trying to -- hold on.

I just want to -- I apologize.  I just don't have that list at the -- at my fingertips.  So what I'd like to do, if it's okay with Your Honor, is maybe I can -- maybe there aren't any, so maybe I misspoke.

THE COURT:  Okay.

MR. HARVIS:  I want to just -- let me confer with them, if that's okay.  Or hopefully we can just resolve that. I'll let them know if there are any, and I'm sure that they'll be kind enough to work that out with me.

THE COURT:  Okay.  I mean, I appreciate that.  I think, you know, to the extent there was a generic response that said, you know, we may withhold things on the basis of privilege, for example, and they have now confirmed that they have not withheld something on the basis of privilege.  You know, I'm not going to order them to reproduce their response.

But if there are interrogatories that you can identify that where there simply is not a response, then yes,

I would ask you to meet and confer.  And, you know, to the extent defendants need to respond, you need to respond.

If you're unable to resolve, you know, the schedule for getting those responses, or you're unable to get a response that you think is satisfactory, then, you know, you can come back to me on the issue of the interrogatories.

MR. HARVIS:  Thank you.

THE COURT:  Okay.  So I'm checking that off.

Now, with respect to the timeframe, let me hear from you, Ms. McLaren, because you mentioned the timeframe earlier as well.  What is your position?

MS. MCLAREN:  As in a standard case, if you're looking at the officer's behavior, it is from 10 years before the incident to the time of incident.  Anything after the arrest or the interrogation wouldn't go to the City's notice.

We never produce disciplinary documents during the time that the person is incarcerated.  It's always up until the time of the arrest or the police action.

And to be asking for 30 years of disciplinary files for 10 detectives, I mean, I've never heard of such a thing.  Judge Pollak didn't contemplate such a thing.  The only reference to such a thing is coming from Plaintiff's Counsel.

THE COURT:  Okay.  So, Mr. Harvis, how is, for example, someone's disciplinary record from 2020 likely to lead to relevant information in this case?

Superior Reporting Services LLC
P.O. Box 11 Winfield, PA, 17889
transcripts@superiorreporter.com

MR. HARVIS: Yeah. We think it's quite straightforward. There's a seminal Second Circuit case. It's called Cohen (ph) versus -- the second name of it is escaping me now, but the Second Circuit has expressly held that post-incident, Monell -- but at post-incident, similar conduct can be admissible for the purposes of establishing a Monell claim. So that would be the first, you know, branch of admissibility.

And then the second one is just going to be broad credibility because any -- the officer's credibility is -- this a credibility contest, especially since there is no notes taken during the eight-hour interrogation period. We really just have the credibility of the -- of Mr. McCloud versus the officers.

I don't see any logical reason why an incident that predated the arrest, that goes to credibility, would be more admissible or more probative than something that happened after. Both of them are going to go to the character of the person.

And so many of these, you know, kinds of complaints relate to situations where the officer, you know, often will deny engagement of conduct, and then a substantiated finding is basically beholden that they were to some extent untruthful. So we view, you know, any substantiated cases potentially bearing on credibility.

And so you know, those are two examples.  I'd be happy to put together a letter that lays out all the authority on that, but that's my general response.

THE COURT:  Okay.  With respect to the timeframe, what -- like, which categories of discovery disputes are you also disputing the timeframe?  Because I understood earlier when we were talking about personnel files or the disciplinary records that I didn't understand there to be a timeframe dispute around those.

MR. HARVIS:  I think that there is, because we're on -- we're obviously on different pages about it.  And it's going to control what the City is going to give us, you know.  Like, if they don't believe that the period from 1984 to 1990 -- well, I guess we both agree that 1984 to 1994 is relevant, which I would think would be the biggest disputed issue, but that seems like we're on the same page about that.

But then, you know, if there's a key event, like, for example, I mean, you know, I can take any of these, but, you know, Gonzalez in -- no, I take that back.  Wray's witness intimidation.  Okay.  He was partially substantiated for intimidating a witness in a 1998 case.

Now, I just don't -- I'm not aware of any reason.  There is no case law that I know of that would render something like that, you know, categorically inadmissible because it happened after --

THE COURT:  Right.

MR. HARVIS:  -- the event.  And while Mr. McCloud was in prison, you know, I believe it's particularly sort of -- it's a particularly strong argument here because it's not like I'm just saying generically I want everything because this happened a long time ago, and I think it's all relevant. He was sitting in jail --

THE COURT:  Yeah.

MR. HARVIS:  -- as a result of this, including making his own complaints during that time that we haven't even received yet.

And so I do think that that creates a very strong basis for us to be able to get relevant, you know, responsive things that are within Judge Pollak's order about credibility or about similar categories of misconduct through Plaintiff's release from prison.

THE COURT:  So this is my question, though.  I want to go back.  Like, you know about that 1998 witness intimidation from the summaries that you've been given; is that right?

MR. HARVIS:  Correct.  It has one line.  It just says witness intimidation.  I don't know who was intimidated, anything like that.

THE COURT:  Okay.  So, Ms. McLaren, I guess I want to back up with you.  You said you produced the summaries.

Superior Reporting Services LLC
P.O. Box 11 Winfield, PA, 17889
transcripts@superiorreporter.com

What timeframe for which should you produce those summaries?

MS. MCLAREN:  I made no redactions at all, Your Honor.  I did not redact any for substance or for timeframe.  It was unlimited by time.

THE COURT:  Okay.  And so when I asked you -- you know, earlier in this call, I said I was ordering you to produce the comprehensive personnel history.  I did not put a time limit on that.  I mean, I take comprehensive to be everything.

So that's what I would like you to do.

MS. MCLAREN:  I'm sorry.  It didn't cross my mind otherwise.  Of course, we will --

THE COURT:  Okay.

MS. MCLAREN:  -- produce that in its entirety.

It's the underlying files --

THE COURT:  Okay.

MS. MCLAREN:  -- that we would take issue with right now --

THE COURT:  Yeah.  I mean, let's cross that bridge when we come to it.  We're going to start with the comprehensive personnel history.

MS. MCLAREN:  But of course, I will --

THE COURT:  Sorry.  Go ahead, Ms. McLaren.

MS. MCLAREN:  Of course, I will produce that in its entirety.  And of course, I will.

THE COURT:  Okay.  So, Mr. Harvis, I don't hear that anything is being withheld on timing grounds yet.  Is there something I'm missing?

MR. HARVIS:  I just know Ms. McLaren said when she was speaking earlier that there were, you know, some of these complaints that we've requested or some of these complaints that, you know, come from a time period that she doesn't believe is responsive, and she therefore hasn't requested them yet from the police department.  And so if that's not the case, then there is no issue.

But I think that all the files should be requested now.  And then if we need to fight about the exact contours of it, then at least they'll be in.  And that's what we normally do.

THE COURT:  Right.

MR. HARVIS:  Then they're in the possession of Defense Counsel.

THE COURT:  Right.

MR. HARVIS:  And then we can figure out what needs to be turned over.

THE COURT:  Right.  Well, let me start with the 31 files you have requested.  Ms. McLaren, you've requested all of those, correct?

MS. MCLAREN:  I could be wrong.  I didn't realize it was anything, like, as much as 31 files.  And it could

also be just the way that the files are -- you know, some have multiple file numbers.

I have requested the Wray file. You know, the ones that Mr. Harvis, after each deposition, specifically writes and requests --

THE COURT: Okay.

MS. MCLAREN: -- except where we have objected in the second set of discovery responses.

For example, there was one incident where Detective Gonzalez, in his first year on the job as a rookie cop, he said that he went into a McDonald's because it was incredibly cold on a winter's day. And he went into McDonald's to heat up, and he got, you know, docked four hours. And that to us is not pertinent to anything and is way too old to be of use to anyone. I didn't request that.

Somebody made an error on an administrative form of sick leave. I didn't request that. Something about where it was --

THE COURT: Okay. So with respect to things being too old or not, I'm going to say two things. One, if it's within the 10 years prior, then -- and Mr. Harvis has specifically requested it, I would like you to at least request it, right. And then, as Mr. Harvis says, if there is a reason to, you know, to withhold it or to not produce it, at least we've got the ball rolling on you getting it.

Superior Reporting Services LLC
P.O. Box 11 Winfield, PA, 17889
transcripts@superiorreporter.com

Because again, I understand these things are not, like, in your file cabinet. You can't just access them right away. So I would appreciate getting the ball rolling on seeing if they even exist.

The only thing I want to say that is outside the timeframe, outside those 10 years that I did want to talk about separately, is, I believe, Gonzalez's Department of Corrections record, which I'm not sure how far back that goes, if that's more than 10 years before Mr. McCloud's arrest?

MR. HARVIS: I believe so, Your Honor. I think it's in the early '80s.

THE COURT: And, you know, give -- oh, here we go. Okay. So this is in document number 78. I think that, at least at this stage, I could see that those employment records and any disciplinary information contained in those records do have the potential to lead to relevant information and could be relevant to this litigation, particularly on the Monell issue and what notice the City might or might not have had about Gonzalez's performance on the job. I guess I'll leave it as.

So I also recognize that those are very old and they may not exist. So I do think that that's something you should request, Ms. McLaren, and let's find out what you're able to obtain, and then we can figure out what needs to be

produced.

MS. MCLAREN:  Can I just clarify?

THE COURT:  Yep.

MS. MCLAREN:  Initially, Your Honor had said requests for the 10 years prior.  So if the McDonald's, a very cold winter's day incident, was more than 10 years prior, which I'm certain that it was, should we request that?

THE COURT:  It seems like Mr. Harvis has made targeted requests of specific files that he thinks are relevant.

MR. HARVIS:  Your Honor, may I -- I'm sorry.  I just wanted to jump in because I think there is a little lack of clarity.

THE COURT:  Okay.

MR. HARVIS:  Is it all right if I say something?

THE COURT:  Yeah, please.

MR. HARVIS:  Thank you.  Because earlier in this conversation, I also heard Ms. McLaren say something about 31 files.  And I thought that I was confused because I don't recall having ever done that.

And I think that what the confusion is, is yes, we've requested, I think it's -- I think there is six files by file number that we've requested after the depositions that we identified as, you know, specifically relevant.  But it was also our understanding that the obligation imposed by

Judge Pollak's order was that Defendants themselves would also review the records because they obviously have more access than we do, and comply.

Meaning, if there is a record within that period that is either of a similar allegation or a false statement that they have an affirmative obligation to produce it because we already requested all of them in our initial requests.

And so I just -- and then that's part of what led me to asking for these comprehensive personnel documents, because that is what I think will enable both them and us --

THE COURT:  Right.

MR. HARVIS:  -- to correctly comply with Judge Pollak's order in terms of what needs to be produced.  I just want to clarify.

THE COURT:  Okay.

MR. HARVIS:  I apologize for interrupting.

THE COURT:  No.  That's okay.

So I mean, I think that is my understanding as well.  And maybe part of it is, you know, that -- and I appreciate you both proceeding piecemeal, you know, after each deposition or, you know, as issues come up.  But it might be then that sort of either some things are getting lost in the shuffle, or we're talking about different things at the same time.

So I agree with you that the comprehensive personnel histories will help clarify what is out there.  I also agree with you that the Defendants should be, you know, requesting and producing the documents that Judge Pollak ordered you to produce.

If there are particular things, Ms. McLaren, that the Defendants think should be accepted, you know, like going into a McDonald's to keep warm, you know, talk to Plaintiff about that.  And if they agree, then fine, you don't have to worry about it.  If it's something that, you know, the parties are going to fight over, and I have to make up my mind, you know, we can do that.

But I think the comprehensive personnel histories will go a long way toward, you know, making sure we have just what they say, the comprehensive list of all the potential files that the Defendants are going to have to turn over.

MR. HARVIS:  And we're happy to confer.  Sit down and confer with them.  Once we are in -- have the comprehensives in hand, that's probably a good time to have a conferral with them.  And we're happy to do that in good faith.  And we'll just try to limit it as much as possible to the directly relevant allegations.

THE COURT:  Okay.  Okay.  So I'm not sure we put a deadline on the production of those comprehensives, Ms. McLaren.  I know you have to go back to some folks to figure

out what they are.  What do you think makes sense in terms of when Mr. Harvis can expect those?

MS. MCLAREN:  As I said, I have ordered them multiple times.  I think being able to go back and say that we've got the Court order and we have to produce them, you know, hopefully that will push it to the top of the pile. There has been a long delay in getting files.

So to the extent that I could have a little bit more time than Your Honor might otherwise give, could we say four weeks?

THE COURT:  What are your thoughts on that, Mr. Harvis?

MR. HARVIS:  It's just printed out from -- it's literally, you know, you go onto the police department screen.  So I defer to the Court, but I think that seems like a fairly long time for that process now that you have the Bates numbers in Hincapie, but if it's how much time Ms. McLaren needs, then that's okay.  We're anxious to move the case forward, so that's all.

MS. MCLAREN:  And, Mr. Harvis, as you know, as soon as I get things, I turn them over.  I am going as fast as I can with this and all the other cases, and with delays occasioned by getting things from the police department.

If I got them tomorrow, I would produce them to you tomorrow.  So I'm just trying not to get into a state where I

am told that things can't be done in a certain timeframe.  So I was being -- I was trying to build in buffer, but if I get them sooner, you'll get them sooner.

MR. HARVIS:  I appreciate that.  Thank you.

THE COURT:  Yep.  I appreciate that too, Ms. McLaren.  And look, I hope that having the Bates number will enable you to get a quicker answer.  And then even if it does take a couple of weeks to, you know, to print them out and pull them together.  Then, you know, I -- hopefully that moves things along.

MS. MCLAREN:  I hope so.

THE COURT:  And I do appreciate you producing things on a rolling basis.

Speaking of moving things along, I have another matter.  And so I want to just make sure -- I think that we've touched on the biggest issues that I have on our list.  And the only thing I think I might have is the inspection of the precinct, but it seemed like you all were working toward resolving that issue, or you have resolved that issue?

MR. HARVIS:  Yeah.  I think we're going to be okay there.  We're just a question of picking the date, and then I -- it seems like we're going to be on the same page about what can be looked at.  So we'll let the Court know if there is any issues, but I think we're okay there.

THE COURT:  Okay.  So is there anything else we

need to do today, Ms. McLaren?

MS. MCLAREN:  No.  I was just going to say, I hope -- the inspection.  I think we've got an agreement in principle.  We've agreed, you know, to areas where Plaintiff was on that night.  I think it's unclear where exactly Plaintiff was.

But I'm hopeful that the two of us can discuss and get the sort of parameters sorted out.  The police department, I just will raise, they do want it done in the morning to minimize interference with the detectives when they come in to start their day.  But I think these are all things that Counsel can agree upon.

THE COURT:  Okay.  To the extent that, you know, it's a little unclear, you know, where people were back then, I guess I would encourage the Defendants to be overly inclusive in terms of the inspection, just because, as Plaintiffs note in, you know, in the status reports, we don't want to have to go through this again.  So if it's a question of, you know, possibly in this room, but we're not sure, like, let's include it and get as much done as we can in this one inspection.

MS. MCLAREN:  And it's purely a question of, you know, the derailing activities of the squad and also the confidential materials that are going to be -- because it is an active detective squad.

THE COURT:  Sorry.  What do you mean by that?

MS. MCLAREN:  Well, you know, for example, initially -- I think we hopefully have resolved it.  But initially, you know, Plaintiffs had suggested that they want to see the commanding officer's office and the admin lieutenant's office.  And all of that will be -- you know, have extensive confidential material inside that we couldn't remove for the purposes of this inspection.  So that's why we are trying to narrow it to the areas that need to be inspected.

And again, we've given over blueprints.  And seeing an office that probably looked a lot different and had different documents in it 30 years ago, to the extent that it doesn't add to relevant information.  We were just trying to cabin to the areas that need to be inspected.

THE COURT:  All right.  Well, look, I just, I think, you know, if we're talking about efficiency, we don't want to have to go through an inspection again.  They don't want to have to move, you know, privileged information a second time.  So to the extent we can make it work, let's try to make it work.

MS. MCLAREN:  Of course.

THE COURT:  Okay.  Anything else from your perspective, Ms. McLaren?

MS. MCLAREN:  Not at the moment, Your Honor.

THE COURT:  Okay.  And what about you, Mr. Harvis?

Anything else we need to do?

MR. HARVIS:  No.  I really appreciate the Court's time today.  Thank you for walking through all this stuff.

The only thing that I wanted to address, if it's possible, is just the idea of, like -- and I don't know Your Honors practices because you're new to the bench.  And so I don't want to presume anything.  But I'm just wondering about a schedule.

I think it might be helpful to have even some idea of what the end date is for discovery, because my concern is that the Defendants will sort of, you know, grow to the size of the aquarium with whatever amount of time we have.  And so if we can cabin it in some way, at least -- or at least, you know, contemplate doing that, we would appreciate it.

THE COURT:  You know, that makes sense to me.  And I do -- you know, I appreciate the overview that you gave me at the beginning, because I had concerns about how old this case was and the fact that we were still sort of mired in these disputes.

What, from your perspective, putting aside depositions that may need to be reopened because, you know, because of subsequent documents that you receive, what is your view of the next steps and sort of the schedule that you would be looking for?

MR. HARVIS: Sure. Thank you. Well, one issue that -- I'm actually I'm glad your Honor mentioned that, because we have a potential Rule 25 substitution deadline that I think is coming up in the month of May. And so that's one thing on the horizon for us.

We contemplate potentially asking for an extension of that deadline, assuming the rules allow for it, because we're still trying to deal with that.

THE COURT: Okay.

MR. HARVIS: We have seven depositions that we want to take. It's the DAs that were involved, the Prosecutor that took the confession and the one that presented the case, and then four other police officers, and the City's 30(b)(6) witness.

We have the inspection, obviously, that we've talked about. In terms of fact discovery from our point of view, that's all that's left. And so you know, I would say, if it was up to me, I would want to have a discovery deadline sometime, like, around June 30th, subject to, you know, us needing an extension, but obviously I defer to the Court and I'm happy to take Defense Counsel's position to account as well, but that's, that's our side of it.

THE COURT: Is there a reason that you all can't be, you know, trying to schedule these depositions now? That you can't notice them now?

MR. HARVIS:  No.  We've already noticed them. We've already provided dates.  We're ready to proceed for sure with those.

THE COURT:  Okay.  Okay.

MS. MCLAREN:  And may I be heard, Your Honor?

THE COURT:  Yes, Ms. McLaren.  Yep.

MS. MCLAREN:  The most recent depositions, the seven, are all retired city personnel.  One of them is actually, I just found out today, is 87 years old.  He remembers nothing.

I will talk to Mr. Harvis about the --

THE COURT:  Okay.  Wait.  Just in the interest of time, I'm going to -- I'm just going to stop you there because we're not going to get -- I don't need to hear about each one today.

But let me say this.  I've set some deadlines of two weeks and four weeks over the course of this call.

So what I'm going to do is ask for a status update in four weeks regarding the issues that we have discussed and the status of discovery from the party's point of view.

That brings us to May 20th.  So I'm going to ask for that status update on May 20th.

Mr. Harvis, I don't have -- you referenced a possible May deadline.  I don't have that in front of me, but if that needs to be altered based on, you know, the things

we've discussed today, you can include it, the request, in that May 20th letter.

MR. HARVIS:  Thank you.

THE COURT:  But in that letter, I want an update on what has happened, you know, along the lines of what we discussed today, and then the party's proposal for wrapping up discovery and a deadline by which that can happen.  And then we can talk about the next steps.

If I can address, you know, the issues that you raised just on the papers, I will.  If not, I'll probably bring you back in the following week or that first week in June for another conference so we can hash things out.

MS. MCLAREN:  May I just for one second just say that, you know, we are -- we have been working around -- we've been working incredibly diligently.  Everything has been responding to Plaintiff's discovery.

Defendants do have depositions that they need to take discovery, that they're still waiting for from various parties.  Defendants do have discovery, and to close discovery when, you know, Mr. Harvis finishes his discovery, and we still haven't taken our depositions.  I just want to let the Court know that there are depositions that the Defendants do need to take.

THE COURT:  Sure.  And the Court would not consider doing that, obviously.  But that's why I want a joint letter

with your views on, you know, what discovery is still outstanding and what a reasonable timeframe is.

MS. MCLAREN:  Thank you.

THE COURT:  Okay.

MS. MCLAREN:  Thank you, Your Honor.

MR. HARVIS:  Okay.

MS. MCLAREN:  We appreciate that.  That was very helpful.  Thank you.

THE COURT:  Okay.  Well, thank you for taking the time to go through all this, and for continuing to meet and confer, and trying to resolve these disputes.  And I will look forward to your letter on May 20th.

MR. HARVIS:  Thank you very much, Your Honor.

MS. MCLAREN:  Thank you.

THE COURT:  Okay.

MS. MCLAREN:  Bye-bye.

THE COURT:  Thank you.  Take care.

MR. HARVIS:  Bye-bye.

MS. MCLAREN:  You too.  Bye-bye.

(Proceedings adjourned.)

Superior Reporting Services LLC
P.O. Box 11 Winfield, PA, 17889
transcripts@superiorreporter.com

TRANSCRIBER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

May 1, 2026

*Nina Winters*
_____          _____
Nina Winters                     DATE

Legal Transcriber

Superior Reporting Services LLC
P.O. Box 11 Winfield, PA, 17889
transcripts@superiorreporter.com